Daniel Alberstone (SBN 105275)
dalberstone@baronbudd.com
Mark Pifko (SBN 228412)
mpifko@baronbudd.com
Evan Zucker (SBN 266702)
ezucker@baronbudd.com
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone:   (818) 839-2333
Facsimile:   (818) 986-9698

Attorneys for Plaintiff
RUSSELL MINORU ONO individually,
and on behalf of other members of
the general public similarly situated

**[PUBLICLY FILED]**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUSSELL MINORU ONO, individually, and on behalf of other members of the general public similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>HEAD RACQUET SPORTS USA, a corporation organized and existing under the laws of the State of Delaware, and HEAD USA, INC., a corporation organized and existing under the laws of the State of Delaware,<br><br>Defendants. | Case No.:  2:13-cv-04222-FMO-(AGRx)<br>**CLASS ACTION**<br><br>**REDACTED VERSION**<br>**JOINT BRIEF RE: CLASS CERTIFICATION**<br><br>[Filed Concurrently with the Evidentiary Appendix in Support Thereof.]<br><br>District Judge:  Hon. Fernando M. Olguin<br>Magistrate: Hon. Alicia G. Rosenberg<br>Location:    Courtroom 22 – 5th Floor<br>              312 North Spring Street<br>              Los Angeles, CA  90012<br>Date:       June 25, 2015<br>Time:       10:00 a.m. |

**TO THE HONORABLE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

Please take notice that on June 25, 2015 at 10:00 a.m., Plaintiff Russell Minoru Ono, individually and on behalf of other members of the general public similarly situated ("Plaintiff"), will and hereby does move this Court for an order:

1.     To certify this action as a class action under Rule 23 of the Federal Rules of Civil Procedure;

2.     To certify the following class of persons as the Plaintiff Class:

> All residents of California who purchased Tour-Line
> Racquets during the period of January 1, 2006, continuing
> through the date of final disposition of this action;

3.     To certify Plaintiff Russell Minoru Ono as the named representative of the Plaintiff Class, and to certify his counsel, Daniel Alberstone, Mark Pifko, Evan Zucker, Barron & Budd, P.C. as Class Counsel.

This joint brief is filed under Rule 23 of the Federal Rules of Civil Procedure, the Court's February 25, 2015 Order, and it is based on this notice, the memorandum of points and authorities, the Evidentiary Appendix and Declarations filed in connection therewith, and the complete files and records in this action.

/ / /

/ / /

/ / /

1   DATED:  May 15, 2015                    BARON & BUDD, P.C.

2                                   By:   /s/Mark Pifko

3                                         Mark Pifko

4                                         Daniel Alberstone (SBN 105275)
5                                         dalberstone@baronbudd.com
                                          Mark Pifko (SBN 228412)
6                                         mpifko@baronbudd.com
7                                         Evan Zucker (SBN 266702)
                                          ezucker@baronbudd.com
8                                         BARON & BUDD, P.C.
9                                         15910 Ventura Boulevard, Suite 1600
                                          Encino, California  91436
10                                        Attorneys for Plaintiff

11
                                          RUSSELL MINORU ONO, individually,
12                                        and on behalf of other members of the
13                                        general public similarly situated

14
                                          Douglas A. Rettew (*pro hac vice*)
15                                        Danny M. Awdeh (*pro hac vice*)
                                          Anna Balishina Naydonov (*pro hac vice*)
16                                        FINNEGAN, HENDERSON,
17                                        FARABOW, GARRETT & DUNNER,
                                          L.L.P.
18                                        901 New York Avenue NW
19                                        Washington DC 20001
                                          Telephone: 202.408.4000
20                                        Facsimile: 202.408.4400

21
                                          MICHAEL L. MALLOW (SBN 188745)
22                                        mmallow@sidley.com
                                          SIDLEY AUSTIN LLP
23                                        555 West Fifth Street
24                                        Los Angeles, CA  90013
                                          Telephone: 213.896.6666
25

26                                        HEAD USA, INC.

27

28
                                          3

# **TABLE OF CONTENTS**

I.    INTRODUCTION AND FACTS ............................................................. 1

    A.    Plaintiff's Introduction and Facts .............................................. 1

    B.    Defendants' Introduction and Facts ........................................... 9

II.   THE REQUIREMENTS OF RULE 23(a) ........................................... 17

    A.    Commonality .......................................................................... 17

        1.    Plaintiff's Position:  Commonality Is Satisfied Because this
Case Is about a Common Advertising Campaign which Gives
Rise to Common Questions which Are Subject to Common
Proof ............................................................................ 17

        2.    Defendants' Position: Ono Cannot Establish Commonality ............. 20

    B.    Typicality ............................................................................... 21

        1.    Plaintiff's Position:  Plaintiff Satisfies the Typicality
Requirement ................................................................. 21

        2.    Defendants' Position: Ono Fails the Typicality Requirement ........... 24

    C.    Adequacy of Representation ..................................................... 29

        1.    Plaintiff's Position:  Adequacy of Representation Is Satisfied
by Plaintiff ................................................................... 29

        2.    Defendants' Position: Ono Is Not a Credible Class
Representative ............................................................... 30

    D.    Ascertainability ...................................................................... 30

        1.    Plaintiff's Position:  Plaintiff's Proposed Class Is
Ascertainable ............................................................... 30

        2.    Defendants' Position: Ono Cannot Ascertain Class
Membership ................................................................. 33

III.  THE REQUIREMENTS OF RULE 23(b)(3) ....................................... 34

    A.    Predominance ......................................................................... 34

i

1.    Plaintiff's Position:  Common Issues Predominate Regarding Plaintiff's Misrepresentation and Fraud Based Claims ..................... 34

2.    Defendants' Position: Common Issues Do Not Predominate ............ 36

3.    Plaintiff's Position:  Whether Class Members Relied upon Head's Misrepresentations Is a Common Issue that Can Be Adjudicated on a Classwide Basis ...................................................... 38

4.    Defendants' Position: Reliance Is an Individualized Inquiry ............ 40

5.    Plaintiff's Position:  Exposure of Class Members to Head's Marketing Can Be Demonstrated with Common Proof ................... 42

6.    Defendants' Position:  It Is Unreasonable to Assume That All Class Members Were Exposed to the Advertising Statements at Issue ................................................................................................ 43

      a.    Plaintiff Improperly Relies on *Tobacco II* ................................ 43

      b.    It Is Unreasonable to Assume That Class Members Were Exposed to the Advertising Ono Relied on ................... 44

B.    Damages ......................................................................................... 45

1.    Plaintiff's Position:  Plaintiff's Damages Model Satisfies the *Comcast* Standard ............................................................. 45

2.    Defendants' Position: Ono's Damages Model Is Fatally Flawed ......................................................................................... 47

C.    Superiority ...................................................................................... 49

1.    Plaintiff's Position:  A Class Action Is the Superior Method of Adjudication ............................................................................. 49

2.    Defendants' Position: The Proposed Class Is Not Manageable ......... 50

IV.    CONCLUSION.................................................................................. 50

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Ahdoot v. Babolat,*
  Order Re: Motion to Dismiss 5, Dkt # 18, CV 13-02823 ............................. 27

*Algarin v. Maybelline, LLC,*
  300 F.R.D. 444 (S.D. Cal. 2014) ................................................. *passim*

*Allen v. Hyland's Inc.,*
  300 F.R.D. 643 (C.D. Cal. 2014) ................................................... 50

*Amgen Inc. v. Connecticut Retirement Plans and Trust Funds,*
  133 S. Ct. 1184 (2013) ................................................................ 8

*Astiana v. Ben & Jerry's Homemade, Inc.,*
  No. C 10-4387, 2014 WL 60097 (N.D. Cal. Jan. 7, 2014) ............... 47, 48, 49

*Astiana v. Kashi Co.,*
  291 F.R.D. 493 ........................................................................ *passim*

*Berger v. Home Depot USA, Inc.,*
  741 F.3d 1061 (9th Cir. 2014) ........................................... 41, 44, 45

*In re Brazillian Blowout Litigation,*
  2011 WL 10962891 (C.D. Cal. Apr. 12, 2011) ............................. 19, 38

*Bruno v. Quten Research Inst.,*
  LLC, 280 F.R.D. 524 (C.D. Cal. 2011) ........................................... 45

*Buckland v. Threshold,*
  155 Cal. App. 4th 798 (2007) ....................................................... 30

*Carrera v. Bayer Corp.,*
  727 F.3d 300 (4d Cir. 2013) ........................................................ 32

*Chavez v. Blue Sky Natural Beverage Co.,*
  268 F.R.D. 365 (N.D. Cal. 2010) ......................................... 23, 28, 32

*In re Clorox Consumer Litig.,*
  301 F.R.D. 436 (N.D. Cal. 2014) ............................................... 33, 34

iii

*Comcast v. Behrend*,
133 S. Ct. 1426 (2013) ....................................................................... 36, 45

*In re Computer Memories Secs. Litigation*,
111 F.R.D. 675 (N.D. Cal. 1986) ................................................................. 30

*Corbett v. Sup. Ct.*,
101 Cal. App. 4th 649 (2002) .................................................................... 46

*County of San Bernardino v. Walsh*,
158 Cal.App.4th 533 (2007) ..................................................................... 46

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) .................................................................... 17, 21, 45

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) .................................................................... 21

*In re Ferrero Litigation*,
278 F.R.D. 552 (S.D. Cal. 2011) ................................................................ 19

*Fletcher v. Security Pacific National Bank*,
123 Cal.3d 442 (1979) ............................................................................ 46

*Forcellati v. Hyland's, Inc.*,
2014 WL 1410264 (C.D. Cal. Apr. 9, 2014) (King, C.J.) ..................................*passim*

*Forcellati v. Hyland's, Inc.*,
876 F.Supp.2d 1151 (C.D. Cal. 2012) ......................................................... 23

*FTC v. Figgie Int'l*,
994 F.2d 595 (9th Cir. 1993) .................................................................... 46

*Guido v. L'Oreal, USA, Inc.*,
2013 WL 3353857 (C.D. Cal. July 1, 2013) ......................................... 31, 32, 46

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) .................................................................. 21

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) ............................................................... 24, 25

*Harris v. Vector Mktg. Corp.*,
753 F. Supp. 2d 996 (N.D. Cal. 2010) ........................................................ 30

JOINT BRIEF RE: CLASS CERTIFICATION

*Hernandez v. Chipotle Mexican Grill, Inc.*,
No. 2:12-cv-05543, 2013 WL 6332002 (C.D. Cal. Dec. 2, 2013) ............................... 33

*Hinojos v. Kohl's Corp.*,
718 F.3d 1098 (2013).................................................................. 7, 22, 29, 39

*Hodes v. Van's Int'l Foods*,
No. CV 09-01530 RGK, 2009 WL 2424214 (C.D.Cal. July 23, 2009) ...................... 40

*In re iPhone 4S Consumer Litig.*,
No. C 12-1127, 2013 WL 3829653 (N.D. Cal. July 23, 2013) ................................... 44

*Johnson v. General Mills, Inc.*,
275 F.R.D. 282 (C.D. Cal. 2011).......................................................... 7, 17, 40

*Keegan v. Amer. Honda Motor Co., Inc.*,
284 F.R.D. 504 (C.D. Cal. 2012)................................................................. 50

*Krueger v. Wyeth, Inc.*,
2011 WL 8791449, at *6 (S.D. Cal. Mar. 20, 2011) .......................................... 38

*Lavie v. Proctor & Gamble Co.*,
105 Cal. App. 4th 496 (2003) .................................................................... 6

*Leyva v. Medline Indus. Inc.*,
716 F.3d 510 (9th Cir. 2013) ................................................................... 47

*Lindell v. Synthes USA*,
2014 WL 841738 (E.D. Cal. Mar. 4, 2014) .................................................... 45

*Major v. Ocean Spray Cranberries, Inc.*,
12cv03067, 2013 WL 2558125 (N.D. Cal. June 10, 2013)........................................ 27

*Mazza v. Am. Honda Motor Co.*,
666 F. 3d 581 (9th Cir. 2012) .......................................................... 20, 44, 45

*McCrary v. Elations Co., LLC*,
2014 WL 1779243 (C.D. Cal. Jan. 13, 2014).................................................. 31, 32, 38

*Mendez et al. v. R+L Carriers, Inc. et al.*,
2012 U.S. Dist. LEXIS 165221 (N.D. Cal. Nov. 19, 2012) ......................................... 29

*Moheb v. Nutramax Labs. Inc.*,
No. CV 12-3633-JFW JCX, 2012 WL 6951904 (C.D. Cal. Sept. 4, 2012) .......... 40, 50

*O'Connor v. Boeing North American, Inc.*,
   184 F.R.D. 311 (C.D. Cal. 1998) ................................................................. 31

*Opperman v. Path Inc.*,
   2014 WL 1973378 (N.D. Cal. May 14, 2014) ....................................... 42, 43

*Ortega v. Natural Balance, Inc.*,
   300 F.R.D. 422 (C.D. Cal. 2014) ................................................................. 39

*Parkinson v. Hyundai Motor America*,
   258 F.R.D. 580 (C.D. Cal. 2008) ................................................................. 31

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985) ....................................................................................... 8

*In re POM Wonderful LLC*,
   No. 10-02199, 2014 WL 1225184 (C.D. CA March 25, 2014) ................... 33

*Red v. Kraft Foods, Inc.*,
   No. CV 10-1028, 2011 WL 4599833 (C.D. Cal. Sept. 29, 2011) ............... 20

*Ries v. Arizona Beverages USA LLC*,
   287 F.R.D. 523 (N.D. Cal. 2012) ........................................................... 19, 32

*Rowden v. Pac. Parking Sys. Inc.*,
   282 F.R.D. 581 (C.D. Cal. 2012) ................................................................. 34

*Sethavanish v. ZonePerfect Nutrition Co.*,
   No. 12-2907, 2014 WL 580696 (N.D. Cal. Feb. 13, 2014) ........................ 33

*Stanton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) ......................................................................... 8

*Stearns v. Ticketmaster Corp.*,
   655 F.3d 1013 (9th Cir. 2011) ......................................................... 19, 24, 36

*Tait v. BSH Home Appliances Corp.*,
   289 F.R.D. 466 (C.D. Cal. 2012) ................................................................. 40

*In re Tobacco II Cases*,
   46 Cal.4th 298 (2009) .......................................................................... *passim*

*Valentino v. Carter-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996) ....................................................................... 49

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) ........................................................................ 18, 20

*Wang v. Chinese Daily News, Inc.*,
    737 F.3d 538 (9th Cir. 2013) ................................................................ 18

*Weiner v. Dannon Co.*,
    255 F.R.D. 658 (C.D. Cal. 2009) ........................................................ 26, 27

*Werdebaugh v. Blue Diamond Growers*,
    No. 12-CV-02724, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) ............................. 48

*William H. Morris Co. v. Group W, Inc.*,
    66 F.3d 255 (9th Cir. 1995) ................................................................ 11

*Wolin v. Jaguar Land Rover North Am., LLC*,
    617 F.3d 1168 (9th Cir. 2010) ............................................................ 21, 28

*Xavier v. Philip Morris USA Inc.*,
    787 F. Supp. 2d 1075 (N.D. Cal. 2011) .................................................. 34

*Ziesel v. Diamond Foods, Inc.*,
    2011 WL 222113 (N.D. Cal. June 7, 2011) ............................................ 32

STATUTES

California Consumer Legal Remedies Act ................................................ *passim*

Fed. R. Civ. P. 23 ........................................................................ *passim*

Fed. R. Evid. 401 ........................................................................ 17

Fed. R. Evid. 403 ................................................................ 17, 21, 45

Fed. R. Evid. 702 ................................................................ 17, 21, 45

Fed. R. Evid. 901 .................................................................... 21, 45

# I.   INTRODUCTION AND FACTS

## A.   Plaintiff's Introduction and Facts

To address false and misleading advertising practices engaged in by Defendants Head Racquet Sports USA and Head USA, Inc. ("Head"), Plaintiff Russell Minoru Ono ("Plaintiff") hereby seeks to certify his claims under Rule 23 of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

> All residents of California who purchased Tour-Line Racquets during the period of January 1, 2006, continuing through the date of final disposition of this action.

