Michael L. Mallow (SBN 188745)
mmallow@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
T: (213) 896-6000/F: (213) 896-6600

Douglas A. Rettew (*Pro Hac Vice*)
Doug.rettew@finnegan.com
Danny M. Awdeh (*Pro Hac Vice*)
Danny.awdeh@finnegan
Anna B. Naydonov (*Pro Hac Vice*)
Anna.naydonov@finnegan.com
FINNEGAN, HENDERSON,
FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue, N.W.
Washington, D.C. 20001
T: (202) 408-4000/F: (202) 408-4400

Morgan E. Smith (SBN 293503)
Morgan.smith@finnegan.com
FINNEGAN, HENDERSON,
FARABOW,
  GARRETT & DUNNER, LLP
3300 Hillview Avenue
Palo Alto, CA 94304
T: (650) 849-6600/F: (650) 849-6666

Attorneys for Defendant, HEAD USA,
INC.

[ADDITIONAL COUNSEL LISTED ON
SIGNATURE BLOCK]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| RUSSELL MINORU ONO,<br><br>Plaintiff,<br><br>vs.<br><br>HEAD RACQUET SPORTS USA, a corporation organized and existing under the laws of the State of Delaware, and HEAD USA, INC., a corporation organized and existing under the laws of the State of Delaware,<br><br>Defendants. | Case No.: 2:13-cv-04222-FMO-(AGRx)<br><br>**JOINT BRIEF RE: SUMMARY JUDGMENT**<br><br>[Filed Concurrently with Statement of Uncontroverted Facts; Evidentiary Appendix in Support Thereof]<br><br>Judge: Hon. Fernando M. Olguin<br>Location: Courtroom 22 – 5th Floor<br>312 North Spring Street<br>Los Angeles, CA 90012<br>Date: July 14, 2016<br>Time: 10:00 a.m. |

1 | **TO THE HONORABLE COURT, ALL PARTIES, AND THEIR ATTORNEYS**
2 | **OF RECORD:**

3 | Please take notice that on July 14, 2016 at 10:00 a.m. Defendant Head USA,

4 | Inc. will and hereby does move this Court for an order granting summary judgment in

5 | Head's favor on all of Ono's asserted claims, including his CLRA, UCL, FAL, fraud,

6 | negligent misrepresentation, breach of express warranty, and unjust enrichment

7 | claims.

8 | This joint brief is filed under Rule 56 of the Federal Rules of Civil Procedure

9 | and the Court's March 16, 2016 Orders (Dkt. 151, 152).  It is based on this notice; the

10 | memorandum of points and authorities; the Evidentiary Appendix, Declarations, and

11 | Statement of Uncontroverted Facts filed in connection therewith; and the complete

12 | files and records in this action.

13 | Dated:   May 06, 2016

14 |

15 | BARON & BUDD, P.C.                           SIDLEY AUSTIN LLP

16 | By:   _/s/ Daniel Alberstone_              By:   _/s/ Michael L. Mallow*_
17 |         Daniel Alberstone                          Michael L. Mallow

18 | Daniel Alberstone (SBN 105275)            Attorneys for HEAD USA, INC.
      dalberstone@baronbudd.com
19 | Mark Pifko (SBN 228412)
      mpifko@baronbudd.com
20 | Evan Zucker (SBN 266702)
      ezucker@baronbudd.com
21 | BARON & BUDD, P.C.
22 | 15910 Ventura Boulevard, Suite 1600
23 | Encino, California  91436

24 |
      Attorneys for Plaintiff, RUSSELL
25 | MINORU ONO

26 |

27 | * Filer attests that all signatories listed, and on whose behalf the filing is submitted,
      concur in the filing's content and have authorized the filing.

28 |

i

# **TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................ 1

    A.    Defendants' Introduction .................................................. 1

    B.    Plaintiff's Introduction ..................................................... 3

II.   RELEVANT BACKGROUND FACTS ........................................ 7

    A.    Defendants' Statement of Facts ........................................ 7

    B.    Plaintiff's Statement of Facts ......................................... 13

III.  HEAD IS ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS 17

    A.    Ono Lacks Standing to Pursue Any of His Claims ........... 17

        1.    Defendants' Position: Ono's Monetary Damages Claim Is Moot ........................................................................ 17

        2.    Plaintiff's Position ................................................. 19

        3.    Defendants' Position: Ono's Request for Attorneys' Fees and Costs Does Not Constitute "Damage" or Preclude Summary Judgment ................................................ 23

        4.    Plaintiff's Position ................................................. 25

    B.    Ono Is Not Entitled to Seek Prospective Injunctive Relief ................ 25

        1.    Defendants' Position: Ono Lacks Standing to Pursue His Prospective Injunctive Relief Claim as to Any Rackets .......... 25

        2.    Plaintiff's Position ................................................. 28

        3.    Defendants' Position: Even If the Court Allows Ono's Prospective Injunctive Relief Claim to Proceed, It Is Limited to the One Specific Racket Model Ono Purchased ................ 33

        4.    Plaintiff's Position ................................................. 34

    C.    Ono Lacks Evidence of "Essential Elements" of His Claims ............. 36

        1.    Defendants' Position: Ono Has No Evidence He Was Exposed to Head's Advertising Involving the YouTek IG Radical Pro Before Purchasing the Racket .............................. 36

        2.    Plaintiff's Position ................................................. 40

        3.    Defendants' Position: Ono Has Provided No Evidence That a Reasonable Consumer Would Be Misled by Head's Advertising ............................................................ 45

        4.    Plaintiff's Position ................................................. 47

IV.   CONCLUSION ................................................................................................51

# <u>TABLE OF AUTHORITIES</u>

**Federal Cases**                                                                       **Page(s)**

*Algarin v. Maybelline, LLC,*
    300 F.R.D. 444 (S.D. Cal. 2014), *appeal dismissed*, 775 F.3d 1444
    (9th Cir. 2014) .................................................................................. 26, 27

*Bates v. United Parcel Serv., Inc.,*
    511 F.3d 974 (9th Cir. 2007) ................................................................. 25

*Bates v. United Parcel Service, Inc.,*
    511F.3d 974 (9th Cir. 2007) ................................................................. 21

*Berger v. Home Depot USA, Inc.,*
    741 F.3d 1061 (9th Cir. 2014) ............................................................... 36

*Brazil v. Dole Packaged Foods, LLC,*
    No. 12-CV-01831-LHK, 2014 WL 6901867 (N.D. Cal. Dec. 8, 2014)................. 46

*Bresgal v. Brock,*
    843 F.2d 1163 (9th Cir. 1987) ......................................................... 29, 35

*Cabral v. Supple, LLC*
    Case No. EDCV-12-00085-MWF-OP.................................... 18, 22, 24

*Campbell-Ewald Co. v. Gomez,*
    136 S.Ct. 663 (2016)....................................................................... 19, 20

*Campion v. Old Rep. Home Protection Co.,*
    861 F. Supp. 2d 1139 (S.D. Cal. 2012) ................................................ 26

*Chafin v. Chafin,*
    133 S.Ct. 1017 (2013)............................................................................ 22

*Chen v. Allstate Ins. Co.,*
    --- F.3d ---, 2016 WL 1425869 (9th Cir. Apr. 12, 2016) ................... 20, 22

*Church of Scientology v. United States,*
    506 U.S. 9 (1992)................................................................................... 20

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983).......................................................................... 25, 27

*Clapper v. Amnesty Int'l USA,*
    133 S.Ct. 1138, n. 5 (2013) ...................................................................... 21, 25, 27

*Clemens v. DaimlerChrysler Corp.,*
    534 F.3d 1017 (9th Cir. 2008) ................................................................. 46

*Cordon v. Wachovia Mortg., a Div. of Wells Fargo Bank, N.A.,*
    776 F. Supp. 2d 1029 (N.D. Cal. 2011) ................................................. 24

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993) ................................................................... 5, 14, 16

*Davidson v. Kimberly-Clark Corp.,*
    76 F. Supp. 3d 964, 969 (N.D. Cal. 2014) ............................................ 26

*Delarosa v. Boiron, Inc.,*
    No. SACV 10-1569-JST, 2012 WL 8716658 (C.D. Cal. Dec. 28,
    2012) ................................................................................................... 26

*Easyriders Freedom F.I.G.H.T v. Hannigan,*
    92 F.3d 1486 .................................................................................... 29, 35

*Fortyune v. American Multi-Cinema, Inc.,*
    2002 WL 32985838 (C.D. Cal. Oct. 22, 2002) ..................................... 33

*Girard v. Toyota Motor Sales, U.S.A., Inc.,*
    316 F. App'x 561 (9th Cir. 2008) .......................................................... 45

*Granfield v. NVIDIA Corp.,*
    No. C 11-05403 JW, 2012 WL 2847575 (N.D. Cal. July 11, 2012) ...... 36

*Hinojos v. Kohl's Corp.,*
    718 F.3d 1098 (9th Cir. 2013) ............................................................ 5, 49

*Hrivnak v. NCO Portfolio Mgmt., Inc.,*
    719 F.3d 564 (9th Cir. 2013) ................................................................. 23

*Knox v. Service Employees,*
    132 S.Ct. 2277 (2012) ........................................................................... 21

*Larsen v. Trader Joe's Co.,*
    No. C 11-05188 SI, 2012 WL 5458396 (N.D. Cal. June 14, 2012) ........ 36

*Lewis v. Cont'l Bank Corp.,*
    494 U.S. 472 (1990) .............................................................................. 23

*Miller v. Fuhu Inc.*,
  No. 2:14-CV-06119-CAS-AS, 2015 WL 7776794 (C.D. Cal. Dec. 1,
  2015) ........................................................................................................ 45

*Mlejnecky v. Olympus Imaging Am. Inc.*,
  No. 2:10-CV-02630 JAM-KJN, 2011 WL 1497096 (E.D. Cal. Apr.
  19, 2011) ................................................................................................. 36

*Neely v. St. Paul Fire and Marine Ins. Co.*,
  584 F.2d 341 (1978) .......................................................................... 3, 44

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
  210 F.3d 1099 (9th Cir. 2000) ...........................................37, 40, 45, 47

*Pitts v. Terrible Herbst, Inc.*,
  653 F.3d 1081 (9th Cir. 2011) ......................................................... 17, 20

*Racies v. Quincy Bioscience, LLC*,
  No. 15-cv-00292-HSG, 2015 WL 2398268 (N.D. Cal. May 19, 2015)................. 26

*Rahman v. Mott's LLP*,
  No. CV 13-3482 SI, 2014 WL 5282106 (N.D. Cal. Oct. 15, 2014)...........27, 46, 47

*Serna v. Bank of Am., N.A.*,
  No. CV 11–10598 CAS, 2012 WL 2030705 (C.D. Cal. June 4, 2012) ................. 24

*Smith v. Greystone Alliance, LLC*,
  722 F.3d 448 (7th Cir. 2014) ................................................................ 23

*Spann v. J.C. Penny Corporation*,
  2015 WL 1526559 (C.D. Cal. Mar. 23, 2015) ................................*passim*

*Stearns v. Ticketmaster Corp.*,
  655 F.3d 1013 (9th Cir. 2011) .............................................................. 36

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998)................................................................................ 23

*Zepeda v. United States Immigration & Naturalization Service*,
  753 F.2d 719 (9th Cir. 1983) ................................................................ 29

**State Cases**

*Buckland v. Threshold Enters., Ltd.*,
  155 Cal. App. 4th 798 (2007) ............................................................... 36

*Kwikset Corp. v. Super. Ct.*,
   51 Cal. 4th 310 (2011) ..................................................................... 5, 50

*Lavie v. Procter & Gamble Co.*,
   105 Cal. App. 4th 496 512 (2003) ................................................... 47, 48

*McBride v. Boughton*,
   123 Cal. App. 4th 379 (2004) ................................................................ 36

*Melchior v. New Line Prods., Inc.*,
   106 Cal. App. 4th 779 (2003) ................................................................ 36

*In re Tobacco II Cases*,
   46 Cal. 4th 298 (2009) ....................................................................... 4, 29

*Weinstat v. Dentsply Int'l, Inc.*,
   180 Cal. App. 4th 1213 (2010) .............................................................. 36

**State Statutes**

Cal. Bus. & Prof. Code § 17200 ................................................................ 21, 22

Cal. Bus. & Prof. Code § 17203 ................................................................ 21, 29

Cal. Civil Code § 1760 ................................................................................... 22

Cal. Civ. Code § 1780(e) ............................................................................... 24

**Federal Rules**

Fed. R. Civ. P. 68 ..................................................................................... 19, 22

**Federal Rules of Evidence**

Fed. R. Evid. 401 ................................................................................... 5, 14, 16

Fed. R. Evid. 403 ................................................................................... 5, 14, 16

Fed. R. Evid. 602 ...................................................................................... 14, 15

Fed. R. Evid. 701 ............................................................................................ 14

Fed. R. Evid. 702 ................................................................................... 5, 14, 16

Fed. R. Evid. 801 ............................................................................................ 14

Fed. R. Evid. 1002 .......................................................................................... 13

JOINT BRIEF RE: SUMMARY JUDGMENT

1    **I.      INTRODUCTION**

2          **A.      Defendants' Introduction**

3          With class certification denied, this case is down to a single individual pursuing

4    litigation because he purchased a high-quality Head tennis racket that he has since

5    been reimbursed for, continues to use (among many other high-end rackets that he

6    owns), and is otherwise completely satisfied with, except for the fact that tennis star

7    Andy Murray does not play competitively with the exact same racket.  Plaintiff Ono

8    claims that he would not have purchased the racket or would have paid less had he

9    known that Murray was not competing with the same one when making his purchase.

10   But prior to filing suit, Head offered Ono a refund and subsequent to this Court

11   denying Ono's motion for class certification, Head tendered to Ono a full refund of

12   the manufacturer's suggested retail price of his racket plus interest.  Consequently,

13   Ono has been provided all of the monetary relief to which he would be entitled,

14   thereby rendering his claims moot and incapable of meeting the standing requirements

15   because he has suffered no economic (or other) injury.

16         Notwithstanding his failure to convince this Court that his claims and requests

17   for relief are suitable for class action treatment, Ono maintains that he can still obtain

18   a broad injunction against Head covering all of Head's tour level racket lines even

19   though Ono did not rely on advertising for those different lines and purchased only a

20   single type of racket in 2012, which Head no longer sells, based on a purchasing

21   decision that was unique to him.  Ono's belief that he can pursue broad injunctive

22   relief under the circumstances of this case is misplaced.