Plaintiff alleges -- and discovery confirms -- that Head uniformly represents to consumers of its "tour" line of tennis racquets (the "Tour-Line Racquets")[1] that the racquets are used in competition by certain professional tennis players ("Head's Paid Professionals") when, in fact, they are not.  Contrary to Head's misrepresentations in its "player centric" marketing campaign, Head's Paid Professionals actually use custom racquets which are not available to the public.  Head's decades-long scheme has a material impact on consumers because it was designed to increase sales of the Tour-Line Racquets.

It is undisputed that Head lied to the public.  Documents produced by Head establish the true nature of the company's fraudulent practices, and, in a few telling moments of candor during depositions taken in this case, Head's executives admitted their lies.  Critically, Head admits that the misrepresentations at issue are uniform and that they were material to consumers because they were intended to increase racquet sales.

---

[1] The "Tour-Line Racquets" are as follows:  the YouTek IG Extreme MP, YouTek IG Extreme MP 2.0, Microgel Extreme Pro, YouTek Extreme Pro, YouTek IG Extreme Pro, YouTek IG Extreme Pro 2.0, and the YouTek Extreme MP (collectively, the "Extreme Silo"); the Graphene Speed Pro, YouTek IG Speed MP 16-19, YouTek IG Speed MP 18-20, YouTek Speed MP, YouTek Speed Pro, and the YouTek IG Speed MP (collectively, the "Speed Silo"); the Microgel Radical MP, YouTek Radical MP; YouTek Radical Pro; YouTek IG Radical Pro; and the YouTek IG Radical MP (collectively, the "Radical Silo"); the YouTek IG Instinct MP and the Graphene Instinct MP (collectively, the "Instinct Silo"); and the Microgel Prestige MP, YouTek Prestige MP, YouTek IG Prestige MP, and the Microgel Prestige Mid (collectively, the "Prestige Silo").  (*See* Joint Exhibit and Declaration Appendix ("APPX.") Ex. 2 at P. 9-10 (response to Interrogatory No. 1).)

Head's President and 30(b)(6) designee, Mr. Greg Mason, testified as follows:

**Redacted**

(*See* Joint Exhibit and Declaration Appendix ("APPX.") at Ex. 4 at P. 86 (Mason Depo. at 215:11-19).)  The record contains numerous other examples of misstatements made by Head as part of its scheme, over a decades-long time period.  (*See*, *e.g.*, APPX. Exs. 3, 5-13, 29 (examples of Head's communications to the public containing the messages at issue).)  In fact, Roger Petersman, Senior Category Manager for Head's tennis division, testified

**Redacted**

(*See* APPX. Ex. 15 at PP. 106-107 (Petersman Depo. at 173:23-174:10).)

Head's advertising and promotional materials repeatedly and consistently communicated the uniform message that Head's Paid Professionals were using the Tour-Line Racquets, even though Head knew its representations were false.  (*See* APPX. Ex. 35 (Declaration of William J. Sanders in Support of Plaintiff's Motion for Class Certification ("Sanders Decl.") at ¶¶ 5.b, 14-19).)  And, designing its communications to reach consumers of its "tour" racquets (*i.e.*, the Tour-Line Racquets), who Head describes as **Redacted**  Head published its uniform misrepresentations in some of the most prominent magazines for tennis fans, in YouTube videos, point of sale posters, banners, racquet cardboard inserts, player stand-ups, and in social media advertising campaigns,

like Facebook.  (APPX. Ex. 35 (Sanders Decl. at ¶¶ 20-25); Ex. 36 (Declaration of Cameron R. Azari in Support of Plaintiff's Motion for Class Certification ("Azari Decl.") at ¶¶ 11, 16-21,25).)

Moreover, Head also provides false information concerning Head's Paid Professionals' purported use of the Tour-Line Racquets to both brick-and-mortar and online retailers, where the misstatements are then re-published to consumers.  (APPX. Ex. 15 at PP. 104-105 (Petersman 151:7-152:9); Ex. 21 (list linking players to retail racquets); Ex. 35 (Sanders Decl. at ¶ 24).)                    **Redacted**

(APPX. Ex. 4 at P.  Mason Depo. at PP. 83-85 (Mason Depo. at 198:13-200:14); Ex. 15 at P. 104-105 (Petersman Depo. at 151:7-152:9).)  The personal websites of professional players like Maria Sharapova do this as well.  (APPX. Ex. 33 (Sharapova's website directing consumers to purchase her "gear").)

Additionally, Head causes its uniform misrepresentations to be re-published by major tennis media outlets as a result of press releases issued by Head, or through articles placed by Head's public relations team.  (APPX. Ex. 35 (Sanders Decl. at ¶¶ 16, 24).)  As a result, Head's misrepresentations are further disseminated to consumers of the Tour-Line Racquets.  For example, faced with a question from the TennisIDENTITY.com blog, "[i]s Andy Murray still playing with the same racquet?  I am putting something up . . . and want to note his current racquet choice with price," Head responded, "Yes, Andy Murray is using the YOUTEK Radical Pro."  (APPX. Ex. 17 (email).)          **Redacted**

APPX. Ex. 34 (*Huffington Post* email exchange and media placement obtained by Head).)

**Redacted**

(APPX. Ex. 16 (email).).

5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Finally, Head goes to great lengths to communicate its uniform message to consumers through implied representations **Redacted**

(*See*, *e.g.*, APPX. Ex. 4 at P. 73 (Mason Depo. at 73:18-23,

Through this practice, Head not only communicates its uniform misrepresentations to any consumer who sees Head's Paid Professionals playing in a tennis tournament (live or on television), but it also lends credibility to the company's lies.  Head knows the consuming public will believe what they think see with their own eyes.  (*See*, *e.g.*, APPX. Ex. 27 (email between head executives stating,                    **Redacted**

; and APPX. Ex. 26 (email noting that                    **Redacted**

APPX. Ex. 28

**Redacted**

In the face of these admissions, Head contends Plaintiff and other reasonable consumers who understood Head's communications as Head intended are unreasonable, and that a class cannot be certified because consumer understanding of Head's message is subject to individual variations.  More specifically, Head argues that                    **Redacted**

4

**Redacted**

1

2           consumers could not have believed Head's Paid Professionals were

3   playing with any particular racquet model.  According to Head, it is virtually impossible

4   to visually distinguish between different racquet models within a particular "silo" (*e.g.*,

5   Radical Silo, Speed Silo, or Instinct Silo).  Through Head's logic, it then follows that, at

6   best,                         **Redacted**                         , Head only linked

7   Head's Paid Professionals to a silo of racquets -- it did not link them to particular racquet

8   models within the silo.  But, Head's argument presents a false premise.

9           Notwithstanding the above, no matter how consumers interpreted it, Head's

10  message is false.  The evidence establishes that            **Redacted**

11                                   (APPX. Ex. 4 at PP. 75-76 (Mason Depo. at

12  101:21-102:5).)  So, whether consumers understood, for example, Head's print

13  advertisements to represent that Andy Murray was playing with a Radical MP, a Radical

14  Pro, or any other model in the Radical Silo is immaterial.            **Redacted**

15                                   (APPX. Ex. 4 at PP. 69-72 (Mason Depo.

16  at 67:21-69:6, 70:14-19).)  Head's representation is always false.  Variations in consumer

17  understanding concerning the racquets depicted, assuming *arguendo* that exist, do not

18  defeat class certification.

19          Additionally, Head contends that consumers are not misled because they know that

20  the racquets used by Head's Paid Professionals are modified and customized, and,

21  therefore, according to Head, consumers know the Tour-Line Racquets they purchased are

22  not "identical" to the actual racquets used by Head's Paid Professionals.  Fatal to Head's

23  argument, however, is the fact that the customizations performed by Head's Paid

24  Professionals after the racquets are manufactured, such as replacing the strings or

25  changing the grip, are nothing more than immaterial personal modifications, which

26  consumers could perform themselves or pay someone to perform for them.  In stark

27  contrast, the differences between the Tour-Line Racquets and the racquets actually used

28  by Head's Paid Professionals are more than personal modifications --            **Redacted**

1
2

**Redacted**

3
4
5
6

(APPX. Ex. 4 at P. 72 (Mason Depo. at 70:14-19.)

7        Tellingly, after Plaintiff's lawsuit was filed, Head implicitly acknowledged its

8   fraudulent conduct by modifying its communications to include a disclaimer stating that

9   "HEAD PRO Players *may* play with different racquets from the model shown."[2]

10  However, Head's disclaimer still does not cure the defect -- it is not that Head's Paid

11  Professionals "may" play with different racquets from the model shown, they indisputably

12  *do not* play with the racquet models shown.  Head's post-litigation attempts to escape

13  liability by avoiding the impact of its uniform misrepresentations on consumers is too

14  little and too late.  In fact, Head continues to prey on consumers of the Tour-Line

15  Racquets who want to play with the same racquets Head's Paid Professionals play with.

16       Moreover, Head's position is belied by its advertising materials and deposition

17  testimony.  For example, in a marketing presentation for 2011,        **Redacted**

18
19

20  (APPX. Ex. 18 (Head definitional slide for "TOUR Consumer").)  "California courts

21  consistently have looked to the ordinary consumer within the target population" to define

22  the reasonable consumer.  *Lavie v. Proctor & Gamble Co*., 105 Cal. App. 4th 496, 497

23  (2003).  Here, Head admits that the target population is influenced by "player idols" like

24  Head's Paid Professionals.

25       The conclusions of Head's anticipated expert reports and surveys are unreliable

26  because they are contrary to the facts and Head's own real-world, real-time marketing

27

28  _____

[2] *See*, *e.g.*, www.head.com/tennis (last visited Apr. 23, 2015) (emphasis added).

strategy and research.  If it was really true that player endorsements, statements, articles, and

**Redacted**

did not drive sales for the Tour-Line Racquets, why would Head devote all of its resources to communicating its uniform misrepresentations to the consuming public?  As other courts have held, "[t]ry as it might, [Head] cannot evade the unmistakable fact that the objective-and realization-of its marketing campaign was to present [each Tour-Line Racquet to] consumers as a product that [was actually used by Head's Paid Professionals in competition]."  *Johnson v. General Mills, Inc.*, 275 F.R.D. 282, 298 (C.D. Cal. 2011) (*quoting Fitzpatrick v. General Mills, Inc.*, 263 F.R.D. 687, 697 (S.D. Fla. 2010)) (finding defendant's argument "unpersuasive that individual issues predominate because purchasers of [its products] have been exposed to different mixes of packages and advertisements since [defendant] has, over time, modified the packaging of [the products] and the content and emphasis of its marketing materials").

Here, in the end, because the evidence establishes that Head's representations concerning the Tour-Line Racquets were uniform, Head believed them to be material to its target audience, and they were communicated in a manner that indisputably exposed them to Head's target audience, this case is ideally suited for class treatment.  (APPX. Ex. 35 (Sanders Decl. at ¶¶ 5, 10-25); Ex. 36 (Azari Decl. at ¶¶ 21-25); *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (2013) ("A representation is 'material,' . . . if 'the maker of the representation knows or has reason to know that its recipient regards or *is likely* to regard the matter as important in determining his choice of action.'") (quoting *Kwikset Corp. v. Super. Ct.*, 51 Cal.4th 310, 333 (2011)) (emphasis added).  Additionally, it is significant that Head's message was communicated as part of an extensive and long-term campaign, because plaintiff "is not required to necessarily plead and prove individualized reliance on specific misrepresentations or false statements where, as here, those misrepresentations and false statements were part of an extensive and long-term advertising campaign."  *In re Tobacco II Cases*, 46 Cal.4th 298, 312 (2009).

7

Moreover, because the standard for determining whether individual class members relied on the misrepresentations made by Head is an objective, reasonable person standard, Plaintiff's claims are particularly well-suited for class treatment.  *See*, *e.g.*, *Forcellati v. Hyland's, Inc.*, 2014 WL 1410264, at *9 (C.D. Cal. Apr. 9, 2014) (King, C.J.) (consumer "statute[s] allow[] [p]laintiffs to establish the required elements of reliance, causation, and damages by proving that [d]efendants made what a reasonable person would consider a material misrepresentation . . . [and] [a]s such, whether or not [d]efendants' claims are misleading is an objective, classwide inquiry.")