23         Ono is an experienced tennis player (former top 50 high school player in

24   Southern California) who has worked in a tennis club selling rackets for a living.  He

25   now knows beyond any doubt (and should have known all along) that professional

26   tennis players like Murray play with custom equipment that cannot be purchased at

27   retail.  While there are serious questions surrounding the veracity of Ono's allegations

28   and motivations for pursuing this case, the evidence submitted with this motion

irrefutably establishes that Ono suffered no damage, is not entitled to injunctive relief for himself or anyone else, and lacks standing to maintain his claims.  The significant time, expense, and resources required for trial are wholly unnecessary under these circumstances and, therefore, Head respectfully moves for summary judgment on all of Ono's individual claims.

Summary judgment is appropriate for several reasons.  First, Ono has been made whole by Head's tender of a full refund.  Accordingly, Ono has suffered no economic injury and lacks standing to pursue his claims further.

Second, Ono is not entitled to injunctive relief because, among other things, he does not face any risk of being "misled."  Ono is well aware that the Head rackets available at retail are not the same as customized rackets used by professional athletes in competitive play—a fact he admits knowing at least several months before bringing this action.

Third, Ono has failed to present evidence establishing that he was exposed to Head's allegedly misleading advertising of the YouTek IG Radical Pro racket before his alleged purchase.  None of the print ads and YouTube videos Ono allegedly saw relate to the tennis racket he supposedly purchased on a whim.  Of the press releases Ono claims he saw, only one references the model he bought.  Given when it was published, Ono would have had a window of roughly twenty-four hours during which he could have seen the press release, driven to the Indian Wells tournament, watched Murray practice with the tennis racket, and purchased the racket at issue.  Ono has no proof to establish that these events actually occurred.  He has no receipts, has no proof of payment, no witnesses, or any other evidence corroborating the highly unlikely and suspect chain of events ultimately culminating in the filing of this lawsuit.

Finally, the undisputed facts show that Ono is not a reasonable consumer and that the conduct Ono seeks to enjoin is neither material to reasonable consumers nor sufficiently pervasive to justify the broad injunction against Head that Ono seeks.  Despite years of selling rackets, Ono incredibly claims he purchased his Head YouTek

1  IG Radical Pro racket *solely* because he thought Murray played competitively with the
2  identical one and for no other reason.  He never tried the racket and had no interest in
3  its specifications, playability, or price (important criteria for the vast majority of
4  consumers).  Ono's anomalous circumstances defy common sense as well as the
5  empirical proof submitted by Head in the form of industry studies and survey
6  evidence.  Ono proffers no proof to the contrary and his own expert has even endorsed
7  the industry studies.

8  **B.  Plaintiff's Introduction**

9  Head's motion for summary judgment is filled with recriminations, conjecture
10  and innuendo aimed at discrediting Plaintiff Russell Ono.  Fundamentally, Head's
11  arguments lack factual support, and Ono disputes Head's contentions.  But, in the end,
12  Head's focus on discrediting Ono is misplaced because it is black letter law that "[i]n
13  considering a motion for summary judgment, of course, the court decides a pure
14  question of law and is not permitted to weigh the evidence or to judge the credibility
15  of witnesses."  *Neely v. St. Paul Fire and Marine Ins. Co.*, 584 F.2d 341, 344 (1978).

16  With respect to the core issues in this case, Head has no substantive defense.  In
17  particular, Head has not, and cannot, overcome the inescapable fact that it engaged in
18  a practice designed to mislead the public about Head Pro Players' use of Head's retail
19  racquets in competition, and Ono was duped into buying his Head tennis racquet
20  because of that practice.  As a result, Head's motion falls far short of meeting the
21  requirements for summary judgment under Rule 56.  Key disputed facts required for
22  Head's motion simply cannot be resolved by the Court at this time.

23  By way of background, for more than two decades, Head misrepresented to
24  consumers that Head Pro Players play with specific racquet models sold at retail.  In
25  the specific case of Head linking Andy Murray to the Head Radical Pro, Head's lies
26  have been proven through admissible evidence.  Contrary to Head's representations,
27  Murray never used in competition any generation of the Head Radical Pro, or any
28  racquet model that has ever been sold at retail to consumers.

In light of this undeniable fact, Head raises several meritless arguments, including one that can be summarized as the "nobody cares" defense, claiming that "reasonable consumers" do not purchase tennis racquets *solely* because they believe a professional uses the racquet.  But, Ono has never said, nor does the law require, that this reason is the only reason.  *In re Tobacco II Cases*, 46 Cal.4th 298, 326 (2009) (a "plaintiff is not required to allege that [the challenged] misrepresentations were the sole or even the decisive cause of the injury-producing conduct").  Ono's position is, and has always been, that it is a *material* reason to him, and the evidence establishes that Head believed it was material to consumers in general.  Ono's decision to purchase a Head Radical Pro based on his understanding that Andy Murray played with it falls directly within Head's definition of its target audience, the Tour Consumer, who is "mainly influenced by their player idols."  (Disputed Fact No. P97 (Ex. 26 - Head's "Tour Consumer" definition).)

In terms of materiality, the Court need not consider the views of Ono alone; it can review internal emails written by Head before this case was filed.  Head's emails reveal a nervous group of executives who were concerned that consumers, who rely on Head's misrepresentations, would turn against them if the company's lies became public:

- "Roger and I are very confused.  We now have our top two players not using the same string pattern of that which is in the racquet ***we claim they use***?  Am I missing something because this really seems like we missed a golden chance to be consistent-***we really don't need the message boards lighting up about how the racquet the players actually use isn't the racquet HEAD says they use*** . . ."[1]  (Disputed Fact Nos. P89, P92 (Exs. 30, 31- Head's internal emails).)

---

[1] All emphasis added, unless otherwise noted.

- "I am sorry to make such a big deal about this again *but this is important*. . . . Now we will be promoting [Murray] on the Pro which is a 16 main string pattern.  Will he be switching to 16 mains?  *It just makes it look like he is really not using the racquet <u>we say he is</u> and when this starts getting around on the message boards, it will not help our cause.  It does not matter if they can handle it or not but <u>people like to have the same racquet</u> (especially the techy geeks) and we are making it impossible. . . . Since Djokovic is new with us-I think we can come up with a story but with Murray-this one is tough.*"  (Disputed Fact Nos. P89, P92 (Exs. 30, 31 - Head's internal emails).)

- "One of our concerns of course is that now *those serious players that want to play with what our pros play with* will doubt they get the chance to play the actual Djokovic racquet . . ."  (Disputed Fact Nos. P89, P92, P98 (Exs. 30, 31, 41 - Head's internal emails).)

As the Court is aware, "[a] representation is 'material' . . . if 'the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action.'"  *Hinojos v. Kohl's Corp*., 718 F.3d 1098, 1107 (9th Cir. 2013) (quoting *Kwikset Corp. v. Super. Ct*., 51 Cal.4th 310, 332 (2011)).  Head has not, and cannot, present evidence to overcome these clear and unequivocal admissions which, as a matter of law, establish the materiality of Head's misrepresentations.  Head's surveys fail to prove, as a matter of law, that Head's target audience, which includes Ono, do not want to play with the "same racquet" used by top professionals like Andy Murray.[2]

---

[2] Head's expert reports of Poret are unreliable and should be accorded no weight.  (D77-D80.)  Moreover, Poret's survey and opinion do not survey the relevant customer base, thus his expert opinions on consumer preference have no probative value.  Fed. R. Evid. 401, 403, 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

1    Head also complains that Ono has failed to present evidence that he was

2    exposed to Head's false and misleading advertising before he purchased his Head

3    Radical Pro.  But, the record proves otherwise.  Ono testified at great length at his

4    deposition concerning the print advertisements, videos, and press releases he saw prior

5    to his purchase, which linked Andy Murray with the Head Radical Pro.  (Disputed

6    Fact No. P104 (Ex. 43 - Ono Depo., at 157:4-160:17).)  Ono also testified that he saw

7    Murray on television playing with that model racquet.  (Disputed Fact No. P105 (Ex.

8    6 - Ono's interrogatory responses).)  In fact, Ono specifically testified that it was his

9    exposure to *all* of these representations that led him to believe Murray played with the

10   Head Radical Pro.  (Disputed Fact No. D43 (Ex. 43 - Ono Depo., at 231:24-232:11).)

11   In the same vein, Head argues that Ono is lying about his having purchased a

12   Head Radical Pro racquet.  Head says Ono has "no proof" to establish that what he

13   said happened, actually did happen.  But, again, the record proves otherwise.  Ono can

14   and has proved his purchase through his deposition testimony.  (Disputed Fact No.

15   P106 (Ex. 43 - Ono Depo., 114:13-17).)  Moreover, Ono has possession of the racquet

16   he purchased, and during pre-trial discovery, Head inspected it.  (Disputed Fact No.

17   D2 (Ex. 43 - Ono Depo., at 114:13-17; Ex. 40 - Ono Decl., at ¶21).)  Head offers

18   nothing other than a challenge to Ono's credibility to dispute Ono's evidence of

19   purchase.

20   Finally, in hopes that it can escape liability for its unlawful advertising

21   practices, Head attempted to moot Ono's case by "tendering" a token payment to

22   Ono's counsel.  (Fact No. D18.)  As discussed in detail below, Head's strategy is

23   contrary to precedent from both the U.S. Supreme Court and the Ninth Circuit.  Ono

24   rejected both tenders made by Head because they did not offer him the full relief to

25   which he was, and remains entitled, including injunctive relief.  (Disputed Fact

26   No. P108 (Ex. 39 - email exchange between counsel).)

27   With respect to the injunctive relief, although the scope of any injunction the

28   Court may ultimately issue is not relevant on summary judgment, Head argues the

1   issue anyway.  To be clear, however, Ono is entitled to the injunctive relief he seeks.

2   Ono has expressed his expectation that he will purchase a Head tour-line tennis

3   racquet in the future.  (Disputed Fact Nos. P93, P103 (Ex. 40 - Ono Decl., at ¶¶33,

4   40).)  Further, Head continues to falsely represent that certain Head Pro Players use

5   specific model racquets sold to consumers, including Andy Murray, and it continues

6   to sell the Head Radical Pro, despite its representation otherwise.  (Disputed Fact No.

7   P109 (Ex. 40 - Ono Decl., at ¶17).)  Moreover, Head's argument that the truth is out

8   and, therefore, Ono is not capable of being misled again is belied by the fact that Head

9   marked all the relevant evidence produced in this case "attorneys eyes only."

10  (Disputed Fact No. P103 (Ex. 40 - Ono Decl., at ¶33).)  In any event, unlike an

11  ingredient in a dietary supplement which can be objectively confirmed not to function

12  as advertised, Head's Pro Players may switch racquets anytime.  Absent an injunction

13  prohibiting Head from falsely linking Head Pro Players to its racquets, Ono has no

14  way of knowing whether Head's representations are true.  As a result, there is an

15  immediate and realistic threat that Ono will be misled again unless an injunction

16  issues.

17  **II.     RELEVANT BACKGROUND FACTS**

18       **A.     Defendants' Statement of Facts**

19       Ono alleges that he purchased a Head YouTek IG Radical Pro racket on

20  impulse while attending the 2012 Indian Wells tennis tournament because he was led

21  to believe, based on Head's advertising, that tennis star Andy Murray played

22  competitively with the identical racket.  Evidentiary Appendix ("EA") Ex. 9 at 119:7-

23  13; EA Ex. 6 at 170-72; Fact Nos. D1, D12, D13.  Disappointed to learn that Murray

24  plays competitively with a custom Head racket, Ono identifies the full extent of his

25  monetary damages as the price he paid for the racket, for which he has no receipt or

26  other proof of purchase.  EA Ex. 6 at 170; EA Ex. 9 at 114:13-115:5; Order re: Mot.

27  for Class Certification 6-7 n.7, Dkt. 150, Mar. 8, 2016 ("Ono also has no proof of

28  where and when he bought his racquet."); Fact Nos. D10, D11, D14.

Ono filed this action on June 12, 2013.  Dkt. 1.  Well before then, Head offered Ono a full refund plus any directly related expenses he may have incurred even though Head believed Ono's position lacked any merit.  EA Ex. 2 at 145; EA Ex. 3 at 149-50; Compl., Dkt. 1; Fact No. D15.  Ono rejected the offer.  EA Ex. 2 at 145; Fact No. D16.  After class certification was denied, Head tendered Ono a check refunding the manufacturer's suggested retail price (MSRP) for the racket (because Ono failed to prove what he actually paid) plus 10% interest accrued through April 1, 2016.  *Id.*; EA Ex. 4 at 152-53; Fact Nos. D17, D18.  Ono's counsel returned the check.  EA Ex. 2 at 145; EA Ex. 17 at 392; Fact No. D19.

Ono has failed to adduce any evidence establishing his alleged exposure to certain Head advertisements, videos, and press releases prior to purchase.  Order re: Mot. for Class Certification 7 n.7, Dkt. 150, Mar. 8, 2016 (Ono "has no proof that he learned of defendant's false advertising after he bought his racquet.").  Ono claims he saw one Head advertisement while casually flipping through *Tennis Magazine* in a bookstore in 2012 or "possibly 2011," a few press releases appearing on Head's website, and two YouTube videos.  EA Ex. 9 at 157:4-160:17; Fact No. D21.  None of the advertisements Head placed in *Tennis Magazine* from 2011-2012 involve the racket Ono purchased.  EA Ex. 1 at 4; EA Ex. 1-2 at 21; EA Ex. 1-3 at 23; EA Ex. 1-4 at 25; Fact No. D25.  One of the YouTube videos[3] Ono allegedly saw was not released by Head.  EA Ex. 1 at 4; EA Ex. 8 at 263; Fact No. D29.  The video shows Murray practicing with a YouTek Radical racket, not the YouTek IG Radical Pro that Ono purchased.  EA Ex. 8 at 263; Fact No. D30.  It does not identify any particular version of that racket (i.e., Pro, MP, Rev, S) or state that Murray plays with the racket depicted in competition play.  *Id.*; Fact No. D31.  The second video shows Murray

---

[3] *See* https://www.youtube.com/watch?v=aBMA_syOLWg (released by *European* division of Tennis Warehouse in 2009) (last visited April 15, 2016); EA Ex. 9 at 244:17-246:2.

1   discussing a "Radical" racket.[4]  *Id.*; Fact No. D33.  This video also does not identify

2   any particular version of the racket (i.e., Pro, MP, Rev, S).  *Id.*; Fact No. D33.  Murray

3   says he tested the Radical racket when he was "13 maybe 14" years old and "never

4   wanted to change."  *Id.*; EA Ex. 1 at 4; Fact No. D34.  This is true: Murray plays with

5   a customized racket frame, the mold for which was used for Radical rackets

6   previously manufactured by Head and sold to the public.  EA Ex. 1 at 4; Fact Nos.