Class actions "permit the plaintiffs to pool claims which would be uneconomical to litigate individually" and ensure that plaintiffs have a right to redress wrongs that would otherwise "have no realistic day in court if a class action were not available." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985).  Plaintiff seeks certification of his claims for violation of the California Consumer Legal Remedies Act ("CLRA"), Unfair Competition Law ("UCL"), False Advertising Law ("FAL"), Fraud, Negligent Misrepresentation, Breach of Warranty, and Unjust Enrichment.

Here, the claims share common elements and each element is amenable to common, classwide proof.  In particular, evidence establishes that certification of Plaintiff's claims is appropriate because they are based on the uniform, material message conveyed to consumers by Head as part of its extensive and long-term marketing scheme.  (APPX. Ex. 35 (Sanders Decl. at ¶¶ 5, 10-25).)  In examining the evidence, the Court may consider evidence which goes to the requirements of Rule 23, but "[t]he court may not go so far, of course, as to judge the validity of" competing evidence.  *Stanton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003).  And, although the Court's "class certification analysis must be 'rigorous' and may 'entail some overlap with the merits of [P]laintiff's underlying claim,' Rule 23 grants no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)).

## B. Defendants' Introduction and Facts

Ono claims that he was duped into purchasing (on a whim) a high-end, expensive, performance HEAD racket solely because he believed that one of the world's top tennis players, Andy Murray, uses the exact same racket in competitive play.  Ono devotes significant portions of his brief painting Head as a villain and himself as a helpless victim.  All the while, Ono continues playing with the Head racket he purchased, finding it perfectly acceptable but for the fact that it is not identical to the one Murray uses in competition.  The hyperbole and rhetoric that fill Ono's brief do not compensate for the serious deficiencies underlying his attempted class certification.

Like other sports companies, Head employs professional athletes as endorsers to enhance its brand image.  Head, however, has never embarked on a "uniform," "extensive" campaign aimed at deceiving consumers.  To the contrary, Head has always worked toward matching consumers with the racket that suits them best.  Indeed, Head's advertising focuses on what matters most to consumers—promoting different racket attributes to meet the individual needs of the wide variety of tennis players in the market for performance rackets.  A negligible portion of Head's advertising made the statements Ono claims are misleading.  And contrary to the few email excerpts plucked from hundreds of thousands of pages of documents, and presented out of context in Ono's arguments, Head never made such statements to increase sales of the referenced racket models.  The isolated statements (also made by other brands in the market) were intended to promote Head's racket lines generally and, at most, to attract potential consumers to try (or "demo") Head's rackets to potentially find one they liked.

While Ono uses the word "uniform" 14 times in his introduction to describe Head's marketing of tennis rackets, repeatedly saying it does not make it so.  Head's advertisements, like its rackets, are varied and diverse.  Most do not include the allegedly false claim at the heart of this dispute—that a professional athlete used a specific racket in competition play.  The evidence also shows it is not material to consumers' purchasing decisions.  Ono's expert opinions regarding the purported content of Head advertising

9

1   guess as to how consumers interpret that content does not make the marketing uniform.

2       Ono supposedly purchased his Head Youtek IG Radical Pro **solely** because he saw

3   Murray play with one, because he likes Murray, and he believed he was getting the same

4   racket Murray was playing with.  Ono presents no evidence that a typical purchaser of

5   high-end tennis rackets purchases one, in whole or in part, because a specific athlete plays

6   with it.  Numerous studies show otherwise.  And in 2014, Judge Walter denied class

7   certification in a virtually identical case against racket maker Wilson, where plaintiff

8   alleged that marketing misrepresented that Wilson's high-end racket, available at retail, is

9   identical to the racket used on tour by world-famous pro Roger Federer.  *See* APPX. Ex.

10  52.  As detailed below, Ono's case fares no better.

11          **1.     How Consumers Purchase Tennis Rackets**

12      Head is among the elite brands of rackets used by professional tennis players.  Paid

13  endorsements by players highlight the brand's quality.  Ono erroneously assumes this

14  results in homogeneous purchasers, who, irrespective of their individual preferences, buy

15  performance rackets because they *all* supposedly believe professional players use the

16  exact same off-the-shelf rackets in competitive play.  Denying class certification, the

17  *Wilson* court acknowledged that purchasing a racket is a highly-individualized inquiry,

18  and "many different factors … motivate a consumer's decision to purchase a racket."

19  APPX. Ex. 52 at APPX584 .  Studies show that player use or endorsement of a racket is

20  most often not considered and, of the few who do consider it, it is one of the last things

21  considered and given virtually no importance.  Instead, purchasers consider and rely upon

22  other factors, e.g., racket specifications, brand recognition, and reputation.

23      The Tennis Industry Association ("TIA") Tennis Consumer Report, relied on in

24  *Wilson*, from 2012 when Ono purchased his Head racket, "provided consumer responses

25  to the question 'What is motivating your desire to buy a new racquet?'"  *Id.* at APPX580.

26  "Over 100 responses by men and women aged 15 to 72 indicate[d] many diverse reasons

27  why people buy a new tennis racquet, including technology updates, the right price point,

28  and the need to replace a broken or worn out racquet;" "[n]one … responded that they

10

were motivated to purchase a new racquet because they saw a professional player use [it]." *Id.*  TIA's 2010 report showed that professional player use influenced new racket choices of only 3% of respondents.  APPX. Ex. 40 at APPX346.  In the 2011 report, player endorsement was the *least* important factor to consumers in choosing a new racket (APPX. Ex. 41 at APPX379), and only 2% who switched brands cited player use as a reason (*id.* at APPX381).

These industry studies are corroborated by the consumer survey conducted in this case.  Head retained a highly-respected expert to design and administer a survey to test empirically the extent to which tennis racket consumers (1) are influenced by professional tennis player endorsements and (2) interpret advertising showing a professional tennis player with a Head Radical Pro racket (the racket Ono allegedly bought) to mean that the professional competes with the same racquet sold to consumers.  The survey showed:

**Redacted**

APPX. Ex. 53-1, Expert Report of Hal Poret (the "Survey").   In sum, for only a negligible **Redacted** of respondents could the alleged misrepresentation be possibly both misleading *and* material.  Ono thus does not represent at least  **Redacted**  of the class.[3]

___

[3] *William H. Morris Co. v. Group W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995) ("less than 3%" is a "small percentage [that] does not constitute proof that … recipients were deceived"; "evidence sufficient where 21 to 34 percent of the recipients were deceived").

Consistent with the TIA industry studies and the Survey, Head's sales show that a pro's use of a racket with a particular cosmetic, and claims made by Head that a pro uses a particular model racket, do not drive sales.  For example,                **Redacted**

APPX. Ex. 38 at APPX266.                                **Redacted**

                                    ("HEAD PRO Players may play with different racquets from the model shown").  *Id.*

2.    **Head's Advertising Practices**

The Survey and industry findings show the prime importance of racket feel and playability (and the various facets thereof).  Consistent with this, Head has focused on the individualized nature of racket purchase decisions by helping consumers identify rackets best suited for their *own* games—irrespective of pro endorsements.  Head's advertising encourages consumers to test or "demo" Head's rackets before purchasing them, [4] not to buy them blindly because a pro endorses or uses them.  Each of Head's **Redacted** sales representatives hosts at least           **Redacted**           "demo days" annually around the country for consumers to try Head's rackets, including the full range of "Tour" rackets.  Head offers special "demo racket" programs to retailers, providing them with free and discounted rackets for demo use.  For example, in 2013-2014 alone,           **Redacted**
                                            *Id*. at APPX265.

Additionally, Head has around **Redacted** teaching pros nationwide who promote Head's rackets and often have demo rackets available.  Head also features a "racket finder" on its website to help consumers find the best fit for them based on numerous criteria, e.g., level

---

[4] APPX. Ex. 38-6 at APPX281, "Improve YOUR game by upgrading to the HEAD racquet that adapts to every shot YOU hit.  Visit a participating retail store in YOUR area and maximize YOUR game!"; Ex. 38-9 at APPX287, "Test a Graphene Racquet and Win Court Time with Novak and Maria"; Ex. 38-10 at APPX289, "Graphene Days Are Coming to a Court Near You—Test Head's New Racquets"; Ex. 38-17, APPX303, "The New Head YouTek Graphene Speed.  Test It Now."

12

of play and preferences on control versus power, weight, head size, string pattern, etc. *Id*. at APPX264-65.

**Redacted**

*Id*. at APPX265-66.  Because a racket purchase is highly individualized, virtually *all* of the endorsements Head ran in 2009-2013 explain the type of player each racket line or model is designed for and/or encourage consumers to visit the website to choose a racket best suited for their individual needs.[5]

Taking Head's advertising as a whole, it is clear Head has not embarked on a uniform campaign to deceive consumers.  Consumers were exposed to numerous distinct advertising claims, from a variety of sources in diverse media.[6]  Aside from a small number of press releases with very limited exposure  **Redacted**  **Redacted**  virtually all the advertisements that feature professional endorsements focus on the HEAD *brand* or racket "line" generally and do not state that a pro uses a particular racket model in competitive play.  *Id.* at APPX268.

---

[5] APPX. Ex. 38-5 at APPX279, "Especially for players like Andy, HEAD has designed the YouTek IG Radical—for Radical Creativity;" Ex. 38-4 at APPX279, "Designed for hard hitters with flat shots like Robin Soderling"; Ex. 38-2, 38-3, 38-4, 38-5 at APPX272-279, "What's your game?  Find out at Head.com /tennis."; Ex. 38-7 at APPX283, "The world's best players use HEAD racquets—why shouldn't you?  Visit a participating retail store in YOUR area and maximize YOUR game!"

[6] APPX. Ex. 38-2 at APPX273, "I am Novak Djokovic and My Game is Speed"; Ex. 38-4 at APPX277, "Robin Soderling.  The Power of Precision.  The Power of Prestige."; Ex. 38-8 at APPX285, "Maria and Novak know the right equipment gives them a competitive edge on the court—that's why they play with HEAD racquets and Penn tennis balls"; Ex. 38-12 at APPX293, "Gilles Simon.  Tommy Haas.  YouTek Prestige.  Take on Anybody—Anytime!"; Ex. 38-13 at APPX295, "Andy Murray.  YouTek Radical Series." A racket "line" is sometimes referred to as racket "series."

Ono attempts to analogize Head's marketing to the tobacco advertising campaigns that saturated the nation for decades, but Head's narrowly-targeted advertising pales in comparison.  In 2009-2013, Head placed various print ads in two publications circulated to a small number of teaching pros (*ADDvantage USPTA* and *Tennis Pro PTR*) and four tennis-focused publications (*Inside Tennis*, *Tennis Magazine*, *ALTA Net News*, and *Tennis View*); ran commercials on *The Tennis Channel* with very limited exposure; and did narrowly-targeted online advertising (including online banners and social media campaigns aimed at avid tennis players).  *Id.* at APPX266-68.  Given the different claims that appeared in various sources and Head's heterogeneous target audience for those ads, Ono cannot support his claims of "extensive," "uniform" advertising.

### 3.    Ono Is Not Representative of the Class

Ono is atypical.  An experienced tennis player (in the top 50 high school players in Southern California), Ono devoted most of his life to working in a tennis pro shop. APPX. Ex 43 at 34:8-19, 38:2-15.  He strung rackets, assisted with ordering and selling rackets, and helped run racket "demo days" and tennis competitions.  *Id.* at 73:23-74:24, 47:18-21, 50:21-51:3, 62:15-25, 63:21-65:13.  Yet, he claims ignorance when it comes to tennis rackets.  He never played with or demoed a Head racket before making his alleged purchase.  *Id.* at 122:23-123:5.  He purportedly never played with or demoed before purchase *any* of the high-end rackets that he owns, despite their hefty price tags.  *Id.* at 88:16-90:9, 98:16-99:13, 109:9-11.  Ono claims he purchased high-end Wilson and Babolat rackets without ever testing either because his boss at the tennis club suggested he buy them and Ono wanted to be a "company person."  *Id.* at 88:16-90:9, 98:16-99:13.

Unlike most consumers of these performance-driven rackets, Ono did not consider *any* specifications of the Head racket before he bought it, nor did he conduct *any* research. *Id.* at 129:7-24; 164:24-165:20.  Consistent with his incredulous lack of interest in racket specifications, Ono decides which of his three tour-level rackets to use on any given day based on whether he "slept well" and his "mood."  *Id.* at 93:22-95:19.

Despite claiming to have not tested his rackets before purchasing them, Ono

14

acknowledges the importance of doing so, having organized "demo days" at his tennis club. *Id.* at 63:21-64:25. During these events, members played with various rackets (*id.* at 65:18-22) to feel how the rackets fit their individualized playing styles/objectives. Because "tour" line rackets are relatively expensive ($150-$200) and fit each person differently, players almost always try rackets before making a purchasing decision. Indeed, industry studies show that this is the top factor influencing purchasing decisions, followed by playability and racket weight. *See, e.g.*, APPX. Ex. 40 at APPX346.

Unlike other players at this level (or even lower), Ono testified that he cannot feel an appreciable difference between his various rackets, notwithstanding differences in weight, balance, flexibility, and strings. APPX. Ex. 43 at 93:22-95:16. To him, they are all the same. This is ironic because Ono's entire lawsuit is premised on his purported injury from not having a racket that is identical to Murray's racket.[7] Incredibly, Ono knows very little about Murray—his tennis idol who purportedly was the sole reason that he bought on "impulse" the racket needed to bring this lawsuit. *Id.* at 126:12-16, 119:11-13. Ono, the alleged Murray "fan," cannot recall any tournaments he watched Murray play in, has never been on Murray's website, and does not know when Murray won Wimbledon (2013)—a match that was one of the most anticipated, followed, and discussed in history. *Id.* at 154:21-155:3, 249:15-19. Further, unlike the customers he seeks to represent, Ono shares a special relationship with the putative class action counsel Dan Alberstone. Ono met Alberstone at the tennis club where he worked several years before he bought his Head racket. *Id.* at 142:4-143:20. Ono has since played tennis with counsel on multiple occasions. *Id.* 138:9-22, 144:6-23.