7   D35, D36.

8         Of the press releases that Ono allegedly saw, only one references the actual

9   model he bought.  *Id.* at 3; EA Ex. 1-1; EA Ex. 6 at 164-65; Fact Nos. D37, D38.

10  That press release was published on March 13, 2012—the day before Murray left the

11  Indian Wells tournament.  EA Ex. 1 at 4; EA Ex. 1-1 at 18-19; EA Ex. 2 at 146-47;

12  EA Ex. 18 at 395; Fact Nos. D39-D41.  Thus, for Ono to have seen this press release

13  and Murray practice at Indian Wells before purchasing his racket (as he claims he

14  did), a number of highly unlikely events would have had to occur within a roughly

15  twenty-four hour period on March 13, 2012.  Yet, Ono offers *no* proof that any such

16  events occurred, i.e., that he saw the press release, traveled to Indian Wells, attended

17  the tournament, saw Murray play, and purchased the racket all during this short

18  window.  EA Ex. 9 at 114:13-115:5; Fact Nos. D2, D10, D11.

19        Ono initially admitted in deposition that he did not rely on Head's press releases

20  for purposes of purchasing his racket or otherwise.  *Id.* at 221:20-23, 223:1-3, 224:13-

21  15, 225:6-12, 225:25-226:2, 226:13-20, 229:6-8, 230:3-5, 230:24-231:1; Fact No.

22  D42.  It was not until meeting with his counsel during a break that Ono "clarified" his

23  position, explaining that he relied on the press releases "collectively, not one

24  specifically."  *Id.* at 231:4-232:1; Fact No. D43.

25

26  _____

27  [4] *See* https://www.youtube.com/watch?v=fqKLFdAke10 (last visited April 15, 2016);
28  EA Ex. 9 at 192:1-7.

Finally, Ono claims—but cannot prove—that he saw pictures and video images of Murray playing competitively with a racket painted like the retail version he purchased.  EA Ex. 6 at 169-70; Fact Nos. D22, D44.  He presents no evidence that he was able to identify the particular model(s) of the rackets he allegedly saw.  This is not surprising because, as this Court recognized and Ono's own expert acknowledges, it is very difficult to identify the specific racket model when viewed from a distance (such as on TV or during live matches).  EA Ex. 10 at 165:24-166:16; Order re: Mot. for Class Certification 22, Dkt. 150, Mar. 8, 2016 ("Nor is there evidence that [consumers] would notice or have the ability to determine the racquet model used by a professional by watching it on TV or even live."); Fact Nos. D8, D22, D45.  Moreover, during his deposition Ono was able to easily identify numerous differences in the appearance of Murray's racket and the one he purchased, including a different color "head guard" surrounding almost the entirety of the racket's head (Murray's is black, the retail version is "clear grey"), different color grommet set surrounding the interior of the racket (Murray's is black, the retail version is clear), and different paint finish (Murray's is a matte finish, the retail version is glossy).  EA Ex. 9 at 205:23-206:25, 208:3-16, 209:12-210:22, 213:13-24, 215:10-20; Fact No. D50.

Adding to his incredible story is the fact that Ono is an experienced tennis player (ranked among the top 50 high school players in Southern California) who has devoted most of his life to working in a tennis pro shop.  *Id.* at 34:8-19, 38:2-15; Fact Nos. D51, D52.  He strung rackets, assisted with ordering and selling rackets, and helped run racket "demo days" and tennis competitions.  *Id.* at 47:18-22, 50:21-51:3, 62:15-25, 63:21-65:15, 73:23-74:25; Fact Nos. D53-D55.  Yet, he purportedly never played with or demoed *any* of the high-end rackets that he owns before purchasing them, despite their hefty price tags.  *Id.* at 88:16-90:9, 98:16-99:13, 109:9-11, 122:23-123:5; Fact Nos. D56-D63.  Unable to feel an appreciable difference between his various high-end rackets, Ono decides which one to use on any given day based on whether he "slept well" and his "mood."  *Id.* at 93:22-95:19; Fact Nos. D64-D65.

1    Ono did not research, consider, or care about *any* of the specifications of the Head

2    racket he allegedly purchased, did not try it beforehand, and was not influenced by the

3    price (he could have bought it for less through his tennis shop).  *Id.* at 115:6-18,

4    129:7-24, 164:24-165:20; Fact Nos. D66, D67, D69.  Ono claims the only reason he

5    purchased his Head racket was not that he needed a racket but that he just wanted it

6    *solely* because he believed Murray played competitively with the identical racket.  EA

7    Ex. 6 at 170-71; Fact No. D13.  But when asked what importance he attributed to

8    Murray playing the YouTek IG Radical Pro, Ono had no answer other than "Andy

9    Murray played with [the racket]."  EA Ex. 9 at 126:12-16.  Ono did not believe

10   purchasing the YouTek IG Radical Pro would enable to him to play like Murray or

11   make him a better player.  He simply bought the racket because he likes Murray.

12   Essentially, the YouTek IG Radical Pro Ono purchased was a souvenir.

13          Ono provides no evidence that a reasonable consumer would ever act like this.

14   On the other hand, Head has presented several forms of empirical data demonstrating

15   that reasonable consumers do not behave like Ono at all.  For example, the Tennis

16   Industry Association ("TIA") Tennis Consumer Report from 2012, when Ono

17   purchased his Head racket, "provided consumer responses to the question 'What is

18   motivating your desire to buy a new racquet?'"  EA Ex. 12 at 355.  "Over 100

19   responses by men and women aged 15 to 72 indicate[d] many diverse reasons why

20   people buy a new tennis racquet, including technology updates, the right price point,

21   and the need to replace a broken or worn out racquet;" "[n]one … responded that they

22   were motivated to purchase a new racquet because they saw a professional player use

23   [it]."  *Id.*  TIA's 2010 report showed that professional player use influenced new

24   racket choices of only 3% of respondents.  EA Ex. 1-5 at 38; Fact No. D70.  In the

25   2011 report, professional player endorsement was the *least* important factor to

26   consumers in choosing a new racket (EA Ex. 6 at 71; Fact No. D71), and only 2%

27   who switched brands cited player use as a reason (*id.* at 73; Fact No. D72).  Ono's

28

1  own expert relied on these studies as persuasive evidence.  EA Ex. 11 at 100:5-24,
2  146:3-7; Fact No. D76.

3          These industry studies are corroborated by the consumer survey conducted by
4  Head in this case.  Head retained a highly respected expert to design and administer a
5  survey to test empirically the extent to which tennis racket consumers (1) are
6  influenced by professional tennis player endorsements and (2) interpret advertising
7  showing Murray with a Head YouTek IG Radical Pro racket (the racket Ono allegedly
8  bought) to mean that he competes with the same racket sold to consumers.  The survey
9  showed:

10 1)  When asked to identify factors important to their purchasing decision, more than
11     93% of respondents did not identify "professionals use it/endorse it."  EA Ex. 7-1
12     at 207; Fact No. D77.  The top four factors were weight (55.5%), brand (45.5%),
13     price (42%), and size (39.8%).  *Id.*; Fact No. D78.  When asked to assign 100
14     points of weight to the importance of various factors, respondents assigned only 1
15     out of 100 points to "endorsement of racket by pro tennis players." *Id.* at 211; Fact
16     No. D79.

17 2)  "Head's advertising does not have a meaningful tendency to mislead prospective
18     purchasers into believing they would be purchasing the identical version of the
19     racket" Murray uses in competitive play.  *Id.* at 217; Fact No. D80.

20 EA Ex. 7-1, Expert Report of Hal Poret (the "Survey").

21         Not a single respondent to the Survey indicated that they, like Ono, would
22 purchase a racket *solely* because they thought a pro player used the identical one.  EA
23 Ex. 7-2; Fact No. D81.  Ono has produced no evidence to counter the Survey or the
24 various TIA studies.  Indeed, Ono's own purchasing history shows that this case is an
25 anomaly even for him.  EA Ex. 9 at 88:16-90:9, 98:16-99:13 (Ono allegedly
26 purchased other rackets solely because his boss said he should); Fact Nos. D58, D61.

27

28

**B.    Plaintiff's Statement of Facts**

Ono purchased his Head Radical Pro tennis racquet at the Indian Wells tennis tournament he attended in March 2012, more than a year prior to filing this lawsuit. (Disputed Fact No. P106 (Ex. 40 - Ono Decl., at ¶21; Ex. 43 - Ono Depo., at 114:13-17).)  After Ono watched Andy Murray practice on one of the many practice courts at the tournament site, he purchased his racquet from Tennis Warehouse, a major online retailer, that had a retail sales tent on the tournament grounds.  (Disputed Fact No. P110 (Ex. 40 - Ono Decl., at ¶¶13-14).)  Ono purchased his racquet with cash and obtained a receipt.  (Disputed Fact No. P111 (Ex. 40 - Ono Decl., at ¶21).)[5]  As a general rule, however, like most people, Ono keeps his receipts for retail purchases for a month or two and then, he discards the receipt.  *Id.*  Here, Ono's purchase is proven both through his testimony surrounding his purchase and the racquet itself, which he still owns, and which Head has inspected during pre-trial discovery.  (Disputed Fact No. D2 (Ex. 40 - Ono Decl., at ¶21; Ex. 43 - Ono Depo., at 114:13-17).)

As Ono explained, he is a fan of Andy Murray because he likes Murray's intense demeanor on the court and his defensive skills, especially how Murray hustles down every ball.  (Disputed Fact No. P112 (Ex. 40 - Ono Decl., at ¶13).)   Ono was excited to see Murray in person at the tournament and recognized that Murray was playing with the Head Radical Pro.  (Disputed Fact No. P113 (Ex. 40 - Ono Decl., at ¶13).)  Although Ono recognizes he does not play at a skill-level anywhere near Murray, there are parts of Murray's game that Ono likes to emulate.

Ono's understanding at the time that Andy Murray was playing with the Radical Pro model was based on various facts.  First, Ono was familiar with the Radical's unique cosmetics, including its distinctive orange paint scheme.  Although the Radical Pro has had several generations, the color scheme, which is largely

---

[5] Ono's testimony concerning his alleged "receipt" violates the best evidence rule, and Head objects pursuant to Fed. R. Evid. 1002.

1   orange, has remained generally the same.  (Disputed Fact No. P114 (Ex. 40 - Ono

2   Decl., at ¶17).)[6]  There is no other line or "silo" of Head racquets that has those

3   distinct cosmetics.  (Disputed Fact No. P115 (Ex. 40 - Ono Decl., at ¶17).)  Second,

4   Ono knew that only one of the Radical models (the Radical Pro) was in the company's

5   "tour line."  (Disputed Fact No. P118 (Ex. 40 - Ono Decl., at ¶23).)  Third, Ono was

6   greatly influenced by various print advertisements, articles, and videos he had seen

7   over the years that showed Andy Murray playing with a Radical Pro, as well as press

8   releases from Head that expressly represented Murray played with a Radical Pro in

9   winning various tournaments.  (Disputed Fact Nos. P104, P105 (Ex. 6 - Ono

10   interrogatory responses; Ex. 43 - Ono Depo., at 157:4-160:17).)

11       Head presents no evidence to contradict the facts surrounding Ono's purchase.

12   Instead, Head attacks Ono's credibility and attempts to distinguish between the

13   various generations of the Radical Pro to suggest that Ono was not exposed to any

14   advertising concerning the particular generation of the Radical Pro Ono purchased.

15   But, the record shows otherwise.

16       Head also attacks Ono as an anomaly, suggesting that the reason and manner in

17   which Ono purchased his Radical Pro sets him apart from a "reasonable consumer."

18   But, again, the record is otherwise.  Ono worked at Sunset Hills Country Club for

19   twenty years.  He was responsible for sales, managing inventory, budgeting, ordering

20   merchandise and assisting with the Club's tennis events.  (Disputed Fact No. 117 (Ex.

21   40 - Ono Decl., at ¶23).)  Based on his twenty years of experience,[7] Ono encountered

22

23

24   [6] Head objects to Ono's testimony to the extent it is speculative and lacks foundation, including his speculation as to the color schemes of Head's rackets.  Fed. R. Evid.

25   602.

26   [7] As a lay witness, Ono is not qualified to testify regarding the purchasing habits of

27   tennis racket consumers and his testimony on this subject should be afforded no weight.  Fed. R. Evid. 401, 403, 701, 702; *Daubert*, 509 U.S. 579 (1993).  Head

28   objects to Ono's declaration (Ex. 40) as hearsay to the extent it relies on the

(continued…)

1   as many Club players who could come in to the Club shop to purchase a racquet,

2   without demoing it, as compared to those who would ask to demo the racquet before

3   purchase.  (Disputed Fact No. P118 (Ex. 40 - Ono Decl., at ¶23).)  In fact, the Tennis

4   Industry Association Consumer Reports ("TIA Reports") Head has offered in support

5   of its motion are consistent with Ono's experience, because, contrary to Head's

6   arguments, they show that ***approximately one third of all respondents and nearly***

7   ***40% of all respondents who are younger than 35 years of age do <u>not</u> demo racquets***.

8   (Disputed Fact No. P96 (Ex. 1-5 - 2010 TIA Consumer Report at EA 41).)

9       Moreover, based on Ono's personal experience over the same twenty-year

10  period, it is quite common for players to be influenced in their purchasing decision by

11  successful pro tour players who purportedly play with specific model racquets.

12  (Disputed Fact No. P119 (Ex. 40 - Ono Decl., at ¶24).)  As Ono explains, it is very

13  common for players to refer to their own racquets or the racquets of others as the

14  "Federer" racquet, the "Murray" racquet, the "Nadal" racquet, or the "Djokovic"

15  racquet, as well as racquets of other tennis professionals.  Again, Ono's personal

16  experience is consistent with Head's target audience, the "Tour Consumer," who are

17  players that "know what's going on and who's who in the International Tennis scene,"

18  and who are "mainly influenced by their *player idols*, coaches, and other players at

19  their age and level of play."  (Disputed Fact No. P97 (Ex. 26 - Head's definition of

20  "Tour Consumer").)

21      Head also suggests that Ono is not reflective of a reasonable consumer because,

22  according to the litigation-driven survey prepared by Hal Poret, as well as the TIA

23  Reports, consumers are not influenced in their racquet purchasing decisions by

24  professional endorsements.  However, the factual record shows otherwise.