Given Ono's relationship with his counsel, along with a number of other aspects of his alleged purchase, the circumstances of when and why Ono purchased his racket are

---

[7] Ono also feigns indifference to the most influential customization made by every unstrung racket purchaser—strings and string tension. He has tried string tensions ranging from 46-54 pounds of tension and selected 52 pounds as "just [a] random number that I felt that I wanted to string my racket at." *Id.* at 81:10-83:13.

suspect.  Ono previously purchased rackets strictly based on what his boss told him and he took advantage of the substantial discounts offered by his tennis club.  *Id*. at 87:13-88:4, 105:4-25.  Even though he likely could have bought the Head YouTek IG Radical Pro racket with an employee discount, Ono purchased the racket, purportedly on "impulse," for full price at the Indian Wells tournament, paid cash for the racket, and does not have a receipt.  *Id*. at 114:3-115:18. [8]

### 4.        The Statements Ono Purportedly Relied on Are Not Representative

Ono claims he believed Murray played with the identical YouTek IG Radical Pro model that he purchased based on Head's advertising, specifically one Head advertisement he saw while casually flipping through *Tennis Magazine* in a bookstore in 2012 or "possibly 2011," a few press releases appearing on Head's website, and two YouTube videos.  *Id.* at 157:4-160:17.  But these materials were so insignificant that during deposition he could not recall the specifics of *any* of them.

From 2011-2012, Head placed three different advertisements featuring Murray in *Tennis Magazine*.  APPX. Exs. 38-22, 38-23, 38-24 at APPX325-29.  One was for "Andy Murray's Weapon of Choice YouTek Radical Pro," a different racket from the YouTek **IG** Radical Pro that Ono allegedly purchased.  APPX. Ex. 38-22 at APPX325.  Two promote the YouTek IG Radical racket *line* generally and do not reference Ono's model or state that Murray plays with any particular model.  APPX. Exs. 38-22, 38-23 at APPX327-29.  One of the YouTube videos[9] Ono allegedly saw was not released by Head.  The video shows Murray practicing with a YouTek Radical racket, not the YouTek IG Radical Pro that Ono purchased.  It does not identify any particular version of that racket (i.e., Pro,

---

[8] It is also curious that Ono purchased a high-end Babolat racket around the same time a class action lawsuit was filed against Babolat.  APPX. Ex. 43 at 87:2-12.  The *Ahdoot v. Babolat VS North America, Inc.* case, which, unlike this case, also involved a claim that Babolat falsely represented that its rackets contain tungsten, recently settled.  APPX. Ex. 59.

[9] APPX. Ex. 43 at 244:17-246:11; https://www.youtube.com/watch?v=aBMA_syOLWg (released by *European* division of Tennis Warehouse in 2009) (last visited May 11, 2015).

MP, Rev, S) or state that Murray plays with the racket depicted in competition play.  The second video shows Murray discussing a "Radical" racket.[10]  Murray says he tested the Radical when he was "13 maybe 14" years old and "never wanted to change."  This is true: Murray plays with a customized racket frame used for Radical rackets that were available to the public.

Finally, of the press releases that Ono allegedly saw, only one references the model he bought.  APPX. Ex. 38-21 at APPX322-23.  The release quotes Murray stating "I've played with the Radical since I was 13 and I never wanted to change since…with the new YouTek IG Radical Pro, I feel I have a lot more variety in my game."  *Id.*  Ono initially testified that he did not rely on the press releases at all when buying his racket.  After meeting with his counsel during a break, however, he "clarified" that he relied on the totality of Head's advertising for purposes of his purchasing decision.  APPX. Ex. 43 at 231:4-232:1.  This is inconsistent with Ono's testimony that he purchased his Head racket on "impulse" after seeing Murray practice with the racket at the Indian Wells tournament.  In any event, Head's press releases have very limited public exposure.  **Redacted**

**Redacted**                                                        [11]  APPX. Ex. 38 at APPX268.

## II.     THE REQUIREMENTS OF RULE 23(a)

### A.     Commonality

#### 1.     Plaintiff's Position:  Commonality Is Satisfied Because this Case Is about a Common Advertising Campaign which Gives Rise to Common Questions which Are Subject to Common Proof

It is not necessary that "[a]ll questions of fact and law . . . be common to satisfy [Rule 23(a)(2)]."  *Johnson*, 275 F.R.D. at 289 (quoting *Hanlon v. Chrysler Corp.*, 150

---

[10] *See* https://www.youtube.com/watch?v=fqKLFdAke10 (last visited May 11, 2015); APPX. Ex. 43 at 192:1-7.

[11] Ono's expert reports of Azari and Sanders are unreliable and should be accorded no weight.  Moreover, Azari, who is a lawyer and a director of "legal noticing," is not qualified to offer expert opinions on advertising and marketing.  Fed. R. Evid. 401, 403, 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

17

F.3d 1011, 1019 (9th Cir. 1998)).  Instead, "[w]hat matters to class certification is . . . the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Wal–Mart Stores, Inc.*, 131 S.Ct. at 2551.  Commonality under Rule 23(a)(2) can be established by demonstrating that Plaintiff and class members' claims "depend on a common contention . . . [that is] capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*  However, a "[p]laintiff need not show that every question in the case, or even a preponderance of questions, is capable of classwide resolution.  So long as there is 'even a single common question,' a would-be class can satisfy the commonality requirement of Rule 23(a)(2)."  *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013) (quoting *Wal-Mart*, 131 S.Ct. at 2556).

Here, all of the class members' claims share the same fundamental premise:  Head materially misrepresents to consumers that each of the Tour-Line Racquets are used in competition by Head's Paid Professionals.  If Plaintiff can prove that Head's representations are misleading because Head's Paid Professionals do not actually play with the Tour-Line Racquets, members of the putative class will be entitled to relief under each of Plaintiff's claims.  Because a determination of the truth or falsity of Head's material representations regarding the Tour-Line Racquets will resolve an issue that is central to the validity of each one of the claims in one stroke, Plaintiff has sufficiently shown there exists a common question of law or fact.

Head's President and 30(b)(6) designee, Mr. Greg Mason,             **Redacted**

1  (APPX. Ex. at P. 74 (Mason 81:1-9 (objection omitted)).)  Additionally, it is undisputed

2  that the reams of press releases issued by Head during the class period contain repeated

3  instances of misrepresentations.  (*See* APPX. Exs. 3,5-13, 29 (exemplar Head press

4  releases and advertisements containing misrepresentations).)

5      Moreover, to the extent Head contends that Plaintiff's claims cannot be certified

6  because consumers had different motivations for purchasing the Tour-Line Racquets,

7  courts have held that "variation among class members in their motivation for purchasing

8  the product, the factual circumstances behind their purchase, or the price that they paid

9  does not defeat the relatively 'minimal' showing required to establish commonality." *Ries*

10  *v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012); *see also In re*

11  *Ferrero Litigation*, 278 F.R.D. 552, 558 (S.D. Cal. 2011) (finding commonality where

12  claims were based on "common advertising campaign").  Contrary to Head's contention,

13  whether the misrepresentations made by Head were reasonably relied upon by class

14  members is subject to common proof:

15          [T]he UCL, FAL, and CLRA . . . allow[] [p]laintiffs to establish
16          the required elements of reliance, causation, and damages by
           proving that [d]efendants made what a reasonable person would
17          consider a material misrepresentation.  As such, whether or not
           Defendants' claims are misleading is an objective, classwide
18          inquiry for purposes of the UCL, FAL and the CLRA.

19  *Forcellati*, 2014 WL 1410264, at *9; *see also*, *Stearns v. Ticketmaster Corp.*, 655 F.3d

20  1013, 1022 (9th Cir. 2011) ("[C]ausation, on a class-wide basis, may be established by

21  *materiality*.  If the trial court finds that material misrepresentations have been made to the

22  entire class, an inference of reliance arises as to the class.")  And, although the *Forcellati*

23  court limited in its discussion to statutory claims, the same standard applies to common

24  law fraud and negligent misrepresentation claims.  *In re Brazillian Blowout Litigation*,

25  2011 WL 10962891, at *8 (C.D. Cal. Apr. 12, 2011) ("Although [p]laintiffs must prove

26  actual reliance as an element of their fraud and negligent misrepresentation claims,

27  reliance may be presumed as to the entire [c]lass if [d]efendant's misrepresentations or

28  omissions were material.") (citing *Vasquez v. Superior Court*, 4 Cal. 3d 800, 814 (1971)).

19

### 2. Defendants' Position: Ono Cannot Establish Commonality

Under Supreme Court precedent, plaintiff's claims "must depend upon a common contention" to satisfy the commonality requirement. *Wal-Mart Stores, Inc.*, 131 S. Ct. at 2551. "What matters to class certification ... is not the raising of common 'questions'— even in droves—but, rather the capacity of a class wide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* Plaintiff must "demonstrate that the class members 'have suffered the same injury.'" *Id.*

Ono questions whether tennis players endorsing Head rackets actually play in competition with the rackets advertised. That question is not "common" to the class. Most of Head's advertisements did ***not*** claim that an athlete used a particular racket in competition. *Red v. Kraft Foods, Inc.,* No. CV 10-1028, 2011 WL 4599833, at *9-10 (C.D. Cal. Sept. 29, 2011) (class action targeted different allegedly misleading statements and plaintiffs failed to meet the commonality requirement because the "common question" was "too fragmented."). And Ono's reliance on press releases found on Head's website is misplaced because those posts received minimal exposure.

In *Mazza v. Am. Honda Motor Co.*, 666 F. 3d 581, 596 (9th Cir. 2012) the Court held that "only members who were exposed to advertising that is alleged to be materially misleading" may be included in the class. Otherwise reliance on the purportedly false advertising is not a common question. *Id.* The Court found that "Honda's product brochures and TV commercials fall short of the 'extensive and long-term [fraudulent] advertising campaign' at issue in *Tobacco II* … and this difference is meaningful." *Id.* There is no evidence here that Head's advertising was more extensive or uniform than the Honda campaign in *Mazza.* Accordingly, "[a] presumption of reliance does not arise" and "an individualized case must be made for each member showing reliance." *Id.*

For the **Redacted** of consumers who might have seen and relied on a representation that a professional plays with a specific racket in competition, there is no evidence that they suffered a common injury. **Redacted**

**Redacted**                                    APPX. Ex. 44 at APPX470-81.  Ono
cannot show that the question of whether the endorsers of Head rackets actually played
competitively with them "is provable on a class wide basis," and not an individual racket
model and endorser basis.  APPX. Ex. 60 at APPX1033.  Any proof Ono may present as
to the advertising he allegedly viewed before his purchase and his resultant expectations
will not resolve these critical class questions: (1) what advertisements, if any, did other
putative class members view before purchasing, (2) did the class members believe the pro
player in the ad plays with the same racket available at retail, (3) was the racket advertised
substantially the same or similar to the racket used by the pro, and (4) were those
representations material to consumer purchases (and, if so, to what degree)?
Consequently, Ono cannot establish commonality.

    **B.**    **Typicality**

        **1.**    **Plaintiff's Position:  Plaintiff Satisfies the Typicality
Requirement[12]**

Rule 23(a)(3)'s "typicality requirement is to assure that the interest of the named
representative aligns with the interests of the class."  *Wolin v. Jaguar Land Rover North
Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010).  Accordingly, "[t]he test of typicality 'is
whether other members have the same or similar injury, whether the action is based on
conduct which is not unique to the named plaintiffs, and whether other class members
have been injured by the same course of conduct.'"  *Ellis v. Costco Wholesale Corp.*, 657
F.3d 970, 984 (9th Cir. 2011) (quoting *Hanlon*, 976 F.2d at 508).  This requirement is
satisfied as long as Plaintiff's claims are "reasonably co-extensive with those of absent
class members; they need not be substantially identical."  *Hanlon*, 150 F.3d at 1020.

The typicality requirement is easily met in this case.  Critically, in purchasing one
of the Tour-Line Racquets, Plaintiff and putative class members were injured by the

---

[12] Defendant's expert report of Poret is irrelevant and lacks foundation.  Fed. R. Evid. 401,
403, and 901(a).  Moreover, Poret not qualified to offer expert opinions on each of the
topics for which he provides an opinion.  Fed. R. Evid. 702; *Daubert v. Merrell Dow
Pharms., Inc.*, 509 U.S. 579 (1993).

1    "same course of conduct" -- Head's player-centric campaign.  (*See* APPX. Ex. 35

2    (Sanders Decl. at ¶¶ 5, 10-25).)  In fact, the Ninth Circuit recently recognized that a false

3    endorsement by a professional athlete is a proto-typical example of a false advertising-

4    based claim.  *See Hinojos*, 718 F.3d at 1106.  Specifically, in *Hinojos*, the court listed

5    several examples of actionable misstatements, including falsely claiming that shoes are

6    "***the same model of shoe worn by LeBron James.***"  *Id*.  The court noted that such a

7    practice is an "example[] [of] [an] effective marketing technique[] that, if false, can be

8    used to deceive consumers into making purchases they would not otherwise make."  *Id.*

9            There can be no real dispute that Plaintiff and the class members have been injured,

10   and their interests align.  This is true even if class members shared different motivations

11   for purchasing the Tour-Line Racquets.  *Forcellati*, 2014 WL 1410264, at *10

12   ("Defendants argue that [p]laintiff's claims are atypical because their children differ from

13   the 'average child taking the products.'  This argument fundamentally misunderstands the

14   typicality inquiry, which turns on [p]laintiffs' legal theory, not the 'specific facts from

15   which it arose.'") (*quoting Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir.

16   1992)); *see also*, *Astiana v. Kashi Co.*, 291 F.R.D. 493, 502-03 (S.D. Cal. 2013 ("That

17   [p]laintiffs may have considered other factors in their purchasing decisions does not make

18   them atypical.  . . . Plaintiffs need not show that the representations were the only cause,

19   or 'even the predominant or decisive factor,' influencing their conduct.") (quoting *In re*

20   *Tobacco II Cases*, 46 Cal.4th at 326–27).