25  _____

        (…continued)
26  statements of others to prove the truth of the matter asserted.  Fed. R. Evid. 801.
    Moreover, Head objects to Ono's testimony to the extent it is speculative and lacks
27  foundation, including his speculation as to whether consumers demoed a racket before
    purchasing it.  Fed. R. Evid. 602.
28

1    First, Head paid tens of millions of dollars to Head Pro Players for at least the

2    last twenty-five years, not just to "endorse" the Head brand, but to expressly represent

3    that they are playing with specific models racquets within a silo or line of Head

4    racquets.  (Disputed Fact No. 120 (Ex. 37 - Expert report of Bill Sanders; Exs. 27, 28,

5    29[8] - Professional player endorsement agreements).)[9]

6    Second, Head misrepresented in its press releases for at least the last ten years

7    that Head Pro Players have been winning tournaments with specific model racquets,

8    rather than just mentioning the Head brand name.  (Disputed Fact No. 121 (copies of

9    press releases).)

10    Third, as part of its scheme to deceive the public, Head writes the names of the

11    models (*e.g*., Radical Pro) on the racquets that Head Pro Players actually use in

12    tournament play.  (Disputed Fact No. 122 (Ex. 20 - Mason Depo., at 73:18-23).)  Head

13    has not presented any evidence or explanation why the names of the specific models

14    or the particular color schemes associated with the racquets is painted on those used

15    by Head Pro Players if, as it claims, nobody can see the words on the racquets they

16    use.

17    Lastly, neither the TIA Reports, nor the survey conducted by Hal Poret, were

18    directed to Head's target audience.  (Disputed Fact No. 107 (Ex. 7-1 - Poret Report).)

19    In terms of the TIA Reports, Head's senor executive already proffered evidence that

20    Head's "tour" line racquets are *priced in the range of around $150-$200* (Disputed

21    Fact No. P123 (Ex. 32 - Mason Decl., at ¶3),) while the 2010 TIA Report states that

22    the approximate amount spent per racquet by respondents was $100, with males under

23

24

25    [8] To the extent Plaintiff has presented evidence relating to Head's sponsorship of
professional players other than Andy Murray, that evidence is irrelevant and

26    inadmissible.  Fed. R. Evid. 401, 403.

27    [9] Ono's expert reports of Sanders and Stewart are unreliable and should be accorded

28    no weight.  Fed. R. Evid. 401, 403, 702; *Daubert*, 509 U.S. 579 (1993).

age thirty-five spending approximately $136 and females under age thirty-five spending approximately $107 per racquet.  (Disputed Fact No. P94 (Ex. 1-5 - 2010 TIA Consumer Report).)  All of these dollar figures are far less than the average cost of a "tour" line racquet.

Head's litigation survey performed by Hal Poret fairs no better:  Poret's survey sampled the wrong universe of consumers.  (Disputed Fact No. P107 (Ex. 7-1 - Poret Report at EA 197).)  Poret did not use any elements of Head's target consumer in designing his survey.  Instead, Poret's respondents included beginners and intermediate players who play infrequently, neither of whom are representative of Head's target Tour Consumer.   (Disputed Fact No. 124 (Ex. 36 - Expert report of David Stewart at ¶¶18-22).)  Poret's survey is also irrelevant because he asked respondents the wrong questions.  His conclusions are based on responses to questions about professional *endorsements*, not professionals' purported *use*, of the racquets.  (Disputed Fact No. 125 (Ex. 7-1 - Poret Report at EA 212, 215, 217).)  Indeed, a player endorsement (*i.e.*, to recommend or support a product) is not the basis of Ono's claims.  Ono's claims are based on the fact that, to influence a consumer's purchase decision, Head falsely advertises that Head Pro Players play with racquets they do not actually use.  Poret's conclusions do not account for this important distinction.

## III.   HEAD IS ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS

### A.   Ono Lacks Standing to Pursue Any of His Claims

#### 1.   Defendants' Position: Ono's Monetary Damages Claim Is Moot

Once the denial of class certification is final, a defendant's tender satisfying the individual plaintiff's claims "moot[s] the merits of the case because the plaintiff has been offered all that he can possibly recover through litigation."  *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1092 (9th Cir. 2011).  Relying on *Pitts*, the Honorable Michael W. Fitzgerald recently granted summary judgment after denying class certification in a false advertising case under the UCL, FAL, and CLRA where the

1  defendant "tendered Plaintiff a check in the amount of $190.70 to reimburse her for

2  the products she purchased in 2009, thereby rendering her individual claims moot."

3  EA Ex. 14 at 379.  The refund in *Cabral* consisted of the purchase price the plaintiff

4  paid, the shipping/handling charge, and the accrued 10% annual interest.  *Id*.  Because

5  "Defendant's refund of $190.70 [was] the most Plaintiff c[ould] hope to recover in

6  this action," the Court dismissed her individual claims as moot.  *Id*. at 381.

7  Here, Ono has been made whole.  When asked to identify the full extent of his

8  alleged damages, Ono responded: "The purchase price of the tennis racquet at issue in

9  this case." [10]  EA Ex. 6 at 170; Fact No. D14.

10  On May 23, 2013—before Ono filed this case—Head agreed to refund Ono the

11  amount he allegedly paid for the Head IG YouTek Radical Pro racket and any directly

12  related expenses that he may have incurred.  EA Ex. 2 at 145; EA Ex. 3 at 149-50;

13  Fact No. D15.  Ono refused this payment.  EA Ex. 2 at 145; Fact No. D16.

14  Once the denial of class certification became final,[11] Head refunded Ono's

15  alleged expense.  Specifically, on March 30, 2016, Head sent Ono a check for $295.55

16  to cover the full extent of his alleged damages.  *Id.*; EA Ex. 4 at 152-53; Fact No.

17  D18.  Because Ono has no receipt or other proof of purchase and could not identify

18  exactly how much he paid for the racket, Head refunded Ono the MSRP for the Head

19  YouTek IG Radical Pro racket ($210) plus 10% interest accrued through April 1,

20

21  _____

22  [10] Moreover, Ono's First Amended Complaint ("FAC") confirms that the extent of

23  Ono's monetary claims is limited to the purchase price of the racket.  *See, e.g.*, FAC

24  ¶ 33 ("But for Head's misrepresentations and omissions, Plaintiff would not have

25  purchased an Endorsed Tennis Racket"; FAC ¶ 34, "Plaintiff was denied the benefit of

26  the bargain when he decided to purchase the latest Head tennis racket purportedly

used by a top professional tennis player over competitor products and other Head

products sold at a lower price.")

27  [11]  Under Rule 23(f), Ono could have appealed the decision by March 22, 2016, but

28  did not.  Fact No. D83.

1   2016.  EA Ex. 2 at 145; EA Ex. 1 at 3; Fact Nos. D10, D11, D17, D18.  Ono has not

2   disputed this calculation.  EA Ex. 2 at 145; Fact No. D20.

3          In response, Ono's counsel stated that Head's "offer has been relayed to our

4   client and is rejected."  *Id.*; EA Ex. 5 at 155; Fact No. D19.  To be clear, however,

5   Head's tender was not an "offer" made for settlement purposes.  Rather, it was a full

6   refund with no conditions attached.  With class certification denied, a refund for

7   $295.55 covers the maximum monetary relief Ono could hope to recover in this

8   litigation.  Head's refund thus renders Ono's claims for monetary relief moot and

9   negates any argument that he has suffered any financial loss, which is necessary to

10  confer standing.  Ono's decision not to keep and cash the check does not change this

11  fact.

12              **2.    Plaintiff's Position**

13         Head claims it has tendered or offered to Ono full ***monetary*** relief.  This

14  consists of $295.55, which purportedly is the cost of his racquet, plus interest.  Head's

15  attempt to strategically moot Ono's claims here, however, fails, both procedurally and

16  factually, because Head has not offered Ono the full relief to which he is entitled in

17  this lawsuit.

18         In *Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663, 666 (2016), the U.S. Supreme

19  Court rejected the same procedural gamble attempted by Head here.  Rejecting the

20  defendant's argument, the *Campbell-Ewald* Court said, "[w]e hold today, in accord

21  with Rule 68 of the Federal Rules of Civil Procedure, that an unaccepted settlement

22  offer has no force.  Like other unaccepted contract offers, it creates no lasting right or

23  obligation.  With the offer off the table, and the defendant's continuing denial of

24  liability, adversity between the parties persists."  *Id.*

25         Head's argument that it did not make a Rule 68 settlement offer, but instead

26  "tendered" a payment is a distinction without a difference.  (Disputed Fact D18, P108

27  (Ex. 39 - email between counsel regard offer -- reflecting Head's view that the check

28  it offered to Ono "is [a] tender of payment").)  The intent and impact are the same,

and the law makes no distinction between the two.  In fact, since *Campbell-Ewald*, the Ninth Circuit confirmed that "[u]nder Supreme Court and Ninth Circuit case law, a claim becomes moot when a plaintiff *actually receives* complete relief on that claim, not merely when that relief is offered or tendered."  *Chen v. Allstate Ins. Co.*, --- F.3d ---, 2016 WL 1425869 at *1 (9th Cir. Apr. 12, 2016) (emphasis in original); *see also*, *id*. at *7 ("a claim becomes moot once the plaintiff *actually receives all of the relief* to which he or she is entitled on the claim") (emphasis in original).  Head's tender fails to moot Ono's claims because Head failed to provide "complete" relief.

In addition to the injunctive relief Ono seeks, which Head has yet to provide, let alone offer, Head's "tender" also does not moot Ono's claims because the Court's class certification order is not final.  Under Ninth Circuit precedent, a putative class case is not moot unless complete relief is provided to the class as well, because "the plaintiff may still pursue a limited appeal of the class certification issue.  Only once the denial of class certification is final does the defendant's offer -- if still available -- moot the merits of the case because the plaintiff has been offered all that he can possibly recover through litigation."  *Id*. at *5 (quoting *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1091-92 (9th Cir. 2011)).  Here, Head erroneously contends that class certification issue *is final* because Plaintiff elected not to pursue a petition for *interlocutory review* under Rule 23(f).  (Disputed Fact No. D83.)  But Head's position is contrary to law and the Ninth Circuit's holding in *Pitts*.  Ono's right to appeal the denial of class certification is not waived simply because he did not seek interlocutory review of the order -- Ono maintains the right to appeal that order from any final judgment in the case.

Moreover, consistent with *Campbell-Ewald* and *Chen*, Head's offer fails to moot the case because it failed to provide "complete relief" with respect to Ono's request for injunctive relief.  Head failed to offer Ono ***any*** injunctive relief, let alone the scope of injunctive relief to which he is entitled.  (Disputed Fact No. P108 (Ex. 39 - email tendering payment to Plaintiff).)  The standard for mootness is whether the

1   Plaintiff has a personal stake in the action such that it has become "impossible for the

2   court to grant any effectual relief whatever." *Church of Scientology v. United States*,

3   506 U.S. 9, 12 (1992) (internal quotation omitted).  This Court maintains its authority

4   to grant injunctive relief based upon Ono's claims.  Head has not offered, stipulated

5   to, or even proposed any injunctive relief as called for by Ono's claims.  (Disputed

6   Fact No. P108 (Ex. 39 - Email tendering payment to Plaintiff).)  Nevertheless, Head

7   asserts that Ono lacks standing to pursue his claims.  If Head's theory were correct, no

8   claim for consumer injunctive relief would ever survive because once a monetary

9   relief component were conferred the injunctive component would disappear.

10        For purposes of injunctive relief, Head misinterprets the standing requirements.

11   This Court previously explained:

12        [t]o have standing to seek such relief, the "threatened injury
13        must be certainly impending to constitute injury in fact,'" or
         there must be a "substantial risk" that the harm will occur.
14        *See Clapper v. Amnesty Int'l USA*, 133 S.Ct. 1138, 1147 &
         1150 n. 5 (2013); *Bates v. United Parcel Service, Inc.*,
15        511F.3d 974, 985 (9th Cir. 2007) (internal quotation marks
         omitted) ("The plaintiff must demonstrate that he has
16        suffered or is threatened with a concrete and particularized
17        legal harm, coupled with a sufficient likelihood that he will
         again be wronged in a similar way."')
18

19

20   *Spann v. J.C. Penny Corporation*, 2015 WL 1526559, *9 (C.D. Cal. Mar. 23, 2015).

21   Without effective injunctive relief, Ono has not received complete relief because

22   under his UCL claim, for example, Ono is entitled to seek an injunction to "prevent

23   the use or employment by any person of any practice which constitutes unfair

24   competition."  Cal. Bus. & Prof. Code § 17203.  Head's attempt to avoid having to

25   modify its practices runs directly contrary to the purpose of Section 17200 which

26   states "unfair competition shall be and include . . .any unlawful, unfair or fraudulent

27   business act or practice and unfair, deceptive, untrue or misleading advertising."  Id. at

28   § 17200.  At a minimum, there is a genuine dispute of a material fact about whether

1    Head's marketing scheme constitutes false and misleading advertising entitling Ono to

2    injunctive relief.  *See*, Knox *v. Service Employees*, 132 S.Ct. 2277, 2287 (2012) (A

3    case becomes moot "only when it is impossible for a court to grant any effectual relief

4    whatever to the prevailing party."); *Chafin v. Chafin,* 133 S.Ct. 1017, 1023 (2013)

5    ("As long as the parties have a concrete interest, however small, in the outcome of the

6    litigation, the case is not moot.").

7         Moreover, even if a claim could be mooted by a tender of full relief,[12] Head

8    fails to point to any legal authority supporting the proposition that a case can be

9    mooted by tendering only the party's ***monetar***y claim without addressing the party's

10   claim for injunctive relief.  In that regard, Head's reliance on *Cabral v. Supple, LLC*

11   Case No. EDCV-12-00085-MWF-OP, a case pending before Judge Michael W.

12   Fitzgerald, is misleading.

13        In *Cabral*, the court, in denying plaintiff's motion for class certification, found

14   that plaintiff had no standing to seek injunctive relief as she had not alleged any plans

15   to purchase defendant's products in the future.  Ex. 13 at EA 363.  Several months

16   later, in granting defendant's motion for summary judgment, the court, having already

17   ruled injunctive relief was not available to the plaintiff, found that defendant's refund

18   was the most plaintiff can hope to recover in that action and thus dismissed the case as

19   moot.  Ex. 14 at EA 381.  Here, on the other hand, Ono is entitled to injunctive relief

20   as he has expressed his intention to purchase Head racquets in the future.  (Disputed

21   Fact No. P93 (Ex. 40 - Ono Decl., at ¶40).)

22        The failure of Head's "tender" strategy here is not of a mere procedural

23   technicality.  As described above, California's consumer protection laws were

24   designed and enacted to "protect consumers against unfair and deceptive business

25   practices" including misleading advertising.  *See* Cal. Civil Code §1760; *see also*, Cal.

26   _____

27   [12] The *Chen* court found that "[l]ike Rule 68, common law tender exists principally as

28   a means of limiting damages or costs rather than mooting claims."  *Id.* at n.7.