21           Plaintiff and all class members share a common interest in establishing that the

22   Tour-Line Racquets are not, in fact, used by Head's Paid Professionals.  Plaintiff and all

23   putative class members are entitled to the same type of damages as a result of Head's

24   conduct, restitutionary disgorgement of the ill-gotten gains (UCL, FAL, CLRA and unjust

25   enrichment claims), damages (fraud, negligent misrepresentation, and breach of express

26   warranty claims) and an injunction to force Head to stop misrepresenting that Head's Paid

27   Professionals use the Tour-Line Racquets when, in fact, they do not.

28

Head also contends that Plaintiff is not typical because he did not purchase each and every one of the Tour-Line Racquets.  However, in order to satisfy the typicality requirement, the representative plaintiff need not purchase each variation of the product in a line, so long as the representations made by the defendant are substantially similar for the various products.  *See, e.g., Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 378 (N.D. Cal. 2010) (defendant argued that plaintiff's claims were atypical because he did not purchase each product in the Blue Sky beverage line, but the court found that although the challenged product line contained several variations, the plaintiff's claims were "'reasonably coextensive with those of absent class members.'") (*quoting Stanton*, 327 F.3d at 957).  Also, in *Forcellati v. Hyland's, Inc.*, 876 F.Supp.2d 1151, 1161-62 (C.D. Cal. 2012), Chief Judge King, in deciding a motion to dismiss, held that the question of whether a class representative can maintain claims on behalf of consumers who purchased products the representative did not purchase was a typicality issue.  Then, when presented the issue during class certification, Judge King ruled that a class representative can represent a class of consumers even though he did not purchase each of the products identified in the class, so long the "misrepresentations about the product[] are uniformly made across Defendants' product line." *Forcellati v. Hyland's, Inc.*, 2014 WL 1410264, at *10 (C.D. Cal. April 9, 2014).

Here, Plaintiff Ono purchased a Tour-Line Racquet, the YouTek Radical Pro because, consistent with Head's uniform campaign, he was led to believe that is the racquet that Andy Murray played with.  (Ono Depo. at 111:25-112:5.)  He testified that he saw the broad range of media where Head communicated its uniform misrepresentations, including Head YouTube videos, press releases, internet articles, magazine advertisements, and he saw Andy Murray in person play with what he believed was a YouTek Radical Pro because, consistent with Head's uniform message strategy, **Redacted** (*Id*. at 157:4-14.)  And, while he did not purchase each and every one of the Tour-Line Racquets, the false statements regarding these racquets are all part of Head's uniform campaign.  (APPX. Ex. 35 (Sanders Decl. at

23

¶¶ 5.b, 14-19).)  It cannot reasonably be disputed that Plaintiff is typical of class members who purchased any one of the Tour-Line Racquets.

### 2.    Defendants' Position: Ono Fails the Typicality Requirement

Ono cannot satisfy the typicality requirement because of his unique background, the atypical course of events surrounding his purchase of the YouTek IG Radical Pro, and his anomalous purchasing behavior.  Related to typicality (or lack thereof), Ono testified that: (1) he sold tennis rackets for twenty years as a pro-shop employee, ran demo days, and played competitive tennis, but he purchased a Head Youtek IG Radical Pro on impulse because he thought it was the racket he saw Murray play with and he likes Murray; (2) whether Murray played with the IG Radical Pro did not convey anything about racket quality, playability, or performance or whether it would make Ono a better player; and (3) Ono did not need a racket when he purchased the IG Radical Pro because he had high-end rackets from Wilson and Babolat that to him are essentially indistinguishable from the Head racket.  APPX. Ex. 43 at 34:2-19, 38:2-8, 63:21-64:4, 112:16-24, 119:7-13.  To Ono, the Head YouTek IG Radical Pro was a souvenir commemorating his visit to the Indian Wells tournament where he saw Murray practice.  Neither Ono, nor his reason for purchasing his IG Radical Pro, nor the importance he places on whether Murray played with the racket, is typical of anyone else in the class.

In *Hanon,* on which Ono relies, the Ninth Circuit denied certification for lack of typicality because "[plaintiff]'s unique background and factual situation require[d] him to prepare to meet defenses that [were] not typical of the defenses which may be raised against other members of the proposed class."  976 F.2d at 508.  His reliance on the integrity of the market would be subject to serious dispute as a result of his "extensive experience in prior securities litigation, his relationship with his lawyers," and his atypical purchase habits.  *Id.  See also*, *Stearns*, 655 F.3d at 1019-20 (9th Cir. 2011) (rejecting class representative because he was too "far from typical of the class").

The circumstances of Ono's purchase are atypical and raise unique defenses.  For standing, Ono must have purchased his racket not knowing whether Murray used it in

competitive play.  Ono, who knew Plaintiff's counsel before his alleged purchase and who could have purchased his racket at a significant discount through his employer, allegedly bought the racket at full price at a tennis tournament for cash and without proof of purchase.  APPX. Ex. 43 at 114:3-115:18.  Absent such proof, only Ono's self-serving testimony can establish actually where and when he bought the racket.  Because the timing of purchase is critical to whether Ono is truthful about his personal knowledge at the time of purchase, Ono would have to, like the *Hanon* plaintiff, "meet defenses that are not typical of the defenses which may be raised against other members of the proposed class."

Ono's anomalous purchasing behavior also makes him atypical.  In *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 450 (S.D. Cal. 2014), plaintiffs claimed to have been deceived into purchasing Maybelline's lipstick and foundation "in reliance on the claimed 24 hour staying power."  Maybelline's consumer survey informed "who the reasonable consumer in the target audience [was] and what dr[ove] her in making purchasing decisions."  *Id*. at 453.  The survey revealed "duration was not the only motivating factor in making the purchases," "4% of the total sample expected the specific 24 hour duration," and "only 9% of the total sample were one-time purchasers who expected the product to last 24 hours and thus [were] 'injured' in the manner alleged by Plaintiffs."  *Id*. at 453-54.  The court denied certification, finding the survey "show[ed] that materiality and reliance varie[d] from consumer to consumer."  *Id*. at 457.  Plaintiffs failed the typicality requirement; their "reliance on the alleged misrepresentations was not typical of other class members" and they could not show that "other members ha[d] the same or similar injury."  *Id*. at 458.

Similarly, Ono's "reliance on the alleged misrepresentations [is] not typical of other class members."  Ono purportedly purchased his Head racket based "solely" on the representations that Andy Murray played with the racquet in competitive play.[13]  Ono did

---

[13] APPX. Ex. 45 at APPX501-02; APPX. Ex. 43 at 111:17-19, 125:16-126:16.

not look at *any* racket specifications; did not read any reviews for the racket; did not conduct any research; did not try the racket; and did not talk to any seller, coach, or other player about the racket.  APPX. Ex. 43 at 122:20-123:5, 128:19-129:24, 164:24-165:25.

This is *not* typical of how a consumer purchases a tennis racket.

**Redacted**

APPX. Ex. 53-1 at APPX621.              **Redacted**

Accordingly, only at most **Redacted** of consumers could possibly have been "'injured' in the manner alleged by Plaintiffs."  *Maybelline*, 300 F.R.D. at 454.

The industry studies concur.  The 2010 TIA report showed that professional use influenced new racket choices of only 3% of respondents.  APPX. Ex. 40 at APPX346.  In the 2011, 2012, 2013, and 2014 reports, endorsement was the *least* important factor to consumers when choosing a new racket.  APPX. Ex. 41 at APPX379, APPX. Ex. 46 at APPX516, APPX. Ex. 47 at APPX542, APPX. Ex. 48 at APPX561.  Similarly, in 2011, only 2% of survey respondents who switched brands cited use by top players as a reason for doing so.  APPX. Ex. 41 at APPX348.  These percentages are even lower than the 4% and 9% found insufficient for typicality in *Maybelline*.

Ono's atypical reliance on the alleged misrepresentation distinguishes this case from *Forcellati* (the case Ono primarily relies on).  *Forcellati* did not address the typicality of reliance on advertising misrepresentations.  Rather, plaintiffs argued that all homeopathic preparations are inherently worthless.  2014 WL 1410264, at *9-10.  Thus, the typicality of plaintiffs' children was irrelevant and immaterial to "prov[ing] the general inefficacy of homeopathy."  *Id*.

Ono purchased only one racket model and has not purchased any other Head "Tour" rackets, which are designed for different types of players and are promoted with different pros using distinct and specialized advertising claims.  *Weiner v. Dannon Co.*, 255 F.R.D.

658, 666 (C.D. Cal. 2009) ("In cases involving a variety of products, courts, emphasizing that different products have different functions and different consumers, have held that a named plaintiff that purchased a different product than that purchased by unnamed plaintiffs fails to satisfy the typicality requirement").  Ono moves to certify a class that purchased 24 unique racket models in 5 different lines (Extreme, Speed, Radical, Instinct, and Prestige) that have changed over the alleged class period.[14]  As explained in *Ahdoot v. Babolat*, Order Re: Motion to Dismiss 5, Dkt # 18, CV 13-02823 (C.D. Cal. Sept. 6, 2013) (alleging the same claims against another racket manufacturer) the suit "centers on the premise that the publicly available racquets differ from the ones used by the professional tennis player associated with that racquet," and "[i]t is therefore significant that '[t]he racquets … vary by size, weight, and composition, and are targeted at different players, categorized by experience, gender, and age." APPX. Ex. 57 at APPX959.  "They are specialized products and not just a generic racquet with different 'flavors.'" *Id*.[15]

Ono cites cases holding that plaintiff need not buy each product in the class "as long as the 'misrepresentations about the product[] are uniformly made across Defendants' product line.'" *Forcellati*, 2014 WL 1410264, at *10.  But where different products are advertised with distinct claims, typicality is not met. *Weiner*, 255 F.R.D. at 666 (refusing to certify a class of different dairy products with probiotic bacteria, advertised with allegedly false health benefits, where plaintiff only purchased one product); *Major v. Ocean Spray Cranberries, Inc.*, 12cv03067, 2013 WL 2558125, at *4 (N.D. Cal. June 10, 2013) ("demonstrative of Plaintiff's failure to meet the Rule 23(a) typicality requirement is the fact that the labels and nutrition claims on each of Defendant's products may be

---

[14]                                    **Redacted**


[15] The *Babolat* Court dismissed the complaint as to rackets not purchased for lack of Article III standing.  APPX. Ex. 57 at APPX959-60.  On Head's Article III motion, this Court held the "argument is better taken under the lens of typicality or adequacy of representation, rather than standing." Order, Dkt. # 59, May 21, 2014.

unique to that product itself").

Here, no misrepresentations were "uniformly" made across the Radical racket line alone, much less the two dozen different racket models spanning five different lines. Rather, purported class members were exposed to a variety[16] of distinct statements from different sources. Not only do the ad claims differ, but the level of customization of the rackets pros use in competition varies too. **Redacted**

APPX. Ex. 44 at APPX470-81.

The cases relied on by Ono are inapplicable because they involved (1) the same exact misrepresentations uniformly made on product labels or (2) products that had the exact same manufacturing defect. *Kashi*, 291 F.R.D. at 502 ("Plaintiff and class members … were all exposed to the same alleged misrepresentations on the packages and advertisements"); *Chavez*, 268 F.R.D. at 378 (challenged representations were "made on every Blue Sky container" and "plaintiff alleg[ed] that all the Blue Sky beverages bore substantially the same misrepresentations"); *Hewlett-Packard*, 167 Cal. App. 4th at 90 (same exact defect in laptop inverters causing dim displays)[17]; and *Wolin*, 617 F.3d at

---

[16] APPX. Ex. 38-8 at APPX285, "Maria and Novak know the right equipment gives them a competitive edge on the courts—that's why they play with HEAD racquets and Penn tennis balls"; APPX. Ex. 38-12 at APPX293, "Gilles Simon. Tommy Haas. YouTek Prestige. Take on Anybody—Anytime!"; APPX. Ex. 38-13 at APPX295, "Andy Murray. YouTek Radical Series."

[17] Ono violated the parties' meet-and-confer agreement that after receiving Head's portion of the joint brief Ono would only "provide [Ono's evidentiary] objections where appropriate," without substantively changing the brief. APPX753. Having received Head's portion of the brief, however, Ono made multiple last-minute substantive changes, including deleting cases that it had asserted earlier (e.g., the *Hewlett-Packard* case that Head distinguished in its section) and adding new, previously undisclosed evidence (e.g., footnote 20). As it has no other choice given the last-minute nature of Ono's conduct, Head will address these changes substantively in supplemental briefing.

28

1175 (all class members injured by the same "defective alignment geometry in the vehicles").

Ono's reliance on *Hinojos* (plaintiff alleged merchandise was falsely marketed as "on sale") is also misplaced. 718 F.3d at 1105. In *Hinojos*, the Ninth Circuit reversed the dismissal of a false advertising claim based on the district court test that limited false advertising to "composition, effects, origin and substance" claims. *Id.* at 1105-1107. In *dicta*, the Court described other potential false advertising claims that might be pled unrelated to "composition, effects, origin and substance," including endorsement claims. *Id.* Ono has pled such a claim, but this is not a motion to dismiss. The sufficiency of the pleadings is not at issue and *Hinojos* is silent as to whether plaintiff's understanding of and reliance upon the advertised "sale" was typical of the putative class. The Ninth Circuit did not hold that such a claim is capable of class certification, much less that an atypical plaintiff like Ono can satisfy the requirements of Rule 23.

## C.   Adequacy of Representation

### 1.   Plaintiff's Position:  Adequacy of Representation Is Satisfied by Plaintiff

During the meet and confer, the only challenge to adequacy raised by Head was based on Head's insinuation, without any evidence, that Plaintiff's testimony regarding his Tour-Line Racquet purchase is not credible. However, Head's feigned concerns are not sufficient to defeat Plaintiff's adequacy as a class representative. Only "[i]n rare circumstances, a plaintiff's lack of credibility may undermine his or her adequacy as a class representative. However, '[f]or an assault on the class representative's credibility to succeed, the party mounting the assault must demonstrate that there exists admissible evidence so severely undermining plaintiff's credibility that a fact finder might reasonably focus on plaintiff's credibility, to the detriment of the absent class members' claims.'" *Mendez et al. v. R+L Carriers, Inc. et al.*, 2012 U.S. Dist. LEXIS 165221, at *39 (N.D. Cal. Nov. 19, 2012) (quoting *Dubin v. Miller*, 132 F.R.D. 269, 272 (D. Colo. 1990)). Head has no evidence to support such a finding. There is no basis for the Court to

29

question Plaintiff's adequacy.