1    Bus. & Prof. Code §17200.  Head's failure to provide for any injunctive relief or

2    cessation of the complained of conduct in its tender fails to satisfy the explicit

3    purposes of these consumer protection statutes.  Head's offer of what it claims is

4    complete relief, without taking into account Ono's right to an injunction is not

5    sufficient.  *Hrivnak v. NCO Portfolio Mgmt., Inc.*, 719 F.3d 564, 567 (9th Cir. 2013)

6    ("An offer limited to the relief the defendant believes is appropriate does not suffice"

7    to moot Plaintiff's claim); *Smith v. Greystone Alliance, LLC*, 722 F.3d 448, 450 (7th

8    Cir. 2014) ("If the plaintiff asks for the moon, only offering the moon extinguishes the

9    controversy.").

10               **3.      Defendants' Position: Ono's Request for Attorneys' Fees and
11                         Costs Does Not Constitute "Damage" or Preclude Summary
                           Judgment**

12         Although never previously asserted as part of his alleged damages, Ono now

13   claims that summary judgment should be denied because his alleged damages include

14   not only the purchase price for his racket, but also the attorneys' fees and costs he has

15   allegedly incurred in litigation.  Thus, Ono contends, he has not been made whole.  As

16   discussed below, this argument fails for multiple reasons.

17         First, attorneys' fees and costs do not constitute "damages." An "'interest in

18   attorney's fees is . . . insufficient to create an Article III case or controversy where

19   none exists on the merits of the underlying claim.'"  *Steel Co. v. Citizens for a Better

20   Env't*, 523 U.S. 83, 107 (1998) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472,

21   480 (1990)).  In other words, "a plaintiff cannot achieve standing to litigate a

22   substantive issue by bringing suit for the cost of bringing suit.  The litigation must

23   give the plaintiff some other benefit besides reimbursement of costs that are a

24   byproduct of the litigation itself."  *Id.* (remanding with instructions to dismiss case for

25   lack of standing).[13]

26   _____

27   [13] Indeed, courts in California have rejected the notion that attorneys' fees and costs
28   incurred in prosecuting UCL claims are sufficient to bestow standing.  *See e.g.,*

(continued…)

1   Second, Ono has not established that he has incurred *any* fees or costs in

2   connection with this litigation.  If Ono's counsel took the case on contingency, he

3   likely has not, and will not, incur any such expenses.

4   Third, even if Ono incurred attorneys' fees and costs, those expenses could

5   have been avoided had Ono accepted the refund offered to him before he instituted

6   litigation.  That he rejected the refund and instead chose to incur attorneys' fees and

7   costs to unsuccessfully pursue class certification does not render those expenses

8   "damages."

9   Fourth, as discussed further below, Ono's request for fees and costs is not a

10  means for maintaining standing to pursue relief, but rather compensation awarded by

11  the Court *after* a trier of fact has established liability on the part of the defendant or a

12  determination is made that Ono is a "prevailing plaintiff," which he clearly is not.

13  The decision in *Cabral* is instructive.  There, the plaintiff argued that the refund

14  of the purchase price (with interest) did "not make her whole because she [was]

15  entitled to attorneys' fees and costs."  EA Ex. 14 at 380.  The Court rejected that

16  argument and held that "[w]hether that is true would be determined after a final ruling

17  on the merits of Plaintiff's claims.  The mere prospect of an award of attorneys' fees

18  and costs does not prevent Defendant from avoiding expensive litigation by fully

19  satisfying Plaintiff's claims."  *Id*.  Here, too, Ono believes he may ultimately recover

20  attorneys' fees and costs—despite losing class certification and already receiving a

21

22  _____

    (…continued)

23  *Cordon v. Wachovia Mortg., a Div. of Wells Fargo Bank, N.A.*, 776 F. Supp. 2d 1029,
    1039 (N.D. Cal. 2011) (finding that costs and fees incurred by plaintiff to prosecute a

24  UCL claim were insufficient to confer standing; holding otherwise would mean that a
    "private plaintiff bringing a UCL claim automatically would have standing merely by

25  filing suit"); *Serna v. Bank of Am., N.A.*, No. CV 11–10598 CAS (JEMx), 2012 WL

26  2030705, at *5 (C.D. Cal. June 4, 2012).  Similarly, the CLRA has a specific
    attorneys' fee provision (Cal. Civ. Code § 1780(e)) that is separate from the provision

27  on damages (*id*. at § 1780(a)).  If attorneys' fees and costs constituted "damage" under

28  the CLRA, there would be no need for the separate provision.

1  full refund—but that does not preclude the Court from granting summary judgment in

2  Head's favor.  Otherwise, Ono could continue with litigation at the great expense of

3  Head and the Court for no other reason but to potentially recover increasingly

4  accumulating attorneys' fees and costs despite having already been made whole.

5  **4.  Plaintiff's Position**

6  **B.  Ono Is Not Entitled to Seek Prospective Injunctive Relief**

7  **1.  Defendants' Position: Ono Lacks Standing to Pursue His Prospective Injunctive Relief Claim as to Any Rackets**

8

9  To have standing to pursue injunctive relief, a plaintiff must show that a "real

10  and immediate threat" exists that he will be wronged again.  *City of Los Angeles v.*

11  *Lyons*, 461 U.S. 95, 111 (1983).  *See also Bates v. United Parcel Serv., Inc.*, 511 F.3d

12  974, 985 (9th Cir. 2007) ("The plaintiff must demonstrate that he has suffered or is

13  threatened with a concrete and particularized legal harm, coupled with a sufficient

14  likelihood that he will be again wronged in a similar way.") (citations and internal

15  quotations omitted).  The "threatened injury must be certainly impending to constitute

16  injury in fact, and allegations of possible future injury are not sufficient."  *Clapper v.*

17  *Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (citations and internal quotations

18  omitted).  The alleged threat cannot be "conjectural" or "hypothetical."  *Lyons*, 461

19  U.S. at 101-02.

20  In cases "where a plaintiff has no intention of purchasing the product in the

21  future, a majority of district courts have held that the plaintiff has no standing to seek

22  prospective injunctive relief, and some have also held that a plaintiff who is aware of

23  allegedly misleading advertising has no standing to seek prospective injunctive relief."

24  EA Ex. 13 at 365 (finding "Plaintiff ha[d] no standing to seek injunctive relief.  She

25  d[id] not allege any plans to purchase Defendant's products in the future and even

26  expresse[d] her clear disappointment in ordering Supple after discovering it did not

27  help her condition.") (quoting *Racies v. Quincy Bioscience, LLC*, No. 15-cv-00292-

28  HSG, 2015 WL 2398268, at *5 (N.D. Cal. May 19, 2015) (dismissing claims for

1   injunctive relief under the UCL and CLRA when plaintiff did not allege "he intends to

2   purchase the Product again in the future")).  *See also Davidson v. Kimberly-Clark*

3   *Corp.*, 76 F. Supp. 3d 964, 969 (N.D. Cal. 2014) ("[P]laintiff lacks standing to assert a

4   claim for prospective injunctive relief, as she has indicated she has no intention of

5   purchasing the same Kimberly-Clark product in the future."); *Delarosa v. Boiron,*

6   *Inc.*, No. SACV 10-1569-JST (CWx), 2012 WL 8716658, at *4 (C.D. Cal. Dec. 28,

7   2012) (holding there was "not a sufficient likelihood that [plaintiff] will again be

8   wronged in a similar way" where she did not intend to purchase the product again)

9   (citation omitted); *Campion v. Old Rep. Home Protection Co.*, 861 F. Supp. 2d 1139,

10  1150 (S.D. Cal. 2012) ("Plaintiff no longer has a warranty plan with Defendant and

11  testified that he does not ever intend to purchase another one.  Furthermore, even if

12  Plaintiff were to purchase another home warranty plan from Defendant, he now has

13  knowledge of Defendant's alleged misconduct.  Thus, Plaintiff cannot show he is

14  realistically threatened by a repetition of the alleged violation."), *appeal dismissed*,

15  775 F.3d 1444 (9th Cir. 2014); *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 458 (S.D.

16  Cal. 2014) ("These consumers will not benefit from the injunctive relief as they

17  cannot demonstrate a probability of future injury; if they know the 'truth' they cannot

18  be further deceived.").

19         Here, Ono has not alleged in the FAC or in discovery that he intends to

20  purchase another Head racket because he believes Murray or another pro plays with

21  the identical one sold at retail.  Such a disingenuous position defies common sense

22  and the undisputed facts.  Ono knows better.  Indeed, he has known that pros use

23  custom rackets different from those available for purchase at retail since before he

24  brought this lawsuit when "in early 2013" he allegedly "overheard" tennis players

25  discussing this openly at his club.  EA Ex. 6 at 173; Fact No. D84.  Moreover, he has

26  been told repeatedly throughout this lawsuit that Head's pro players use custom

27  equipment different from what Ono could buy off the shelf.  In the words of the

28

1    *Maybelline* court, if Ono "know[s] the 'truth' [he] cannot be further deceived."  300

2    F.R.D. at 458.

3           Ono cannot manufacture standing by simply submitting a declaration claiming

4    that he may someday buy another Head racket based on his belief (even though he

5    now knows better) that an endorsed professional competes with the identical one.[14]

6    "Absent showing a likelihood of future harm, a plaintiff may not manufacture

7    standing for injunctive relief simply by expressing an intent to purchase the

8    challenged product in the future."  *Rahman v. Mott's LLP*, No. CV 13-3482 SI, 2014

9    WL 5282106, at *6 (N.D. Cal. Oct. 15, 2014).  First, such a declaration fails the

10   requirement that the threat of future injury be "real" and "immediately impending."

11   *Lyons*, 461 U.S. at 111; *Clapper*, 133 S. Ct. at 1138.  It is precisely the type of a

12   "conjectural" or "hypothetical" injury (manufactured for purposes of defeating a

13   motion for summary judgment) that cannot support a claim for injunctive relief.

14   *Lyons*, 461 U.S. at 101-02.  Second, as the *Mott's* court explained, the "future harm

15   required is defined by California's unfair competition laws.  Those laws require,

16   among other things, that the plaintiff prove that he relied on the unlawful or deceptive

17   act, and that he suffered damages as a result . . . [M]erely feeling that one cannot trust

18   defendant's future representations is not sufficient harm to confer standing for

19   injunctive relief."  2014 WL 5282106, at *6 ("Rahman cannot plausibly prove that he

20   will, in the future, rely on the 'No Sugar Added' statement to his detriment.  He

21   therefore lacks Article III standing for injunctive relief.").

22          Nor can Ono rely on *Spann v. J.C. Penney Corp.*, No. SA CV 12-0215 FMO

23   (RNBx), 2015 WL 1526559 (C.D. Cal. Mar. 23, 2015).  In that case, the plaintiff

24

25   _____

26   [14] Nor can Ono claim that he may be deceived into buying another racket model in the
     future endorsed by a different player.  Ono has throughout this case alleged that
27   Head's allegedly deceptive advertising is "uniform" and extends to all tour silos and
     endorsing players.
28

1  bought some items at J.C. Penney thinking they were on sale.  *Id*. at *2.  She then

2  brought a lawsuit alleging that "the price comparisons for the items she purchased

3  were false, in violation of the UCL, FAL, and CLRA."  *Id*.  The "plaintiff has shopped

4  at JCPenney since she filed this lawsuit" and was "interested in buying from the store

5  again" in the "near future."  *Id*. at *2, 12.  J.C. Penney "briefly stopped, but has [later]

6  returned, to its strategy of false comparative price advertising" and "acknowledge[d]

7  its repeated adjustments to its pricing strategies may create confusion among

8  customers."  *Id*. at *12.

9      Unlike *J.C. Penney*, where the plaintiff was a regular J.C. Penney shopper who

10  planned on returning to the store "in the near future," Ono is not a regular consumer of

11  Head's rackets and is not at risk of being misled in the future.  Of the numerous high-

12  end rackets that Ono owns, he has purchased only one Head racket in the 20+ years

13  since he has been playing tennis, i.e., the YouTek IG Radical Pro racket giving rise to

14  this litigation.  EA Ex. 9 at 87:2-8, 97:11-16; Fact No. D85.  Moreover, this is the only

15  racket that he has allegedly purchased solely because he believed a professional

16  played competitively with the identical one.  Ono thus cannot show an "imminent,"

17  credible probability of future harm, as he must, which alone is sufficient to deny

18  standing for prospective injunctive relief.

19      Moreover, unlike *J.C. Penney* where the defendant itself acknowledged that its

20  ever-changing pricing schemes may create confusion among consumers and where the

21  plaintiff could rely to her detriment on future representations that certain items were

22  on sale, Ono cannot credibly assert reliance and/or damage for his hypothetical future

23  purchases.  As it has been established time and time again throughout this case,

24  Murray uses a custom racket unavailable for purchase at retail, and Ono knows that.

25  EA Ex. 6 at 173; Fact No. D84.

26      **2.    Plaintiff's Position**

27      It is no secret that Ono seeks to enjoin Head's business practice of lying to the

28  general public, as it has for at least the last twenty-five years, by claiming that Head

1    Pro Players play with racquets that are available for sale to consumers when they are

2    not.  Head's lies have been depicted over time in print advertisements, press releases,

3    promotional materials, information provided to its retailers linking specific players

4    with specific Head models, as well as in the cosmetics of these player racquets, which

5    are painted to look identical to the off-the-shelf models.  (Disputed Fact Nos. D29,

6    P98, P104 and P121 (press releases, advertisements and testimony that Head provides

7    information to retailers matching players to racquets for dissemination to the public).)

8           The UCL provides that "[an]y person who engages, has engaged, or proposes to

9    engage in unfair competition may be enjoined in any court of competent jurisdiction."

10   Cal. Bus. & Prof. Code § 17203.  An injunction is "the primary form of relief

11   available . . . to protect consumers from unfair business practices[.]"  *In re Tobacco II*

12   *Cases,* 46 Cal.4th 298, 319 (2009).  A Court's authority to issue an injunction is as

13   broad as necessary to ensure appropriate and effective relief.  In *Easyriders Freedom*

14   *F.I.G.H.T v. Hannigan*, 92 F.3d 1486, 1501-1502, the court issued an injunction

15   limiting the CHP's ability to issue citations for motorcycle helmet laws to ***all***

16   motorcyclists, not just the plaintiffs, despite that case not being a class action.  The

17   court held that "while injunctive relief generally should be limited to apply only to

18   named plaintiffs where there is no class certification, *see generally Zepeda*, 753 F.2d

19   at 727-28 & n.1, 'an injunction is not necessarily made overbroad by extending

20   benefit or protection to persons other than prevailing parties in the lawsuit-even if it is

21   not a class action -*if such breadth is necessary to give prevailing parties the relief to*

22   *which they are entitled*.'"  *Id.* at 1501 *citing Bresgal v. Brock*, 843 F.2d 1163, 1170-71

23   (9th Cir. 1987).