### 2.    Defendants' Position: Ono Is Not a Credible Class Representative

"The honesty and credibility of a class representative is a relevant consideration when performing the adequacy inquiry 'because an untrustworthy plaintiff could reduce the likelihood of prevailing on class claims.'"  *Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010)*; In re Computer Memories Secs. Litigation*, 111 F.R.D. 675, 682 (N.D. Cal. 1986) (stating that "it is self evident that a Court must be concerned with the integrity of individuals it designates as representatives for a large class of plaintiffs").  Based on the evidence, Head questions Ono's veracity regarding the critical issue of his purchase of the Youtek IG Radical Pro racket that gives him standing to pursue his case, including when and where he purchased the racket and whether he had knowledge of the issues presented in this case at the time of purchase.

Ono has no proof of when and where he bought his Radical Pro.  He claims he bought it for the full retail price of $180 in cash at the Indian Wells tournament and discarded his receipt.  APPX. Ex. 43 at 114:13-115:5.  He could have bought the racket at a discount from his employer.  *Id.* at 115:6-21.  And Ono, who knew Plaintiff's counsel from before buying his racket, claims he first learned that Murray did not play with the Youtek IG Radical Pro when he overheard a conversation between unidentified people at the tennis club.  *Id.* at 146:19-147:11.  But he has no proof whether that conversation took place before or after his alleged purchase.  Ono also claims to have purchased his racket without any need for it and, conveniently for this case, based solely on his belief Murray played with the exact same racket.  A jury could reasonably believe Ono made the purchase not based on any misrepresentations by Head, but simply to bring this case.  *See, e.g.*, *Buckland v. Threshold*, 155 Cal. App. 4th 798 (2007) (dismissing case where plaintiff's testimony showed that she purchased the product to bring a lawsuit).

### D.     Ascertainability
#### 1.        Plaintiff's Position:  Plaintiff's Proposed Class Is Ascertainable

A class is sufficiently ascertainable if "the proposed class definition allows
prospective plaintiffs to determine whether they are class members with a potential right
to recover." *Parkinson v. Hyundai Motor America*, 258 F.R.D. 580, 593-94 (C.D. Cal.
2008).  "While the identity of the class members need not be known at the time of
certification, the class definition must [be] 'definite enough so that it is administratively
feasible for the court to ascertain whether an individual is a member." *O'Connor v.
Boeing North American, Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998).

Here, as discussed above, Plaintiff's proposed class is defined as follows:

> All residents of California who purchased Tour-Line Racquets
> during the period of January 1, 2006, continuing through the
> date of final disposition of this action.

To confirm membership in the putative class, individuals need only determine if they
purchased a Tour-Line Racquet during the relevant time period.  This is enough to satisfy
Rule 23(a)'s implied ascertainability requirement.  *See McCrary v. Elations Co., LLC*,
2014 WL 1779243, at *8 (C.D. Cal. Jan. 13, 2014) (holding that the class was sufficiently
ascertainable because "the class definition clearly define[d] the characteristics of a class
member by providing a description of the allegedly offending product and the eligible
dates of purchase"); *Guido v. L'Oreal, USA, Inc.*, 2013 WL 3353857, at *18 (C.D. Cal.
July 1, 2013) (holding that the class was sufficiently ascertainable where "the requirement
for membership in the class [was] whether a consumer purchased a product after a
particular date").

Courts in the Ninth Circuit hold that self-identification of class members in
situations where there are a large group of injured retail consumers who purchased a
product and suffered a relatively small individual harm is appropriate and often the only
effective method available for justice.  As explained by Chief Judge King:

> [r]elying primarily on the Third Circuit's reasoning in *Carrera
> v. Bayer Corp.*, 727 F.3d 300 (4d Cir. 2013), [d]efendants
> contend that [because there are no records to confirm class
> membership, there is an] inability to feasibly ascertain the

31

identity (not the existence) of class members should preclude class certification because: (i) a self-identified class deprives [d]efendants of their due process rights to challenge individual members' claims; (ii) the finality of any judgment would be undermined because class members could later assert that fraudulent claims diluted their recovery; and (iii) the challenges in confirming class membership make a class action an inferior method of adjudicating this controversy. **We disagree. Given that facilitating small claims is "[t]he policy at the very core of the class action mechanism,"** ***Amchem products, Inc. v. Windsor*, 521 U.S. 591, 617, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997), we decline to follow *Carrera*. *See McCrary*, 2014 U.S. Dist. LEXIS 8443, at \*24 ("*Carrera* eviscerates low price consumer class actions in the Third Circuit . . . . While this may now be the law in the Third Circuit, it is not currently the law in the Ninth Circuit.").**

*Forcellati*, 2014 WL 1410264, at \*5 (emphasis added.)

Indeed, courts in this Circuit routinely certify classes consisting of purchasers of low-dollar consumer products, like the class proposed by Plaintiff here. *See*, *e.g.*, *McCrary*, 2014 WL 1779243, \*8-9 (rejecting the Third Circuit's holding in *Carrera*, and holding that a class of retail purchasers of an over-the-counter supplement, who did not have receipts, was sufficiently ascertainable); *Guido*, 2013 WL 3353857, at \*18-19 (class of purchasers of L'Oreal products, including those who did not have receipts, was "easily identifiable"); *Astiana*, 291 F.R.D. at 500 (rejecting proof of purchase requirement and finding class of purchasers of Kashi products labeled "Nothing Artificial" to be ascertainable); *Ries*, 287 F.R.D. at 535 (rejecting proof of purchase requirement and finding ascertainability satisfied where class members were permitted to self-identify purchases of Arizona iced tea with "natural" on the label); *Ziesel v. Diamond Foods, Inc.*, 2011 WL 222113, at \*6 (N.D. Cal. June 7, 2011) (rejecting proof of purchase requirement and finding class of purchasers of Shelled Walnut products to be ascertainable); *Chavez*, 268 F.R.D. at 377 (class of purchasers of beverage bearing disputed mark or brand was ascertainable).

Here, the class of racquet purchasers can be notified by records from online retailers and by publication to targeted sources designed to reach as many class members as

32

1   practicable.  In fact, in a similar case against another tennis racquet manufacturer, the

2   Hon. Virginia Phillips finally approved a $4.5 million settlement, which included a class

3   notice program based upon publication notice.  *See*, APPX. Ex. 58 at APPX973,

4   APPX988.

5               **2.    Defendants' Position: Ono Cannot Ascertain Class Membership**

6                                              **Redacted**

7               APPX. Ex. 38 at APPX264.  Head has no records to identify California racket

8   purchasers and Ono has not obtained this critical information.  Thus, Ono fails to propose

9   a manageable, objective, and fair way to ascertain class membership.  *In re Clorox*

10  *Consumer Litig.*, 301 F.R.D. 436, 440-42 (N.D. Cal. 2014).

11          Courts in the Ninth Circuit have declined to certify a class absent a viable way to

12  ascertain membership.  *See, e.g., In re POM Wonderful LLC*, No. 10-02199, 2014 WL

13  1225184, at *6 (C.D. CA March 25, 2014) ("no way to reliably determine who purchased

14  Defendant's products or when they did so"); *Sethavanish v. ZonePerfect Nutrition Co.*,

15  No. 12-2907, 2014 WL 580696 at *6 (N.D. Cal. Feb. 13, 2014) ("unclear how Plaintiff

16  intends to determine who purchased ZonePerfect bars ... [and] how Plaintiff intends to

17  weed out inaccurate or fraudulent claims"); *Hernandez v. Chipotle Mexican Grill, Inc.*,

18  No. 2:12-cv-05543, 2013 WL 6332002, at *2 (C.D. Cal. Dec. 2, 2013) ("very few people"

19  can provide information about when and where they purchased the product).[18]

20          Ono fails to show which retailers have sales records to California consumers from

21  which to identify class members.  This is critical.  Ono cannot testify precisely as to the

22  details of his own purchase.  Ono has identified no method to "confirm membership in the

23  putative class." *Sethavanish*, 2014 WL 580696 at *5 (requiring "method of identifying

24  absent class members").

25

26

27  _____

28  [18] This is not to suggest that no consumer class action can be certified.  The question
    before this Court is based on the facts of this case, including Ono's specific testimony.

This putative class cannot be identified via affidavit or testimony.[19]  The cases cited by Ono taking a different approach are unpersuasive where, as here, self-identification of class members has no indicia of accuracy.  Ono has no evidence proposed class members possess receipts for purchases made up to nine years ago.  It is unrealistic to assume they would.  Ono does not even have a receipt from a 2012 purchase.  During the class period, when similar cases were filed and publicized against Wilson and Babolat, Head added a disclaimer to its advertising addressing the idiosyncratic interpretation of its marketing advanced by Ono.  The purported "falsity" of player endorsements was publicly known years ago.  Ono has no way by which class members could identify with accuracy whether they purchased rackets before or after this information was publicly available.

## III.   THE REQUIREMENTS OF RULE 23(b)(3)

Plaintiff seeks certification under subsection Rule 23(b)(3).

### A.   Predominance

#### 1.   Plaintiff's Position:  Common Issues Predominate Regarding Plaintiff's Misrepresentation and Fraud Based Claims

Plaintiff's claims for violation of the CLRA, UCL, FAL, Fraud and Negligent Misrepresentation all require that the Plaintiff show that Head made false or misleading representations.  Whether Head's claim that Head's Paid Professionals actually played with the Tour-Line Racquets, is false, unfair, deceptive, or misleading to a reasonable consumer is the predominant question in this litigation.

Along with the press releases and articles described above, Head produced marketing for social media, point of sale posters and racquet inserts consistently conveying the same message.  (APPX. Ex. 35 (Sanders Decl. at ¶¶ 5.b, 14-19).)  **Redacted**

---

[19] *See Clorox*, 301 F.R.D. at 440 ("Affidavits from consumers alone are insufficient to identify members of the class."); *Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1089-90 (N.D. Cal. 2011) ("membership must be determinable from objective, rather than subjective, criteria"); *Rowden v. Pac. Parking Sys. Inc.*, 282 F.R.D. 581, 586 (C.D. Cal. 2012) (refusing to certify class who purchased parking with a credit card, where members would have to testify to prove membership via "tens of thousands of speculative testimonials about parking transactions occurring five years ago").

1

**Redacted**

2

3

4

5

    (APPX. Ex. 20 (Andy Murray Endorsement Agreement).)[20]

6

**Redacted**

7

8

    (APPX. Ex. 15 at PP. 104-105 (Petersman 151:7-152:9); Ex. 21 (list of

9

professional players and a corresponding retail racquet).)  Thus, Head has infected the

10

entire online and retail sales process with its misrepresentation.  In fact, Mason admitted

11

that                         **Redacted**

12

13

14

15

16

17

18

19

20

21

     . . .

22

---

23

[20] Moreover, in videos Head posts on YouTube as part of its marketing campaign, Murray refers to the Head Radical racquet and states:  "this is the launch of the new racquet I will be ***using*** next year" and "I've ***used*** the Radical for 12 years now." (www.youtube.com/watch?v=kAXT0O4wluU at 0:12 and 0:55 (last visited March 28, 2015).)  Similarly, Sharapova refers to the Head Instinct racquet and states: "you know, I have played with Instincts for a few years now."  (www.youtube.com/watch?v=a5Lh-sUQgDM at 0:16 and 1:20 (last visited March 28, 2015)) (The video also features a picture of Sharapova in a professional match with a racquet that is cosmetically painted to look like a Head Graphene XT Instinct, and it ends with the Head name and logo.)

24

25

26

27

28

35

**Redacted**

(APPX. Ex. 4 at PP. 83-85 (Mason Depo. at 198:13-200:14 (objections omitted)).)[21]

        **2.      Defendants' Position: Common Issues Do Not Predominate**

      The predominance criterion is demanding and rigorous.  *Comcast v. Behrend*, 133 S. Ct. 1426, 1432 (2013).  Certification is inappropriate if class members were exposed to "quite disparate" information.  *See Stearns,* 655 F.3d at 1020; APPX. Ex. 52 at APPX583. Ono attempts to circumvent his burden by claiming Head's advertising "consistently convey[ed] the same message."  But each of the 24 different "Tour" racquets (with variations based on model year) was advertised in different ways during the class period.

---

[21] *See also*, APPX. Ex. 22, exemplar online store product pages for Tour-Line Racquets containing misrepresentations that the Tour-Line Racquets are used by Head's Paid Professionals, from Tenniswarehouse.com, Amazon.com, Midwestsports.com, tennisexpress.com, racquetdepot.com, tennisplaza.com, tennis.com, fromuthtennis.com.

As in *Wilson*, potential "class members could have been exposed to one of many different kinds of allegedly deceptive information from a wide variety of sources." *Id.* The court denied certification holding that class members could have relied on input as varied as Wilson's catalog stating that the racket at issue was "Roger's personal choice," YouTube video stating that the racket was "actually the racquet of Roger Federer," or "merely seeing Federer play tennis with what appeared to be the BLX Pro Staff Six.One 90 racquet." APPX584. The same holding is warranted here. Common issues did not predominate in *Wilson* with one racket model endorsed by a single pro player. Here, Ono seeks to certify a class of 24 different racket models from five "Tour" lines, endorsed by at least 14 different pro players with differing degrees of customization over nine years.[22]

Head advertises each of its "Tour" racket lines differently. The Speed line "offers a stiffer feel for hard hitters with a long, fast swing style," the Extreme line "offers increased power and spin for players with an aggressive long swing style," the Instinct line "makes it easier to swing fast and hit powerful shots," the Prestige line is "[d]esigned for hard hitters with flat shots like Robin Söderling," and the Radical line is for those whose "playing style is unpredictable." APPX. Ex. 38-2, 38-3, 38-4, 38-5 at APPX272-79. Ono himself was purportedly exposed to different claims involving Murray and the Radical racket from various sources, i.e. two YouTube videos, an ad in *Tennis Magazine*, and various press releases.[23] While these ads show Murray endorsing a racket line, none of them represent that Murray plays with any of the depicted rackets in competition play.