24          Here, Head claims that Ono does not have standing to seek injunctive relief

25   because there is no threat of future injury.  But there is concrete evidence that unless

26   an injunction issues Head will continue its practice of deception and that there is a

27   reasonable likelihood that Ono will be harmed again.  (Disputed Fact No. 93 (Ex. 40 -

28   Ono Decl., at ¶40).)

1    For instance, Maria Sharapova, who is the highest paid female athlete in the

2  world and who Head represents plays with an Instinct model, showed her indifference

3  towards consumers like Ono during her deposition.  Her testimony evidences the need

4  of an injunction broad enough to ensure that Ono will not be harmed again:

5    Q: Would you have an interest to know that you are playing with a racquet

6    frame from a Radical mold?

7    A:  I have no interest.

8    …..

9    Q:  And as far as you know, you could have been playing with a Head Radical

10    frame during that period of time?

11    A:  I don't know what I was playing with.

12    ….

13    Q:  When you said "go test out my new Head Graphene racquet," were you

14    talking about your customized racquet or the retail version?

15    A:  I don't know.  That was scripted.

16    Q:  Scripted by Head.

17    A:  Yes.  It wasn't scripted by me.

18    ….

19    Q:  So when you said "go test out my new Head Graphene racquet," you didn't

20    give any thought as to whether or not you were telling the public to go try my

21    personal customized racquet or the retail version, correct?

22    A:  I didn't

23    Q:  Now that I've told you that Greg Mason from Head has testified that you

24    play with a racquet frame from a Radical mold, do you intend to ask or inquire

25    of Head whether that's true or not?

26    A:  No.

27    Q:  Is there a reason why not?

28    A:  No.

1   ….

2   Q:  So getting back to my question before we took a break, Ms. Sharapova, can

3   I get a commitment from you, now that I've told you that you play with a frame

4   out of a Radical mold, that you will not continue to make public statements that

5   you play with a Head Instinct racquet?

6   A:  I'm not ready to make a commitment until—I said that I want to know what

7   racquet I'm playing with.

8   Q:  So you're going to make an inquiry as to what racquet you're playing with?

9   A: No.

10   Q:  Do you care to know which racquet you're playing with?

11   A:  I don't.

12   (Ex. 22 at 21:13-16; 40:15-19; 89:14-90:21, 93:4-24.)

13        Moreover, despite this lawsuit, Head has not ceased its practice of painting

14   Head Pro Player racquets to look identical to those that are sold to consumers.

15   (Disputed Fact No. P126 (Ex. 40 - Ono Decl., at ¶17, Ex. A).)  In addition, following

16   the filing of this lawsuit Head changed its print and television advertising, which has

17   only added to the confusion.  In particular, Head has added a disclaimer in small print

18   at the bottom of its print and television advertisements, which reads "HEAD PRO

19   PLAYER may play with different racquet from the model shown."  (Disputed Fact

20   No. P102 (Ex. 20 - Mason Depo., at 98:19-99:7; Ex. 40 - Ono Decl., at ¶38).)  This

21   "disclaimer" is confusing for at least three important reasons.

22        First, in most instances, the disclaimer is patently false because Head has

23   admitted that Murray does not currently play with the Head Radical Pro, but rather a

24   racquet frame made out of a mold that only he uses.  (Disputed Fact No. P100 (Ex. 20

25   - Mason Depo., at 18:6-10; 68:12-21; 78:1-11; 80:14-20).)  Therefore, *it is not true*

26   that Murray "may" not play with the model shown because he does not currently do so

27   as a matter of fact.  To be truthful, and not false and misleading, the disclaimer should

28

1    say "THIS HEAD PRO PLAYER plays with a customized racquet not sold to the

2    general public," or words to that effect.

3        Second, Head has admitted that at least some Head Pro Players actually play

4    with off-the-shelf models that are not customized during the manufacturing process.

5    Ex. 20; (Mason Depo., at 210:2-25.)  But, because Head marked these facts and the

6    identity of those players in discovery as "HIGHLY CONFIDENTIAL-ATTORNEY

7    EYES ONLY," not even Ono has been allowed to access to this information.

8    (Disputed Fact No. P103 (Ex. 40 - Ono Decl., at ¶33).)

9        Lastly, the disclaimer is misleading in the sense it implies that the Head Pro

10   Player shown in the ad may actually be playing with a different model, but still one

11   that is sold to consumers, not that Head is deceptively painting a player's customized

12   racquet to look exactly like the model shown in the ad and sold to consumers, when it

13   actually is not.

14        Ono is likely to be deceived again by Head because he has expressed his

15   expectation to purchase new tennis racquets in the future, and based on Head's large

16   market share of  tour line racquets, he expects he will purchase another Head tour line

17   racquet model because he is largely influenced by professional tennis players that he

18   follows or for whom he is a fan.  (Disputed Fact No. P93 (Ex. 40 - Ono Decl., at

19   ¶40).)

20        This Court has previously addressed the fact that there is split of authority in

21   this Circuit on the issue of whether a consumer has standing to seek an injunction

22   when he has been deceived by false advertising, based on the notion that the

23   consumer's knowledge makes it unlikely that he will be deceived again.  Ultimately,

24   the Court concluded that "[d]efendant's assertions run counter to the Ninth Circuit's

25   warning that when determining what constitutes the same type of relief or the same

26   kind of injury, courts must be careful not to employ too narrow or technical an

27   approach . . . and must reject the temptation to parse too finely." *Spann v. J.C. Penny*

28   *Corporation*, 2015 WL 1526559, *10 (C.D. Cal. Mar. 23, 2015) (internal citations and

1    quotations omitted).  Instead, a consumer maintains standing because "to do otherwise

2    would eviscerate the intent of the California legislature in creating consumer

3    protection statutes because it would effectively bar any consumer who avoids the

4    offending product from seeking injunctive relief."  *Id*. at *12 (internal citations and

5    quotations omitted); *see also*, *Fortyune v. American Multi-Cinema, Inc.*, 2002 WL

6    32985838, *7 (C.D. Cal. Oct. 22, 2002) ("If this Court [does not find standing], like

7    defendants would always be able to avoid enforcement of the ADA.  This Court is

8    reluctant to embrace a rule of standing that would allow an alleged wrongdoer to

9    evade the court's jurisdiction so long as he does not injure the same person twice.")

10       Here, similar to *Spann,* Ono has made clear his interest in buying a Head tour-

11   line racquet again, even if those plans are not concrete or specific.  (Disputed Fact No.

12   P93 (Ex. 40 - Ono Decl., at ¶40).)  Ono has also established that Head continues to

13   misrepresent that Head Pro Players play with racquets sold the general public and that

14   its new "disclaimer" only adds to the confusion among consumers.  Whether Head's

15   current business practices support a threat of harm for which an injunction may be

16   appropriate involves at the very least disputed questions of fact.

### 3.    Defendants' Position: Even If the Court Allows Ono's Prospective Injunctive Relief Claim to Proceed, It Is Limited to the One Specific Racket Model Ono Purchased

19       Even if the Court finds that Ono has standing to seek injunctive relief, his claim

20   is limited to the one specific racket model he purchased—the YouTek IG Radical Pro.

21   Ono cannot seek an injunction as to any other racket models or silos.  That issue was

22   put to rest with the Court's denial of class certification.

23       At the outset of the case, Head moved for judgment on the pleadings on the

24   ground that Ono did not have Article III standing to bring claims against rackets he

25   did not buy and advertising claims he did not see or rely on.  Dkt. 31.  In opposing the

26   motion, Ono did not dispute that he purchased (and thus suffered alleged injury in

27   connection with) only one racket endorsed by only one pro player; he, however,

28   repeatedly argued that "whether plaintiff may assert claims as to the endorsed tennis

1   racquets he did not purchase is an issue that must be decided under Rule 23, in

2   connection with a motion for class certification."  Pl.'s Opp. to Def. Head USA, Inc.'s

3   Mot. for J. on the Pleadings 9, Dkt. 32, Oct. 31, 2013.  *See also id.* at 1 ("a plaintiff's

4   ability to assert claims for a line of similar products, not all of which were purchased

5   by the plaintiffs, is to be considered *based on the evidence*, at the class certification

6   stage of the case, in connection with the court's consideration of whether the plaintiff

7   can serve as a class representative for purchasers of all the products"); *id.* at 7 ("the

8   Court should deny Defendant's Motion, and defer its analysis of the issue until a fully-

9   developed record presented to the Court in connection with a Motion for Class

10  Certification"); and *id.* at 11 ("Plaintiff has alleged claims on behalf of unnamed class

11  members who purchased the same kind of product, in reliance on the same uniform

12  practice, who suffered the same injury.  This is sufficient to establish standing.").

13      On May 21, 2014, the Court denied Head's motion for judgment on the

14  pleadings and held that the "issue [of] whether Ono has standing to pursue claims on

15  behalf of a class relating to tennis rackets and advertising that Ono did not purchase or

16  rely on" "is better taken under the lens of typicality or adequacy of representation,

17  rather than standing."  Order Re: Pending Mot. and Further Proceedings 3, Dkt. 59,

18  May 21, 2014.  Agreeing with Ono, the Court held that the issue was "therefore a Rule

19  23 question, rather than one of standing."  *Id.* at 4.

20      On March 8, 2016, on a complete record after extensive fact and expert

21  discovery, the Court denied class certification. Dkt. 150.

22      With class certification foreclosed, this case concerns only Ono's individual

23  claims and purported injury of having been deceived into purchasing a YouTek IG

24  Radical Pro racket.  Ono can no longer pursue much broader claims based on the

25  hypothetical experiences of unnamed class members.

26          **4.      Plaintiff's Position**

27      Head's argument concerning the scope of the injunction to which Ono may be

28  entitled at trial is misguided.

1   First, Head's motion does not seek *partial* summary judgment. Rather, Head's

2   notice expressly states that it moves this Court "for an order granting summary

3   judgment in Head's favor on all of Ono's asserted claims…"  Thus, even assuming

4   *arguendo* it was appropriate on partial summary judgment for the Court to consider

5   the scope of any prospective permanent injunction it may ultimately issue, Head's

6   motion did not seek an adjudication on that part of Ono's claim.  In fact, Head cites to

7   no authority for the proposition that a limitation on the scope of injunctive relief is

8   appropriate on a motion for summary judgment.

9   Second, under the circumstances of this case, enjoining Head's unlawful

10   business practices only as to a single generation of a single racquet model would deny

11   Ono the relief to which he is entitled.  In fact, if Head were to prevail in its argument,

12   Ono's victory at trial would be hollow.  Although Head continues to sell the Radical

13   Pro model, it no longer sells the specific generation of the model Ono purchased.  So

14   to narrow the injunction to that single generation would, as Head knows, provide Ono

15   no relief at all.

16   Moreover, Ono has shown that Head's unlawful business practices run across

17   all "silos" of its "tour" line of racquets, including the Extreme, Instinct, Speed and

18   Prestige.  Ex. 20; (Mason Depo., at 138:25-142:24.)  Thus, the breadth of any

19   injunction should cover Head's entire tour line to ensure that Ono is protected in the

20   future from Head's false and misleading advertising, even if the breadth of the

21   injunction extends benefits or protection to persons other than Ono.  *See Bresgal v.*

22   *Brock*, 843 F.2d 1163, 1171, where the Ninth Circuit recognized that "[c]lass-wide

23   relief may be appropriate even in an individual action" where it is necessary to give

24   prevailing parties the relief to which they are entitled. *See also*, *Easyriders Freedom*

25   *F.I.G.H.T v. Hannigan*, 92 F.3d 1486, 1501-1502

26

27

28

C.    **Ono Lacks Evidence of "Essential Elements" of His Claims**

1.    **Defendants' Position: Ono Has No Evidence He Was Exposed to Head's Advertising Involving the YouTek IG Radical Pro Before Purchasing the Racket**

Ono's claims[15] all require his exposure to the advertisements at issue.  *See Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) (UCL and FAL claims require that plaintiff was "actually exposed to the business practices at issue"); *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011) (defendant's conduct must be the cause of plaintiff's harm); *Buckland v. Threshold Enters., Ltd.*, 155 Cal. App. 4th 798, 806-07 (2007) (fraud and negligent misrepresentation require exposure to a misrepresentation); *Weinstat v. Dentsply Int'l, Inc.*, 180 Cal. App. 4th 1213, 1227 (2010) (breach of express warranty requires seller to make statements constituting an affirmation of fact or promise or a description of goods that are a part of the basis of the bargain).  Because Ono only has standing to bring claims relating to the product he purchased—the YouTek IG Radical Pro—the relevant advertisements are only those relating to this racket.  *See Larsen v. Trader Joe's Co.*, No. C 11-05188 SI, 2012 WL 5458396, at *1, 4-5 (N.D. Cal. June 14, 2012) (plaintiffs had no standing for UCL, FAL, CLRA, and fraud claims relating to products they did not purchase); *Mlejnecky v. Olympus Imaging Am. Inc.*, No. 2:10-CV-02630 JAM-KJN, 2011 WL 1497096, at *1, 4 (E.D. Cal. Apr. 19, 2011) (plaintiff had no standing for  CLRA and UCL claims relating to products she did not purchase despite alleging that the products had the same underlying defect); *Granfield v. NVIDIA Corp.*, No. C 11-05403 JW, 2012 WL 2847575, at *2, 6 (July 11, 2012) (plaintiff did not have standing for CLRA, UCL, FAL, and breach of warranty claims for products she did not

---

[15] Ono's unjust enrichment count fails as a matter of law because, as a "general principle underlying various legal doctrines and remedies," it is not an independent cause of action. *McBride v. Boughton*, 123 Cal. App. 4th 379, 387 (2004) (quoting *Melchior v. New Line Prods., Inc.*, 106 Cal. App. 4th 779, 793 (2003)).

1 purchase).  Because Head may prevail on summary judgment by showing that "the

2 nonmoving party does not have enough evidence of an essential element of its claim

3 or defense to carry its ultimate burden of persuasion at trial," it is entitled to summary

4 judgment on all of Ono's claims.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210

5 F.3d 1099, 1106 (9th Cir. 2000).

6      Ono struggles to recall any of the ads he relied on in purchasing his racket.  He

7 claims he saw one ad while casually flipping through an issue of *Tennis Magazine* in a

8 bookstore in 2012 or "possibly in 2011," some press releases on Head's website, and

9 two YouTube videos.  EA Ex. 9 at 157:4-158:18; Fact No. D21.  Head placed three

10 different advertisements featuring Murray in *Tennis Magazine* in 2011-2012.  EA Ex.