To overcome the fact that individual issues predominate, Ono suggests that any athlete endorsement is *per se* misleading if the athlete does not use the specific product available at retail in competition play. Under this logic, Ono would have the Court believe pros use a $49.99 pre-strung Head IG tennis racket sold at Costco in championship

---

[22] Novak Djokovic, Andy Murray, Gilles Simon, Richard Gasquet, Marat Safin, Maria Sharapova, Tomas Berdych, Tommy Haas, Stan Wawrinka, Ivan Ljubicic, Michael Youzhney, Svetlana Kuznetsova, Amelie Mauresmo, and Robin Soderling.

[23] APPX. Ex. 43 at 157:4-158:18, 192:1-7, 231:24-232:1, 244:17-246:11.

play merely because pros are shown on retail point-of-sale material swinging the racket. *See* APPX. Ex. 51.  Moreover, the same exact argument was rejected in *Wilson* because, like Ono's claims, the plaintiff's claims there were "primarily based on misrepresentations rather than omissions i.e. whether Wilson misrepresented that Federer uses an identical racquet to the BLX Pro Staff Six.One 90 racquet available for sale to the public."  APPX. Ex. 52 at APPX585.  Even more so than in *Wilson*, individual issues predominate here, requiring the Court to "separately analyze which [] business practices were likely to deceive consumers and then individually determine which class members were exposed to potentially misleading or deceptive statements."  *Id.* at APPX584.

### 3.   Plaintiff's Position:  Whether Class Members Relied upon Head's Misrepresentations Is a Common Issue that Can Be Adjudicated on a Classwide Basis

At the core of Plaintiff's claims for violation of the CLRA, UCL, FAL, Fraud and Negligent Misrepresentation, Plaintiff must establish that Plaintiff and class members relied upon the misrepresentations made by Head's marketing scheme.  As discussed above, each of these claims, allows the Plaintiff to establish the element of reliance and causation by showing that the misrepresentations were "material."  *Forcellati*, 2014 WL 1410264, at *9 (*citing In re Tobacco II Cases*, 46 Cal. 4th at 312.); *In re Brazilian Blowout Litigation*, 2011 WL 10962891, at *8 ("reliance may be presumed as to the entire class if [d]efendant's misrepresentations or omissions were material.") (*citing Vasquez*, 4 Cal.3d at 814).

Critically, however, "[i]t is important to note that at this stage in the litigation, ***the issue is not whether the alleged misrepresentations were in fact material***.  The proper inquiry for class certification purposes is whether the plaintiff can use common proof to prove whether a misrepresentation [] is material."  *Krueger v. Wyeth, Inc.*, 2011 WL8791449, at *6 (S.D. Cal. Mar. 20, 2011) (emphasis added) (rejecting  argument that defendant's misrepresentation might not be material because a physician may have many patient-specific factors that make up his decision to prescribe the products at issue); *see also*, *McCrary*, 2014 WL 1779243 at *14 ("[A]t the class certification stage [p]laintiff

need not prove that the [defendant's misrepresentations] were material to all consumers of [the product] or that they relied on those claims.")   Materiality "is generally a question of fact unless the 'fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man could have been influenced by it.'"  *Ortega v. Natural Balance, Inc.,* 300 F.R.D. 422, 429 (C.D. Cal. 2014) (quoting *In re Tobacco II Cases*, 46 Cal.4th at 329).

Here, the common, classwide evidence of the materiality of the misrepresentations can be found in Head's own documents and testimony.[24]  As noted above, "[a] representation is 'material,' . . . if 'the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action.'"  *Hinojos*, 718 F.3d at 1107 (quoting *Kwikset Corp.*, 51 Cal. 4th at 330).  In this case, although the materiality of Head's misrepresentations need not be actually established at this stage, it cannot reasonably be disputed that Head believed that consumers of the Tour-Line Racquets were "likely to regard" Head's message that Head's Paid Professionals actually played with Tour-Line Racquets "as important in determining [their] choice of action" (*i.e.*, whether to purchase a Tour-Line Racquet).  *Id.*

**Redacted**

(APPX. Ex. 18 (Head definitional slide for "TOUR Consumer").)  Numerous other examples abound, confirming that Head had reason to know that consumers of its Tour-Line Racquets were likely to regard its misrepresentations as being important in determining whether to purchase Tour-Line Racquets.  (*See* APPX. Ex. 35 (Sanders Decl. at ¶¶ 5.a-b, 14-19).)

Moreover, in *Hinojos* the Ninth Circuit specifically identified "the same model of shoe worn by LeBron James" as an example of a material representation.  *Hinojos*, 718 F.3d at 1106.  "Try as it might, [Head] cannot evade the unmistakable fact that the

[24] There can be no dispute that Plaintiff relied on the advertisements -- he testified that he purchased the Radical Pro because, based on Head's misrepresentations, he thought that Andy Murray played with it.  (APPX. Ex. 19 at P. 115 (Ono Depo. at 112:2-21).)

objective-and realization-of its marketing campaign was to present [the Tour-Line Racquets to] consumers as a product that [was actually used by Head's Paid Professionals in competition]" to increase sales.  *Johnson*, 275 F.R.D. at 298 (C.D. Cal. 2011) (quoting *Fitzpatrick*, 263 F.R.D. at 697).

Because the test for materiality and thus, reliance, is to be decided by the trier of fact using an objective, reasonable person test, Plaintiff's claims are ideally suited for class treatment.  *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. 2012) ("This objective test renders claims under the UCL, FAL, and CLRA ideal for class certification because they will not require the court to investigate 'class members' individual interaction with the product.'") (quoting *Bruno v. Quten Research Inst*., LLC, 280 F.R.D. 524, 535 (C.D. Cal. 2011)).  There is more than enough evidence to establish that a trier of fact could determine that Head's marketing message was uniform, intended to deceive and could be reasonably relied upon by consumers.  (*See* APPX. Ex. 35 (Sanders Decl. at ¶¶ 5, 10-25).)

### 4.    Defendants' Position: Reliance Is an Individualized Inquiry

Certification is inappropriate when reliance and materiality vary in the class.[25] Reliance or materiality vary if consumers are exposed to and interpret advertisements at issue in different ways or if a variety of factors motivate their purchasing decisions.[26]

Ono relies on internal Head emails to suggest that all consumers necessarily relied

---

[25] *Moheb v. Nutramax Labs. Inc.*, No. CV 12-3633-JFW JCX, 2012 WL 6951904, at *7 (C.D. Cal. Sept. 4, 2012) (denying class certification where "issues of reliance and injury require individualized inquiry."); *Hodes v. Van's Int'l Foods*, No. CV 09-01530 RGK (FFMx), 2009 WL 2424214 (C.D.Cal. July 23, 2009) ("Courts in the Ninth Circuit and in California have regularly found that where [individualized purchasing] inquiries predominate over common questions of law or fact, courts may refuse to certify a class action.").

[26] *Maybelline*, 300 F.R.D. at 459 (relying on survey evidence of consumers' differing product performance expectations and wide variety of factors motivating their purchase decisions to deny class certification); *Kashi*, 291 F.R.D. at 508-09 (denying class certification because consumers' perception of "all natural" varied, thus necessitating an individualized inquiry into materiality and reliance).

40

upon professional player endorsements because Head intended them to do so.  Ono's reliance is misplaced.  First, this is a non-sequitor.  The desires of Head employees are distinct from consumer decisions.  Second, the emails plainly state          **Redacted**

**Redacted**

APPX. Ex. 4 at APPX86; APPX. Ex. 55 at APPX720-21.  This is not the basis for Ono's complaint.  Ono's claim is specifically that consumers believed the exact racket they purchased at retail was used by professionals in competition.

Moreover, common issues of fact regarding reliance and materiality cannot predominate for Ono's proposed class of purchasers of unstrung "tour" rackets because a buyer must necessarily customize the racquet by selecting strings and stringing the racquet to a personalized tension preference—strings and string tension selections affect a racket's playability significantly.  APPX. Ex. 38 at APPX265.  Ono, who does not know the type of strings Murray uses, ensured he played with a racket different from Murray's by stringing his YouTek IG Radical Pro with strings his dad had "laying around," and choosing a "random" tension.  APPX. Ex. 43 at 81:10-83:13, 130:11-25, 161:14-16.  Other class members would also make highly individualized decisions in selecting racket strings and tensions.

Not only were consumers exposed to a wide variety of advertising claims, but Ono presents no evidence as to whether or how consumers would uniformly interpret Head's endorsement claims (e.g., that Murray plays with a YouTek IG Radical Pro).  Ono's lack of evidence on this defeats class certification.  *Kashi*, 291 F.R.D. at 508 (denying class certification for products with certain ingredients "absent stronger evidence as to what consumers perceived or what they would find material").  Most significantly, the class-wide evidence before the Court—the surveys and other evidence introduced by Head—establishes that the questioned representations are immaterial and not common.  Ono cannot show that all potential class members "have both actual injury and show that the injury was caused by the challenged practice."  *Berger v. Home Depot USA, Inc.*, 741 F.3d

41

1061, 1069 (9th Cir. 2014).  Ono thus cannot certify a class for his CLRA, UCL, or FAL claims.[27]

### 5. Plaintiff's Position:  Exposure of Class Members to Head's Marketing Can Be Demonstrated with Common Proof

Head contends that, notwithstanding the above, consumers of the Tour-Line Racquets could not have relied on Head's material misrepresentations because there is no evidence that they were exposed to Head's misrepresentations.  But, Head's contention is belied by the facts.  Plaintiff's experts, Cameron R. Azari and Bill J. Sanders, explain that given nature of Head's communications campaign, consumers of the Tour-Line Racquets were exposed to Head's misrepresentations -- and multiple times.  (APPX. Ex. 36 (Azari Decl. at ¶¶ 21-25); Ex. 35 (Sanders Decl. at ¶¶ 5.c, 20-25).)

Additionally, Head's lengthy, widespread, and decades-long campaign of misinformation provides an *independent* ground to establish that members of the Class were exposed to Head's misrepresentations.  *In re Tobacco II Cases*, 46 Cal.4th at 328 (Plaintiff "is not required to necessarily plead and prove individualized reliance on specific misrepresentations or false statements where, as here, those misrepresentations and false statements were part of an extensive and long-term advertising campaign."); *see also*, *Opperman v. Path Inc.*, 2014 WL 1973378, *16 (N.D. Cal. May 14, 2014) (collecting cases and explaining that "[h]ow long and how extensive the advertising campaign must be is a fact-intensive inquiry").  Here, it cannot reasonably be disputed that the campaign at issue was sufficiently extensive and long-term.  (APPX. Ex. 15 at PP. 106-107 (Petersman Depo. at 173:23-174:6          **Redacted**

*see also*, (Ex. 36 Azari Decl. at ¶¶ 15-19; and Ex. 35 Sanders Decl. at ¶¶ 14-25 (discussing the

---

[27] Ono's fraud, negligent misrepresentation, breach of express warranty and unjust enrichment claims are pled only on behalf of a nationwide subclass.  There are no grounds for certifying a nationwide subclass and Ono has not moved to do so.

extensive nature of Head's campaign)); (APPX. Exs. 3,5-13, 29 (exemplar Head press releases and advertisements containing the misrepresentations at issue).)

### 6. Defendants' Position: It Is Unreasonable to Assume That All Class Members Were Exposed to the Advertising Statements at Issue

#### a. Plaintiff Improperly Relies on *Tobacco II*

Plaintiff mistakenly relies on *In re Tobacco II Cases* to argue that Head's "lengthy, widespread, and decades-long campaign of mis-information" means all class members were exposed to the ads at issue.

The inference of exposure articulated in *Tobacco II* is appropriate where the ads at issue are "similar enough to be considered as part of one campaign, or the delivery of a single message or set of messages, rather than a disparate set of advertising content published in the ordinary course of commerce." *Opperman*, 2014 WL 1973378, at *17. Head, like other tennis companies, uses market segmentation and product differentiation to advertise its products.  APPX. Ex. 55 at APPX713-14; APPX. Ex. 38 at APPX264. Head helps consumers self-identify which market/product segment they fall into with the "What's your game?" tool, which asks consumers for seven pieces of information before suggesting certain racket models.  APPX. Ex. 49.  Rather than conveying a *single* message, Head touts the various and "disparate" attributes of each Tour racket line.

Here, Ono claims a single message—Andy Murray's use of the racket—influenced his decision to buy the YouTek IG Radical Pro.[28]  But Head did not associate Murray with the YouTek <u>IG</u> Radical Pro until January 2012, only two months before Ono allegedly

---

[28] APPX. Ex. 45 at APPX501-02; APPX. Ex. 43 at 111:17-19, 125:16-126:16.  Though Ono cannot consistently identify the precise racket he purchased, the complaint and interrogatory responses list it as the YouTek IG Radical Pro, but in deposition Ono referred to the racket he bought as simply "Radical Pro," undifferentiating the YouTek Radical Pro, YouTek IG Radical Pro, Graphene Radical Pro, etc.  Indeed, Ono testified that he did know of an IG Radical Pro and believed he did not own one.  APPX. Ex. 43 at 188:7-23.  Even in this brief, Ono claims he bought a YouTek Radical Pro not a YouTek IG Radical Pro.

bought his racket.[29]  A two-month advertising stint is not the type of "massive" or "long-standing" advertising campaign that would allow Ono to establish that class members were exposed to Head's alleged misrepresentations.  *In re iPhone 4S Consumer Litig.*, No. C 12-1127, 2013 WL 3829653, at *12 (N.D. Cal. July 23, 2013) (six month advertising campaign not "comparable to that at issue in *Tobacco II*.").