11 1 at 4; Fact No. D24.  One advertised the YouTek Radical Pro, rather than the YouTek

12 <u>IG</u> Radical Pro Ono purchased; the second advertised the full YouTek IG Radical silo

13 (making it impossible to associate Murray with any particular model within the silo);

14 and the third advertised the YouTek IG series from six different racket silos.  *Id.*; EA

15 Ex. 1-2 at 21; EA Ex. 1-3 at 23; EA Ex. 1-4 at 25; Fact Nos. D25-D28.  One of the

16 YouTube videos Ono saw (which was released by Tennis Warehouse Europe, not

17 Head) discusses the "Head YouTek Radical," not the YouTek IG Radical Pro; the

18 other shows Murray discussing the "Radical" racket.  EA  Ex. 1 at 4; EA Ex. 8 at 263-

19 65; Fact Nos. D29, D30, D33.  None of these mention the racket model Ono

20 purchased and Ono cannot predicate any of his claims upon his exposure to them.

21      Ono also claims he saw a dozen Head press releases before purchasing his

22 racket.  EA Ex. 9 at 183:4-184:8, 221:9-23, 223:1-3, 223:22-224:15, 224:18-225:12,

23 225:15-226:2, 226:5-20, 229:1-8, 229:20-230:5, 230:16-231:1; EA Ex. 1 at 3; EA Ex.

24 6 at 164-65, 169-70; Fact No. D37.  All but one involve racket models (the MicroGel

25 Radical MP, YouTek Radical Pro, and YouTek Radical MP) *other* than the model

26 Ono bought.  EA Ex. 1 at 3; EA Ex. 1-1; EA Ex. 6 at 164-65; Fact No. D38.

27      Additionally, Ono claims he purchased his racket because he saw Murray play

28 competitively with a racket that looks like the one he purchased.  EA Ex. 6 at 169-70;

1   Fact No. D44.  Yet, as this Court recognized and Ono's own marketing expert

2   concedes, it is "very difficult," if not impossible, for spectators to identify the specific

3   racket model used—the most a spectator can discern is that a Head-branded racket is

4   used.  EA Ex. 10 at 165:24-166:16; Order re: Mot. for Class Certification 22, Dkt.

5   150, Mar. 8, 2016 ("Nor is there evidence that [consumers] would notice or have the

6   ability to determine the racquet model used by a professional by watching it on TV or

7   even live."); Fact No. D45.  Ono's testimony reflects this difficulty.  Ono remembers

8   seeing Murray play *competitively* twice on television, at the 2010 US Open and the

9   2011 French Open, but cannot recall anything else about these matches (e.g., Murray's

10   opponent, what round of the tournament it was).  EA Ex. 9 at 189:12-191:5; Fact Nos.

11   D46-D48.  It is impossible for Ono to predicate his claims on these tournament

12   viewings because Head did not associate Murray with the YouTek IG Radical Pro

13   racket Ono purchased until January 2012.  EA Ex. 1 at 3; Fact No. D49.

14        Further still, Ono has no evidence of what "statements" about Murray's racket

15   he gleaned from watching Murray play in these tournaments.  To the extent Ono

16   claims he relied on the racket cosmetics, this argument fairs no better than his alleged

17   reliance on  print advertisements featuring the full range of the Radical silo of rackets.

18   The Radical silo is associated with an orange cosmetic, and all rackets in the silo,

19   from junior-level to Tour rackets, have the same orange cosmetic.  EA Ex. 1 at 3; Fact

20   Nos. D86, D87.  Thus, the cosmetic alone cannot identify a particular racket model

21   within the silo.

22        Ono also saw Murray once live at Indian Wells in 2012, but did not watch

23   Murray play *competitively*.  EA Ex. 9 at 168:12-169:16 ("Let me clarify.  I didn't see

24   Andy Murray play.  I saw Andy Murray practice."); Fact Nos. D4, D5.  Ono was only

25   close enough to see the color of Murray's racket, and the color of the grip (which he

26   cannot remember), not the writing on it.  *Id.* at 168:12-169:4; Fact Nos. D6-D8.  As

27   discussed above, color alone does not convey the specific racket model.

28

1       Moreover, there are several readily-observable differences between the racket

2 Murray played with competitively in March 2012 and the racket Ono purchased.  Ono

3 easily identified these differences during his deposition: different color "head guard"

4 (Murray's is black, the retail version is "clear grey"), different color grommet

5 (Murray's is black, the retail version is clear), and different finishing (Murray's is a

6 matte finish, the retail version is glossy).  *Id.* at 205:23-206:25, 208:3-16, 209:12-

7 210:22, 213:13-24, 215:10-20; Fact No. D50.

8       The sole press release Ono saw referencing the YouTek IG Radical Pro was

9 released on March 13, 2012, eight days in to the Indian Wells tournament—which

10 took place March 5-18 that year—where Ono allegedly purchased his racket.  EA Ex.

11 1 at 4; EA 1-1 at 18-19; Fact Nos. D1, D39.  Ono testified that he saw the March 13,

12 2012 press release before purchasing the racket, and that he went to the Indian Wells

13 tournament for just one day, where he purchased the racket and watched Murray

14 practice.  EA Ex. 9 at 114:13-18, 120:21-121:8, 121:18-22, 183:11-184:4; EA Ex. 6 at

15 165; Fact Nos. D1, D3-D5, D37.  Murray left the Indian Wells tennis tournament on

16 March 14, 2012, after losing his doubles match the day before.  EA Ex. 2 at 146-47;

17 EA Ex. 15 at 383; EA Ex. 16 at 386; EA Ex. 18 at 395; Fact Nos. D40, D41.  Ono's

18 dubious testimony about this sequence of events leaves only about one day (March

19 13) where Ono could have seen Murray at Indian Wells and purchased the racket *after*

20 seeing the press release.  Without a receipt from his "impulse" cash purchase, Ono has

21 no proof that he purchased the racket on this date (or that he attended the tournament

22 or saw Murray practice on this date).  EA Ex. 9 at 114:13-115:5, 119:7-13; Fact Nos.

23 D2, D10, D11.

24       Because Ono has no evidence of an "essential element" of his claims—

25 exposure to this press release before purchasing the racket—none of Ono's claims can

26

27

28

1    survive summary judgment.[16]  *Nissan*, 210 F.3d at 1106.

2                    **2.      Plaintiff's Position**

3              There is no question that Ono was exposed to Head's unlawful business

4    practices at issue here.  Ono testified at great length concerning the various print

5    advertisements, press releases and videos he saw and relied on prior to his purchase,

6    linking Andy Murray to the Radical Pro racquet, as well as his observations of Murray

7    on-court, using a racquet with the distinctive orange graphics, which are unique to the

8    Radical line of racquets.  (Disputed Fact Nos. P104, P114, P115 (Ex. 43 - Ono Depo.,

9    at 157:4-160:17).)  This is not a surprise given the admissions made by a Head's

10   executive that Head's practice of misrepresenting to the public that Head Pro Players

11   are using racquets they are not actually using has "always been done in the industry"

12   and at least as far back as he arrived at Head "almost 25 years ago."  (Ex. 21;

13   (Petersman Depo., at 173:23-174:10).)

14             In fact, Andy Murray himself said it best when he candidly testified at

15   deposition as to why he believed he plays with a Radical Pro:  "Yeah, I don't know

16   how anyone knows what any racquet would be, like what racquet they were using if,

17   you know, you weren't told or it wasn't said on the frame."  (Ex. 23 at 27:6-21.)  And

18   that's the point.  Ono was repeatedly told by Head over a number of years that Murray

19   played with the Radical Pro, when he didn't, and Head paints Murray's racquet to

20   look like the Radical Pro.

21             Head's claim that Ono did not see and could not have relied upon Head's

22   advertising, press releases and painted racquets on the tennis court to make his

23   purchasing decision is contrary to the facts.  (Disputed Fact Nos. P89, P90, P100,

24   P104, P105 (Ex. 40 - Ono Decl., at ¶19; Exs. 30, 40, 41 - emails between Head

25

26   _____

27   [16] At a minimum, Head's motion should be granted with respect to all other
     advertisements, press releases, videos, and live/TV observations, which do not involve
28   the racket Ono purchased.

1  employees; Ex. 20 - Mason Depo., at 68:12-21, 78:1-11, 80:14-20, 166:14-167:9; Ex.

2  43 - Ono Depo., at 157:4-160:17; Ex. 6 - Ono's interrogatory responses).)

3         **Print Advertising.**  There were *at least* three print advertisements that Ono

4  relied upon explicitly linking Murray with the YouTek Radical prior to his purchase

5  on or about March 13, 2012.  In an advertisement dated June 12, 2009, Andy Murray

6  is depicted holding the familiar orange YouTek Radical painted racket with the text

7  "Murray's all-new YouTek Radical adapts to anything and amplifies everything."

8  (Ex. 33.)  In an advertisement dated June 24, 2011, Andy Murray is depicted holding

9  an orange painted racket with the text, "Murray's Weapon of Choice YouTek Radical

10 Pro."  (Ex. 1-2.)  On March 2, 2012, Andy Murray is depicted holding an orange

11 painted racket with the text "Especially for players like Andy, HEAD has designed the

12 YouTek IG Radical."  (Ex. 1-3.)  Each of these advertisements is dated before Ono's

13 purchase date.  And while Head did not show these advertisements to Ono during his

14 deposition to elicit testimony about whether he saw them, Ono makes it clear that he

15 remembers seeing these or similar advertisements prior to his purchase.  Ex. 40; (Ono

16 Decl., at ¶19.)[17]

17        **Press Releases.**  During his deposition, Ono identified at least nine publically

18 released statements made by Head that he had seen prior to his purchase that explicitly

19 identified Andy Murray playing with a YouTek Radical during tournament play.

20  • Ex. 1-1 at EA 9 - "HEAD pro **Andy Murray**, who plays with a **YOUTEK**

21    **Radical Pro,** again showed his grace and skill on the court and defeated Julien

22    Benneteau . . ." August 25, 2009

23

24

25  _____

26 [17] To the extent Head argues that some of the ads refer only to the "Radical" and  not
   the "Radical Pro," its argument is unavailing.  The fact is that Murray never played
27 with any model in the Radical line.  P100; (Ex. 20 Mason Depo., at 68:12-21, 78:1-11,
   80:14-20, 18:6-10.)
28

- Ex. 1-1 at EA 10 - "HEAD pro and World No. 4 **Andy Murray** took home his sixth ATP title of the year . . . Murray plays with a **YouTek Radical Pro.**" November 9, 2009

- Ex. 1-1 at EA 12 - "Murray, who plays with a HEAD **YouTek Radical Pro,** had reached the semi-final match without dropping a single set . . ." January 28, 2010

- Ex. 1-1 at EA 13 - "**Andy Murray** carried the weight of British expectations on his **YouTek Radical Pro** . . ." July 5, 2010

- Ex. 1-1 at EA 15 - "**Andy Murray's** preparation for 2010 Wimbledon not only includes intense on-court training, but also a bit of fun for the HEAD ace. The street-smart Scot goes urban in HEAD's newest viral video, demonstrating that superb touch with his HEAD **YouTek Radical Pro** is not just limited to the tennis court." June 15, 2010

- Ex. 1-1 at EA 16 - "Murray (YouTek Radical Pro) stands 2-3 against Gasquet (YouTek IG Extreme Pro) . . ." June 26, 2011

- Ex. 1-1 at EA 17 - "The victory acehieved with [Murray's] YouTek Radical Pro completes and October Asian trophy hat-trick for Murray." August 22, 2011

- Ex. 24 at EA 441 - ". . . Murray, who won his 15th carrer trophy with his **YOUTEK Radical Pro.**"

- Ex. 25 at EA 443 - ". . . Murray (HEAD **YouTek Radical Pro**) ended the run of Spain's David Ferrer, taking down the seventh seed . . ."

Ex. 43; (Ono Depo., at 157:4-160:17.)

In a sign of desperation, Head also attacks Ono's credibility, suggesting that Ono changed his testimony after purportedly meeting with counsel during a break. (Disputed Fact Nos. D42, D43.) But the truth is otherwise. *Prior to the restroom break,* Ono made it clear, in response to one of the many press releases on which he was examined, that he did not *solely* rely on that particular one:

> Q. Mr. Ono, have you seen Exhibit Number 15 [ONO_00033] prior to today?
>
> A. Yes.

42

1    Q. And when did you see it?

2    A. Before I purchased the racquet.

3    Q. Did you rely on Exhibit Number 15 in purchasing your

4    racquet?

5    **A. *Not solely.***

6  (Disputed Fact Nos. D42, D43 (Ex. 43 - Ono Depo., at 226:8-15).)

7    Ono simply came back after a restroom break to clarify, upon reflection, some

8  of his answers relating to the information and materials he relied upon in his purchase.

9  His testimony following the break was entirely consistent with his response prior to

10  the break.  Head's attempt to portray Ono's testimony as lawyer driven is reflective of

11  the fact that they have no substantive defense to Ono's underlying claims.

12    Finally, Head claims that Ono could not have identified the racquet model Andy

13  Murray plays with when he saw Murray play live or on television.  However, this fact

14  is directly disputed by Head's own contemporaneous statements made prior to

15  litigation.  In an email from Head's President, Kevin Kempin, to Head marketing

16  personnel, Kempin, in discussing new products states: "aren't we saying Djokovic is

17  playing with the 16x19 mp - it certainly looks more like that on TV."  (Disputed Fact

18  No. P89 (Ex. 41 - emails between Head employees).)

19    Also, in an email Head's Roger Petersman sent to the company's marketing

20  team he expressed his concern that the company should attempt to eliminate any

21  visible differences in the racquet model sold to consumers from the racquet actually

22  by Novak Djokovic  (Ex. 30 Email from Head employee Roger Petersman.)  ("I am

23  aware that players do not play with the retail version and I have no problem with that

24  **but we should have tried to make this as invisible to the public as we could**,

25  especially on a new series.  Can anything be done on this?")  The obvious fear was

26  that these differences may be visible to the public which would undermine Head's

27  marketing strategy of linking Head Pro Players with models sold to consumers.

28

1    Furthermore, Ono testified, under oath, that he saw Murray playing with a
2    racquet we now know was painted specifically to look like a Radical Pro.  (Disputed
3    Fact Nos. D46, D47, D48 (Ex. 43 - Ono Depo., at 189:12-191:5).)  Head doubts the
4    veracity of Ono's testimony because he could not remember Murray's opponent or
5    what round of the tournament he watched.  (Def. section C.1 p. 28:18-22.)  However,
6    (1) judging Ono's credibility is not appropriate on a ruling for summary judgment
7    (*See Neely v. St. Paul Fire and Marine Ins. Co.*, 584 F.2d 341, 344 (1978); and (2) if
8    Head's executives like Kempin and Petersman can identify the racquets on television,
9    and if Head is concerned about consumers identifying racquet differences, why is
10   Ono's testimony somehow unbelievable on this same point?