> b.   It Is Unreasonable to Assume That Class Members Were Exposed to the Advertising Ono Relied on

Ono must show that class members were "actually exposed" to the advertisements at issue.  *Berger*, 741 F.3d at 1068; *Mazza*, 666 F.3d at 596 ("[i]n the absence of the kind of massive advertising campaign at issue in *Tobacco II*, the relevant class must be defined in such a way as to include only members who were exposed to [the allegedly misleading advertisements].").  Yet Ono himself struggles to recall the ads he relied on in purchasing his racket.  He claims he saw one ad while casually flipping through an issue of *Tennis Magazine* in a bookstore in 2012 or "possibly in 2011," some press releases on Head's website, and two YouTube videos.  APPX. Ex. 43 at 157:4-158:18.  In deposition, Ono could not identify which ad he saw in *Tennis Magazine*.  Head placed three different advertisements featuring Andy Murray in *Tennis Magazine* in 2011-2012.  APPX. Ex. 38-22, 38-23, 38-24.  One advertised the YouTek Radical Pro, rather than the YouTek IG Radical Pro, and the other two promoted the YouTek IG Radical series generally.  *Id.*  One of the YouTube videos Ono saw discusses the "Head YouTek Radical," not the YouTek IG Radical Pro; the other shows Murray discussing the "Radical" racquet.  APPX. Ex. 50.  These two videos were each viewed less than 20,000 times *worldwide*.  *Id.*

Ono claims he saw a dozen Head press releases before purchasing his racket.  APPX. Ex. 38-21; APPX. Ex. 43 at 231:24-232:1.  All but one involve racket models *other* than the model Ono bought.  Few, if any, prospective class members have been exposed to these releases as most of the releases in  **Redacted**

APPX. Ex. 38 at APPX268.

---

[29] APPX. Ex. 38 at APPX268; APPX. Ex. 45 at APPX502.

For the reasons further detailed in the report of Head's expert, Dr. Larry Chiagouris, it is "unreasonable" to assume that all class members were exposed to the same advertising Ono relied on in purchasing his racket.  *Mazza*, 666 F.3d at 594-96.  APPX. Ex. 55 at APPX714, APPX718-19.  As a result, common issues do not predominate and class certification fails.  *Id*.  *See also*, *Berger*, 741 F.3d at 1069.

### B.   Damages

#### 1.   Plaintiff's Position:  Plaintiff's Damages Model Satisfies the *Comcast* Standard[30]

In order to establish predominance under Rule 23(b)(3), Plaintiff is required to show that "damages are capable of measurement on a classwide basis."  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013).  However, "so long as the damages can be determined and attributed to . . . [P]laintiff's theory of liability, damage calculations for individual class members do not defeat certification."  *Lindell v. Synthes USA*, 2014 WL 841738, at \*14 (E.D. Cal. Mar. 4, 2014); *see also*, *Johns*, 280 F.R.D. at 555 ("The amount of damages is invariably an individual question and does not defeat class action treatment.")  Here, Plaintiff presents two damages models to support his claims.  (*See* APPX. Ex. 37 (Declaration of Colin Weir in Support of Plaintiff's Motion for Class Certification ("Weir Decl.")).)  In his report, Plaintiff's damages expert, Mr. Colin Weir, presents a well-accepted economic analysis of information from Head's production to determine that he is able to calculate each putative class members damages on a per racquet model basis.  These damages calculations are based on reliable, common facts and the application of sound economic principles to those facts.

Specifically, with respect to Plaintiff's CLRA, UCL, FAL, and Unjust Enrichment claims, Plaintiff presents a restitutionary disgorgement model.  In this case, Plaintiff contends, among other things, that "[b]ut for Head's misrepresentations, Plaintiff and

---

[30] Defendant's expert report of Schoettelkotte is irrelevant and lacks foundation.  Fed. R. Evid. 401, 403, and 901(a).  Moreover, Schoettelkotte not qualified to offer expert opinions on each of the topics for which he provides an opinion.  Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579 (1993).

45

members of the Class would not have purchased" the Tour-Line Racquets.  (First Amended Complaint at ¶ 35); *see also*, *FTC v. Figgie Int'l*, 994 F.2d 595, 606 (9th Cir. 1993) ("The seller's misrepresentations tainted the customers' purchasing decisions.  If they had been told the truth, perhaps they would not have bought [the products at issue] at all or only some. . . . The fraud in the selling, not the value of the thing sold, is what entitles consumers in this case to full refunds . . .")

Accordingly, under Plaintiff's restitutionary disgorgement model, Plaintiff seeks to return the parties to the position they would have been in had Plaintiff and the members of the Class not purchased the Tour-Line Racquets.  *Fletcher v. Security Pacific National Bank*, 123 Cal.3d 442, 454 (1979) ("A court of equity may exercise its full range of powers in order to accomplish complete justice between the parties, restoring if necessary the *status quo ante* as nearly as may be achieved.")  By subtracting from the retail sales price Head's cost of goods sold and the retailer's added charge (including profit), Plaintiff's model puts Head in the position it would have been in had it not made the racquet sold to Plaintiff or the members of the Class and it returns to Plaintiff Head's operational profits from the sale of the racquets, while controlling for the value Plaintiff received for the racquets (the cost of the racquet and the retail markup).  (*See* APPX. Ex. 37 (Weir Decl. at ¶¶ 22-25)); *see also*, *Corbett v. Sup. Ct.*, 101 Cal. App. 4th 649, 671 (2002) ("allowing the defendants to retain any portion of their illicit profits would impair the full impact of the deterrent force that is essential if adequate enforcement of the UCL is to be achieved") (internal citations and quotations omitted); *Guido*, 2013 WL 3353857, at *13 ("The form of restitutionary relief authorized by California law has two purposes: returning money unjustly taken from the class, and deterring the defendant from engaging in future violations of the law."); *County of San Bernardino v. Walsh*, 158 Cal.App.4th 533, 542 (2007) ("The emphasis is on the wrongdoer's enrichment, not the victim's loss. . . . Without this result, there would be an insufficient deterrent to improper conduct that is more profitable than lawful conduct.").

With respect to Plaintiff's Fraud, Negligent Misrepresentation, and Breach of Express Warranty claims, Plaintiff presents a benefit-of-the-bargain damages model. Plaintiff and the members of the Class allege that they purchased Tour-Line Racquets that Head represented were the racquets actually used in competition by Head's Paid Professionals.  Plaintiff and the members of the Class are entitled to receive what they were promised -- *i.e.*, the benefit-of-the-bargain.  This litigation revealed that, contrary to Head's promise, the Tour-Line Racquets sold to Plaintiff and the Class were not the racquets actually used by Head's Paid Professionals because Head's Paid Professionals actually use custom made racquets, which were not available to the public.  However, since this lawsuit was filed, Head announced its "Custom Made" program, which, for the first time, allows consumers to have a racquet custom made to the specifications of one of Head's Paid Professionals.  Plaintiff's benefit-of-the-bargain model takes the cost of what Plaintiff and members of the Class bargained for (a racquet custom made to the specifications of one of Head's Paid Professionals) and subtracts the price they already paid for Tour-Line racquets.  (*See* APPX. Ex. 37 (Weir Decl. at ¶¶ 14-21).)

## 2.    Defendants' Position: Ono's Damages Model Is Fatally Flawed

"[A] court can certify a Rule 23(b)(3) class only if there is evidence demonstrating the existence of a classwide method of awarding relief that is consistent with the plaintiffs' theory of liability."[31]  Plaintiff must show that the damages "stem[] from the defendant's actions that created the legal liability."[32]  The proper measure of restitution in consumer fraud is "the difference between the product as labeled and the product as

---

[31] *Astiana v. Ben & Jerry's Homemade, Inc.*, No. C 10-4387, 2014 WL 60097, at *12 (N.D. Cal. Jan. 7, 2014) (citing *Forrand v. Federal Exp. Corp.*, No. CV 08–1360, 2013 WL 1793951, at *3 (C.D.Cal. Apr. 25, 2013)).

[32] *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (citing *Comcast*, 133 S. Ct. at 1435).

1  received."[33]

2      Ono does not provide a method for calculating this difference, as it is impossible to

3  tell what value, if any, consumers placed on each athlete's endorsement.  Nor can Ono

4  attribute any price difference to Head's actions because no such difference exists.  Head

5  has never charged a premium for rackets that are the subject of Ono's claims versus other

6  models in its tour lines.                          **Redacted**

7

8

9                          APPX. Ex. 42 at APPX390.  Tour line

10 rackets generally sell at higher price points than pre-strung rackets for several reasons,

11 including improved technology, construction methods, and manufacturing costs.

12 *Maybelline*, 300 F.R.D. at 460 (denying certification because the court could "fathom a

13 number of reasons why" the cosmetic products were priced as they were, including colors

14 offered and research and development costs).  Retail prices of "Tour" rackets vary

15 substantially among retailers and damages are not measurable on a classwide basis.

16 *Astiana*, 2014 WL 60097, at *12 (denying certification because defendant was not the

17 retailer who set prices and plaintiff did not offer any evidence that products marketed as

18 "all natural" were priced higher).[34]

19      As detailed further in the report of Head's damages expert, Todd Schoettelkotte,

20 Ono's comparison to Head's custom made program is misplaced because Ono knew he

21 was purchasing a mass-produced racket, not a significantly more expensive unique racket

22 made to his personal specifications.  APPX. Ex. 54 at APPX685-87.  More importantly,

23 ─────────────

24 [33] *Werdebaugh v. Blue Diamond Growers*, No. 12-CV-02724, 2014 WL 7148923, at *8
   (N.D. Cal. Dec. 15, 2014) (citing *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App 4th
25 663, 700 (2006)).

26 [34] Ono's benefit-of-the-bargain model for fraud, negligent misrepresentation, and breach
   of warranty is irrelevant since those claims were not pled on behalf of the California class.
27 It also is flawed in assuming consumers bargained for and did not receive custom rackets
   because the rackets were not advertised as custom made.
28

1   Ono only paid $180, not the $400 charged for a custom racket.  Hence, the difference

2   between the value of the custom racket and the one Ono actually received is irrelevant

3   because Ono did not pay that difference and did not received a product of less value than

4   what he paid.  *Id.*

5        Ono's disgorgement theory is equally flawed because his expert did not compute

6   the difference in value of the racket Ono received against a comparative racket he could

7   purchase from a manufacturer that did not implement a marketing campaign that he finds

8   to be deceptive.  The value of the racket he received cannot be based on a manufacturer's

9   cost of goods and a retail mark up, as the value of the racket must incorporate, at

10  minimum, all costs associated with manufacturing, distributing, and selling the product.

11  Moreover, the disgorgement theory is based on the assumption that all class members

12  would not have purchased a Head racket had they known "the truth," but the evidence

13  clearly establishes that assumption to be incorrect because most purchasers do not care

14  about athlete endorsements of specific products.  *Id.* at APPX687-88.

15      **C.    Superiority**

16          **1.    Plaintiff's Position:  A Class Action Is the Superior Method of
                    Adjudication**

17

18  Rule 23(b)(3)'s superiority requirement tests whether "classwide litigation of

19  common issues will reduce litigation costs and promote greater efficiency."  *Valentino v.*

20  *Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996); *Astiana*, 291 F.R.D. at 507

21  ("Here, it would not be economically feasible to obtain relief for each class member given

22  the small size of each class member's claim.  Accordingly, the Court finds that [a] class

23  action is clearly superior to ensure a fair and efficient adjudication of the present action.")

24      Courts evaluating superiority look to four non-exclusive factors:  "(1) the interest of

25  each class member in individually controlling the prosecution or defense of separate

26  actions; (2) the extent and nature of any litigation concerning the controversy already

27  commenced by or against the class; (3) the desirability of concentrating the litigation of

28  the claims in a particular forum; and (4) the difficulties likely to be encountered in the

management of a class action." *Keegan v. Amer. Honda Motor Co., Inc.*, 284 F.R.D. 504, 549 (C.D. Cal. 2012).

Where, as here, the "damages suffered by each putative class member are not large, this factor weighs in favor of certifying a class action." *Zinser*, 253 F.3d at 1190; *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 671 (C.D. Cal. 2014). Additionally, given that there are no other cases challenging Head's marketing practices, there is no "threat of multiplicity" or "risk of inconsistent adjudications" in proceeding as a class action. *Zinser*, 253 F.3d at 1191. Additionally, because the proposed class involves only California purchasers of the Tour-Line Racquets, there can be no real dispute that it is appropriate to concentrate the litigation in this Court. *See* Fed. R. Civ. P. 23(b)(3)(C). Finally, analysis of the fourth factor confirms the superiority of class litigation here. Resolution of the predominate legal issues will be driven by an overriding common question -- *i.e.*, whether the misrepresentations made by Head are material to an objective reasonable consumer.

### 2.   Defendants' Position: The Proposed Class Is Not Manageable

Manageability analysis "requires consideration of the potential difficulties in notifying class members of the suit, calculation of individual damages, and distribution of damages." *Moheb*, 2012 WL 6951904, at *8. Given the lack of common questions, atypical class representative, predominance of individual issues, inability to ascertain or identify class members, impossibility of calculating damages, and the need to consider different advertising across at least five different racket lines and 24 distinct racket models (within each the characteristics, marketing, and athlete association has differed over the nine-year class period), a class action is unmanageable and not a superior method of adjudication here. *Maybelline*, 300 F.R.D. at 461.

### IV.   CONCLUSION

For the foregoing reasons, subject to supplemental briefing due on June 4, 2015, the parties submit their respective positions.

1  DATED:  May 15, 2015                    BARON & BUDD, P.C.

2                                     By:  /s/Mark Pifko
3                                          Mark Pifko

4                                          Daniel Alberstone (SBN 105275)
5                                          dalberstone@baronbudd.com
                                           Mark Pifko (SBN 228412)
6                                          mpifko@baronbudd.com
7                                          Evan Zucker (SBN 266702)
                                           ezucker@baronbudd.com
8                                          BARON & BUDD, P.C.
9                                          15910 Ventura Boulevard, Suite 1600
                                           Encino, California  91436
10                                         Attorneys for Plaintiff

11
                                           RUSSELL MINORU ONO, individually,
12                                         and on behalf of other members of the
13                                         general public similarly situated

14
15                                         Douglas A. Rettew (*pro hac vice*)
                                           Danny M. Awdeh (*pro hac vice*)
16                                         Anna Balishina Naydonov (*pro hac vice*)
17                                         FINNEGAN, HENDERSON,
                                           FARABOW, GARRETT & DUNNER,
18                                         L.L.P.
19                                         901 New York Avenue NW
                                           Washington DC 20001
20                                         Telephone: 202.408.4000
                                           Facsimile: 202.408.4400
21
22                                         MICHAEL L. MALLOW (SBN 188745)
                                           mmallow@sidley.com
23                                         SIDLEY AUSTIN LLP
                                           555 West Fifth Street
24                                         Los Angeles, CA  90013
25                                         Telephone: 213.896.6666

26                                         HEAD USA, INC.
27
28
                                      51