11   Lastly, it should not be lost on this Court that in the face of the admissions
12   made by Head's executives, the company has never offered any explanation why
13   Andy Murray's racquet has the identical cosmetics of the Head Radical Pro sold to
14   consumers.  Of course, there is only one plausible reason.  Head engaged in a
15   deceptive marketing strategy aimed directly at consumers like Ono.  The company
16   wanted Ono to believe that he was able to purchase the same model racquet used by
17   Andy Murray.  The truth, however, is that Andy Murray has never used any model
18   racquet in the Radical line.  (Disputed Fact No. 100 (Ex. 20 - Mason Depo., at 18:6-
19   10, 68:12-21, 73:18-23; 78:1-11, 80:14-20; Ex. 42 - Ferguson Depo., at 42:18-43:13,
20   82:18-83:7) ("Q. . . . You do have an understanding that over the years Head has had
21   various generations of Radical Pro racquets sold to the general public, correct?  A. I
22   believe that.  . . .  Q. Okay. What's your understanding of the changes that were made
23   in [Murray's] racquet frame during the period of time you've customized it?  A. It has
24   received different paint finishes.  Q. Other than the graphic or cosmetic changes that
25   have been made to the frame, do you know of any other changes that were made to the
26   frame during the period of time you've customized it?  A. I don't know of any.").)

27
28

3.  **Defendants' Position: Ono Has Provided No Evidence That a
    Reasonable Consumer Would Be Misled by Head's
    Advertising**

Ono's UCL, FAL, CLRA, and negligent misrepresentation claims require him

to show that a "reasonable consumer" would be misled by Head's advertising.  *Miller*

*v. Fuhu Inc.*, No. 2:14-CV-06119-CAS-AS, 2015 WL 7776794, at *15 (C.D. Cal.

Dec. 1, 2015) (UCL, FAL, and CLRA all "invoke the 'reasonable consumer test' to

determine whether allegedly false or deceptive advertising is unlawful.");  *Girard v.*

*Toyota Motor Sales, U.S.A., Inc.*, 316 F. App'x 561, 562 (9th Cir. 2008) (reasonable

consumer standard applies to claims for negligent misrepresentation).  Ono has put

forth no such evidence, nor has he countered Head's survey and other industry

evidence that "reasonable consumers" do not purchase tennis rackets solely because

they believe a professional uses the racket in competitive play.  Without evidence of

this "essential element," Head is entitled to summary judgment.  *Nissan*, 210 F.3d at

1106.

Ono's anomalous purchasing behavior is not that of a reasonable consumer.

Ono testified that he purchased a Head YouTek IG Radical Pro on impulse because he

thought it was the racket he saw Murray play with and he likes Murray.  EA Ex. 9 at

112:16-24, 119:7-13; Fact Nos. D12, D13.  Ono did not review or consider *any* racket

specifications; did not read any reviews for the racket; did not conduct any research;

did not try the racket; and did not talk to any seller, coach, or other player about the

racket.  *Id.* at 122:20-123:5, 128:19-129:25, 164:24-165:25; Fact Nos. D66-D68.

This is *not* how reasonable consumers purchase rackets.  Head's survey shows

that most consumers (over 93%) do not identify "professionals use it/endorse it" as a

factor important to their purchasing decision at all.  EA Ex. 7-1 at 207; Fact No. D77.

Those who identified it as a factor attribute around 1% (on a scale of 1 to 100%)

importance to it.  *Id.* at 211; Fact No. D79.  Not a single respondent, like Ono, gave

this factor 100% importance.  EA Ex. 7-2; Fact No. D81.

1        Industry studies, *embraced by Ono's own expert*, concur.  The 2010 Tennis

2   Industry Association (TIA) report showed that professional use influenced new racket

3   choices of only 3% of respondents.  EA Ex. 1-5 at 38; Fact No. D70.  In the 2011,

4   2012, 2013, and 2014 reports, endorsement was the *least* important factor to

5   consumers when choosing a new racket.  EA Ex. 1-6 at 71; EA Ex. 1-7 at 91; EA Ex.

6   1-8 at 117; EA Ex. 1-9 at 136; Fact Nos. D71, D73-D75.  Similarly, in 2010, only 2%

7   of survey respondents who switched brands cited use by top players as a reason for

8   doing so.  EA Ex. 1-5 at 40; Fact No. D88.

9        Head's survey also shows that consumers do not believe, based on Head's

10   advertising, that Murray plays competitively with the identical racket available for

11   purchase at retail.  EA Ex. 7-1 at 217; Fact No. D80.

12        Ono offers nothing to rebut this evidence.  He has not conducted a survey of his

13   own, merely proffering an expert to criticize Head's survey who, despite his

14   experience in marketing and consumer behavior, has *no opinion* on whether Head's

15   ads communicate to consumers that a racket used by a professional is the identical

16   version people can buy in stores.  EA Ex. 11 at 86:20-23, 232:2-233:10; Fact

17   No. D82.  Such speculation is insufficient to survive summary judgment.  *Clemens v.*

18   *DaimlerChrysler Corp.*, 534 F.3d 1017, 1026 (9th Cir. 2008) ("a few isolated

19   examples of actual deception are insufficient" to survive summary judgment) (internal

20   quotations omitted); *Mott's*, 2014 WL 5282106, at *9; *Brazil v. Dole Packaged*

21   *Foods, LLC*, No. 12-CV-01831-LHK, 2014 WL 6901867, at *5 (N.D. Cal. Dec. 8,

22   2014) ("binding Ninth Circuit precedent requires the Court to conclude that

23   [plaintiff's] own testimony, without more, is not enough to survive summary

24   judgment.").  In *Mott's*, the Court granted defendant's motion for summary judgment

25   on plaintiff's UCL, FAL, CLRA, and negligent misrepresentation claims because

26   "[a]part from plaintiff's own testimony, the only evidence advanced by plaintiff

27   tending to show that a reasonable consumer would be deceived is an assertion by

28

1   [plaintiff's critiquing expert], unsupported by any independent facts or data."  2014

2   WL 5282106, at *10.

3         Here, Ono has provided even less evidence, presenting only his own testimony

4   and an expert with *no* opinion on Head's advertising message.  Head is therefore

5   entitled to summary judgment on Ono's UCL, FAL, CLRA, and negligent

6   misrepresentation claims because Ono "does not have enough evidence of an essential

7   element" of these claims, namely, that a reasonable consumer would be misled by

8   Head's advertising.  *Nissan*, 210 F.3d at 1106.

9                    **4.    Plaintiff's Position**

10         Head claims that Ono's purchasing behavior is anomalous and not that of a

11   reasonable consumer.  However, the record proves otherwise.

12         As a preliminary matter, "[w]here the advertising or practice is targeted to a

13   particular group or type of consumers, either more sophisticated or less sophisticated

14   than the ordinary consumer, the question whether it is misleading to the public will be

15   viewed from the vantage point of members of the *targeted* group, not others to whom

16   it is *not* primarily directed."  *Lavie v. Procter & Gamble Co.*, 105 CalApp.4th 496 512

17   (2003).

18         Here, with respect to Head's tour line racquets at issue, Head defined its

19   *targeted* group as the Tour Consumer, which according to Head consists of players

20   who are "most often 12-25 years old, [] die –heard Tennis freak[s], [t]hey play

21   competitively 5 to 7 times a week and follow the game religiously.  (Disputed Fact

22   No. P97 (Ex. 26 - Head definition of "Tour Consumers").)  They know what's going

23   on and who's who in the international Tennis scene…They are mainly influenced by

24   their player idols coaches and other players at their age and level of play."  (Disputed

25   Fact No. P97 (Ex. 26 - Head definition of "Tour Consumers").)  But neither the TIA

26   Report nor the Poret survey focus on Head's targeted group.  (Disputed Fact No. P107

27   (Ex. 7-1 - Poret Report).)  Thus, there is very little, if any probative value to their

28   conclusions.

1       The TIA Reports considered "all players," and categorized purchasing trends

2   related to brand, age and gender, *with no regard to whether respondents were*

3   *consumers of a tour level racquet*, a beginner racquet, a junior racquet or any other

4   category or class of product.  This fact is made clear when looking at the portions of

5   the TIA Reports that Head has ignored.  For instance, the 2010 TIA Report relied

6   upon by Head, shows that the approximate amount spent per racquet by all age and

7   gender groups was $100, with males under 35 spending approximately $136 and

8   females under 35 spending approximately $107 per racquet.  (Disputed Fact No. P94

9   (Ex. 1-5 - TIA Consumer Report at EA 37).)  Yet, Head admits that the tour-line

10  racquet purchased by Ono has an MSRP of $210.  Fact No. D17.  The conclusions

11  reached by the TIA simply do not apply to the class of racquet Ono purchased.

12      Moreover, even if the Court was to give some weight to the TIA Reports, a

13  detailed review of them actually contradict Head's arguments.  For example, Head

14  tries to paint Ono as an anomalous consumer because he did not "demo" his racquet

15  before purchase.  (Disputed Fact No. D63.)  However, the same TIA Reports Head

16  relies upon and are relied upon by Head's expert, Poret, evidence that *a full one-third*

17  *of all frequent players do not demo a racquet before purchase*.  (Disputed Fact No.

18  P96 (Ex. 1-5 - 2010 TIA Consumer Report at EA41).)  More importantly*, the age*

19  group identified as Head's target market for the tour- line racquet at issue here, males

20  under 35, ***do not*** *demo racquets before purchase 42% of the time*.  *Id.*

21      The Poret survey fares no better.   Poret did not use any elements of Head's

22  target consumer in designing his survey.  Instead, Poret broadly defined the relevant

23  universe for his survey only to be those consumers who have purchased or are likely

24  to purchase a tennis racket in the price range of $150 or more and who play tennis "at

25  least *somewhat* regularly."  As a result, Poret's respondents included beginners and

26  intermediate players who play infrequently, neither of whom are representative of

27  Head's target Tour Consumer or Ono himself.  (Disputed Fact No. P107 (Ex. 7-1 -

28  Poret report at EA 197; Ex. 36 - Stewart Decl., at ¶¶18-24).)

1    Poret's survey is also irrelevant because he asked respondents the wrong

2    questions. Poret's conclusions are based on responses to questions about professional

3    *endorsements*. (Disputed Fact No. 125 (Ex. 7-1 - Poret Report at EA 212, 215, 217).)

4    However, a player endorsement (*i.e.,* to recommend or support a product) is not the

5    basis of Ono's claims. Ono claims that Head falsely advertises that Head's Pro

6    Players play with racquets they do not actually use in order to influence a consumer's

7    purchase decision. Poret's conclusions do not account for this important distinction.

8    Poret also asked respondents the unintelligible question of whether they believe

9    Andy Murray plays with a "different *version* of the racket." (Ex. 7-1 at EA 257;

10   (Poret report.)) But nowhere does Poret define the term "version." Does it mean an

11   older or newer generation model? A different model altogether? Does the question

12   implicate "aftermarket" differences in over grips, strings, dampeners or string

13   tensions? The responses from respondents evidence this confusion. Aftermarket

14   customizations are not what this case is about.

15   Further supporting the lack of relevance and probative value of the TIA Reports

16   and Poret's survey data is that Head's own pre-litigation, marketing department

17   statements directly contradict Head's characterization of the data for tour line

18   consumers. (Disputed Fact Nos. P89, P91, P92, P98 (Exs. 30, 31, 41- Head's internal

19   emails).) Ono's testimony that he purchased the Radical Pro racquet because he was

20   misled to believe that one of his favorite players, Andy Murray played with it,

21   constitutes a reasonable purchasing decision in the same way that a purchase of

22   basketball shoes is reasonable where it is falsely claimed that shoes are ***"the same***

23   ***model of shoe worn by LeBron James."*** *Hinojos*, 718 F.3d at 1107 (such a practice is

24   an "example[] [of] [an] effective marketing technique[] that, if false, can be used to

25   deceive consumers into making purchasing they would not otherwise make").

26   Head also falsely claims that the only evidence Ono has offered to support his

27   contention that consumers are likely to be misled by Head's unlawful business

28

1   practices is his own testimony , as well as his "critiquing" experts unsupported by

2   facts or data.  But, again, the record proves otherwise.

3         The Court need look no further than Head's own internal statements previewed

4   in Ono's introduction above, which establish the reasonable likelihood that consumers

5   have been misled by Head's business practices.  (Disputed Fact Nos. P89, P91, P92,

6   P98 (Exs. 30, 31, 41 - Head's internal emails.) ("we really don't need the message

7   boards lighting up about how ***the racquet the players actually use isn't the racquet***

8   ***HEAD says they use***" (Ex. 31); "It just makes it look like ***he is really not using the***

9   ***racquet we say he is*** and when this starts getting around on the message boards, it will

10  not help our cause.  It does not matter if they can handle it or not but ***people like to***

11  ***have the same racquet*** (especially the techy geeks) and we are making it impossible.

12  . . . Since Djokovic is new with us-I think we can come up with a story but with

13  Murray-this one is tough" (Ex. 31); "One of our concerns of course is that now those

14  ***serious players that want to play with what our pros play with*** will doubt they get the

15  chance to play the actual Djokovic racquet."  (Ex. 30.)  As discussed above, this alone

16  establishes the materiality of Head's misrepresentations.  *Kwikset Corp. v. Super. Ct.*,

17  51 Cal.4th at 332 ("[a] representation is 'material' . . . if 'the maker of the

18  representation knows or has reason to know that its recipient regards or is likely to

19  regard the matter as important in determining his choice of action'").

20        In the face of these facts, Head cannot seriously dispute that at the very least it

21  believed the company's marketing strategy was successful in deceiving consumers

22  and that there is at bottom a reasonable likelihood that its business practices will

23  continue to mislead and confuse reasonable consumers in their purchasing decisions.

24

25

26

27

28

## IV.    CONCLUSION

For the foregoing reasons, subject to supplemental briefing due on June 30, 2016, the parties submit their respective positions.


Dated:   May 6, 2016                                      SIDLEY AUSTIN LLP

BARON & BUDD, P.C.

By:    /s/ Daniel Alberstone              By:    /s/ Michael L. Mallow*
        Daniel Alberstone                          Michael L. Mallow

Daniel Alberstone (SBN 105275)
dalberstone@baronbudd.com                 Attorneys for Defendant
Mark Pifko (SBN 228412)                   HEAD USA, INC.
mpifko@baronbudd.com
Evan Zucker (SBN 266702)
ezucker@baronbudd.com
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436

Attorneys for Plaintiff, RUSSELL
MINORU ONO

* Filer attests that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.